IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DAUDI M. MWANGANGI,                    )
       Plaintiff                        )
     vs.                                 )    Cause No. 1:19-cv-4105-JMS-MJD
                               )
TAYLOR NIELSEN, *et al*                )
       Defendants.                      )

**PLAINTIFF'S BRIEF IN SUPPORT OF PARTIAL SUMMARY JUDGMENT**

Plaintiff, Daudi M. Mwangangi, by counsel, submits his brief in support of Partial Summary Judgment.  Plaintiff contends that on October 7, 2017, the Defendant Police Officers violated his Fourth Amendment rights when they seized him, surrounded him, ordered him from his vehicle, handcuffed him and arrested him for Intentional Police Impersonation, without having either reasonable suspicion or probable cause.  There is an extensive video record establishing what occurred and when it occurred.  Plaintiff is entitled to Partial Summary Judgment as requested in his Motion and/or as the Court determines justice and the application of law require.

## I.  PARTIAL SUMMARY JUDGMENT STANDARD

The standard for summary judgment is the same, whether addressing the entire case or only a portion of it.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc*., 476 F.3d 487, 489-90 (7th Cir. 2007). The court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. Deluga*, 555 F.3d 582, 585 (7th Cir. 2009) (citation omitted). However, "[w]hen the record evidence includes videotape of the relevant events, the Court should not adopt the non-movant's version of the facts when that version contradicts what is depicted on the videotape." *Scott v. Harris*, 550 U.S. 372, 379-80, (2007).

## II.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE
### (Pinpoint citation to record contained in Appendix attached as Exhibit 1.)

Raised in Kenya, Daudi M. Mwangangi (pronounced *Mon-Gon'-Gee*) has been a U.S. citizen since 2008.[1]  Mr. Mwangangi is black skinned and speaks with a Kenyan accent.[2]  At the time of the incident, he was fifty-one (51) years old, 5'6" tall and weighed 190 pounds.[3]  Mr. Mwangangi earns his living through his company, Finderserve LLC, which acts as a subcontractor to national companies providing roadside assistance to stranded motorists.[4]  In 2017, Mr. Mwangangi used his 2003 Ford Crown Victoria (the "Vehicle") as his service vehicle for work.[5]

Years before 2017, Mr. Mwangangi purchased the used Vehicle "as is."[6]  While its prior use is not known,[7] Ford designed the Vehicle to be compatible with police use.[8]  If it had ever been used as a police car, prior to his purchase, any lights/markings officially/legally designating it as a police car had been removed, disconnected or otherwise rendered completely inoperable.[9]  It had no flashing/moving red and blue police emergency lights, described in I.C. §9-19-14-5.[10] There were no silhouette altering, roof mounted lights.[11] On the night in question, the husk/remnant of a non-functioning lightbar, all wiring having been cut/removed, was still bolted down near the Vehicle's tinted back window.[12]  The vehicle was a single color, dark blue.[13]

The Vehicle was equipped with functioning clear/white strobe lights, on the outside corners of the Vehicle.[14]  Mr. Mwangangi's roadside assistance work was often performed at night, in heavy traffic conditions.[15] Mr. Mwangangi used the white strobe lights to provide additional safety and visibility when assisting stranded motorists.[16]

At 9:31 pm, on October 7, 2017, Mr. Mwangangi received a service request from a company he sub-contracts for called, Agero, requesting that he travel to a Lebanon, Indiana Speedway gas station to assist a stranded motorist named Charles Palmisano.[17] Because Mr. Mwangangi's job performance is judged, in large part, on promptness, it was important to Mr. Mwangangi that he get to Mr. Palmisano without any stops or delays.[18]

Initially given the wrong address, he arrived at the Speedway at 10:16:06 pm.[19]   Mr. Palmisano was waiting by his Toyota, Camry, with its hood up, at Pump 11, facing north.[20]   Pump 11 is the second pump, moving west to east, from Lebanon Street.[21]   The farthest west pump, and closest to Lebanon Street, is Pump 12.[22]   Defendant Phelps testified this Speedway, located just off I-65, is on what he believes to be the busiest portion, of the busiest road, in Lebanon, Indiana.[23]

Upon arrival, Mr. Mwangangi parked, at an angle, facing the fuel island, approximately two (2) car lengths northwest of Mr. Palmisano's vehicle.[24] He then engaged his white strobe lights.[25] Using a portable charger, Mr. Mwangangi had the Toyota started by 10:17:21 pm.[26] The entire encounter, from his arrival, to the moment Mr. Palmisano was getting back into his now running car (which occurred at 10:19:20 pm), lasted 3 minutes and 14 seconds.[27]   When the service was completed, Mr. Mwangangi turned off his white strobe lights.[28] He planned to remain at the Speedway to log in the service call, which was required for him to receive compensation.[29]  He also planned to purchase gas.[30]

Mr. Mwangangi pulled forward and stopped/parked at Pump 12 (10:19:42 pm).[31] Approximately eight (8) seconds after he stopped at Pump 12, Mr. Palmisano slowly pulled away from Pump 11 to continue his trip.[32]   The first police officer arrived on the scene, two minutes and fifty (2:50) seconds later, and seized Mr. Mwangangi by turning on her Red and Blue Police Emergency Lights (hereinafter "Red and Blues") at 10:22:33 pm.[33]

## A. INITIAL USEFUL FACTS

All Defendant-conduct discussed herein occurred under color of state law.  At all times relevant hereto, Officers Nielsen, Phelps, Noland and Hendrix were acting in the course and scope of their duties as employees of Defendant Lebanon, Indiana and Deputy Garst was acting in the course and scope of his duties for Defendant Boone County. The relevant police dispatches, seizure and arrest relate solely to alleged Intentional Police Impersonation.  This crime is codified in Indiana under I.C. §35-44.1-2-6 (b) (Impersonating a Public Servant).  It can be distilled into two (2) elements:

1) A person intentionally and falsely represents herself/himself as a law enforcement officer;

2) With the intend to deceive or induce compliance with the person's instructions, orders, or requests. I.C. § 35-44.1-2-6 (b)

At the time of the encounter, the Defendant Officers understood that § 35-44.1-2-6 did not describe specific prohibited conduct.  Rather, § 35-44.1-2-6 (b) could be applicable to a range of conduct.[34]  The Defendant Officers testified that reasonably detailed information about the activity being labeled police impersonation is needed to make any assessment of its potential criminality.[35]

Prior to arriving at the scene, all information leading to seizure/arrest came from Boone County Emergency Dispatch ("Boone Dispatch") through the radio system in place.  The Defendant Officers could hear communication between Boone Dispatch and police and between officers in the field.  They could *not* hear communication Boone Dispatch had with any caller.[36]

The Boone County Dispatcher involved that night had no training or specific understanding of the elements of police impersonation, had no special knowledge of Indiana statutes relating to police identification, or training relating to issues associated with establishing reasonable suspicion, probable cause or the intent requirements for the crime of police impersonation.[37]  Prior to that evening, none of the Defendant Officers had ever investigated a police impersonation call.[38]  While they had attended the required courses at the academy, none of the police training provided any special/focused attention to police impersonation statutes or provided information relating to the prevalence of violence and/or the probability of weapons, in police impersonation investigations.[39]

As the first officer on the scene, Officer Nielsen was officially in charge of the investigation.[40]  When the commanding or supervising officer arrived on the scene, in this case Sgt. Phelps, he became the command presence in charge of the scene, but it remained Officer Nielsen's investigation.[41]  Notwithstanding the hierarchy at the scene, the Defendant Officers testified that in addition to assisting in the investigation, each officer had a duty to look for potential civil rights violations and step in to stop behavior that violated a citizen's civil rights.[42]

### B.  THE 865 DISPATCH

At approximately 9:50 pm on October 7, 2017, Boone Dispatch sent out a call which was heard by some of the Defendant Officers:

> **Boone County and Whitestown units investigate for a possible police impersonator westbound on 865 from the two, westbound on 865 from the two, approaching 65 northbound. It's going to be a blue Crown Vic with strobe lights, plate (Sam) R (Robert) 393. They do have a trooper attempting to catch up to it at this time, no further**[43] (hereinafter, the "865 Dispatch").

This was the Defendant Officers' first notice of a possible police impersonator that evening.[44] While a vehicle was identified, the Defendant Officers did not know of any alleged activity, legal or illegal, that formed the basis of the dispatch.[45]  Officer Root asked Boone Dispatch, **"Did they advise if they had a Caller?"[46]** Boone Dispatch responded, **"All they advised they had a trooper trying to catch up to it."[47]**  The Defendants did not know if a caller had made a report or what such a hypothetical report actually alleged.[48]

The 865 Dispatch identified the car as having "strobe lights."  The Defendant Officers all testified that in 2017, as now, driving a car equipped with strobe lights was not illegal.[49]  In fact, Defendant Officers testified that there is nothing inherently illegal about someone driving on the highway with activated strobe lights.[50]

The Defendant Officers knew that white/clear strobe lights on non-police vehicles were not uncommon and were used by Indiana drivers in a variety of perfectly legal activities.[51]  Sgt. Phelps, testified white strobes were used by both government vehicles and non-government vehicles to make that vehicle more visible/noticeable, to simply communicate "Hey, I'm here."[52] The Defendant Officers testified that use of white strobes on a vehicle was not indicative of an intent of a driver to represent herself/himself as a police officer.[53]

Officer Root was the only Defendant who actively responded to the 865 Dispatch(es).  He stationed himself on northbound I-65 waiting for the Vehicle to pass him.  He did not see the

Vehicle.[54]   While waiting, Officer Root saw the ISP abandon their pursuit/investigation.[55]   At approximately that time, the Boone County Dispatch provided an update:

> **Information, the post called and advised the vehicle was approaching Lebanon.  They didn't have a mile marker and they didn't have a car, check, caller behind the vehicle and no further for you**.[56]

The Defendant Officers who were aware of the 865 Dispatch(es), believed there was no caller information relevant to the 865 Dispatch(es).[57]   Officer Root informed Boone Dispatch that he was unable to locate the vehicle and was ending his active efforts to do so.[58]

The ISP never asked any police agency to stop, detain or arrest the driver of the Vehicle**.[59]** The Defendant Officers never spoke to the ISP.[60]   None of the Defendant Officers had any information regarding why the Vehicle was identified as a "possible police impersonator."[61]   No Defendant Officer knew what observations, if any, the ISP had made relevant to the Vehicle.[62]   None of the Defendant Officers had any idea of what level of suspicion/probable cause, if any, the ISP had relevant to the vehicle/driver.[63]

### C.  THE SPEEDWAY DISPATCH

At approximately 10:20:54 pm,[64] Boone Dispatch sent out a call stating:

> **Lebanon unit __ for Speedway south 1335 south Lebanon Street, 1335 south Lebanon Street for a possible police impersonator with a vehicle pulled over, be an unmarked Crown Vic**.[65] (Hereinafter the "Speedway Dispatch")

The Speedway Dispatch identified a car similar to the one that the ISP had shown interest in.[66] But neither this dispatch nor its updates referenced the existence or use of strobe lights.

Every Lebanon Police Officer on duty that evening responded to the call,[67] as well as officers from Whitestown, Thorntown and the Boone County Sherriff.[68] Prior to even starting to respond to the call, Officer Nielsen, who was the first officer to arrive at the scene, was aware that at least four (4) other police vehicles, in addition to hers, were converging on the Speedway.**[69]**

Officer Root, who also responded to the 865 Dispatch, testified that the nature of the Speedway Dispatch "wasn't a life-and-death situation" and that it did not sound like someone was

about to die or that there was imminent danger to any person**.[70]**  In like manner, the Boone Dispatcher testified that she was not aware of, and did not dispatch anything indicating, that there was an imminent threat to public safety, the safety of the caller, or potential harm to property.[71]

While the Speedway Dispatch identified a potentially criminal subject matter to be investigated, the Defendant Officers each concede the Speedway Dispatch did not identify any specific illegal conduct.  Defendant Officers have testified that the sole conduct described (allegedly pulling a vehicle over at a gas station) is not illegal or an indication that the driver of the subject Vehicle was representing herself/himself as a police officer.[72]  There are perfectly legal reasons one could try to stop, engage with or pull over another car.[73] The Defendant Officers acknowledged that more information was required before any evaluation could be made as to whether the driver in question was representing herself/himself as a police officer.[74]

At 10:21:31 pm, Officer Nielsen asked Boone Dispatch for clarification of the situation: "**Could you advise if the possible impersonator has someone pulled over or the police have him pulled over**?"[75] Dispatch did not answer her question,[76] replying, "**My caller advised the one that followed him is at the Speedway South. He advised the lights are on. He pulled up behind the pump or on the side of it. They are trying to get a description of it**."[77]

This communication represented the first Boone Dispatch reference to the existence of an actual caller reporting information.[78] However, the Defendant Officers had no information about the caller's identity, reliability or location.[79]   Officer Nielsen believed that the caller was still on the line with Dispatch but did not know if the caller was at the Speedway.[80]

The Defendant Officers understood that the conduct referenced in Boone Dispatch's response (1. A driver allegedly following another driver; 2. Either the Speedway facility having lights on by its pumps *or* a driver having her/his car lights on, in the evening hours; and 3. A car pulled up to a gas pump, at a gas station, that was open for business) did not identify illegal conduct or indicate anyone was representing herself/himself as a police officer.[81]

As Officer Nielsen was pulling up to Speedway's north entrance on Lebanon Street,[82] Boone Dispatch provided an update:

> **Information, the vehicle they thought they had pulled over left.  But that vehicle still, the blue Crown Vic, it is still pulled over by a pump not getting gas, not getting out of the vehicle or anything**.[83]

At that moment, Officer Nielsen and the other responding officers knew that whoever had allegedly been thought to be stopped/pulled over at the Speedway, if he/she ever existed, had left.[84]  The Speedway Dispatch gave no information as to why a caller thought a car, at a gas station, by a busy street, was pulled over.  No illegal conduct had been identified.  The Speedway Dispatches did not indicate there was an ongoing emergency, a dangerous situation,  a citizen in need of help, or any volatility, threats or weapons of any kind.[85]

### D.  OFFICER NIELSEN ARRIVES AND IMMEDIATELY SEIZES MR. MWANGANGI

Using events that can be seen/heard on multiple videos, the dash cams and surveillance video can all be cross-referenced to establish the exact second of all police activity. In doing so, Officer Nielsen's Dash Cam will be treated as the correct time.[86]

As Officer Nielsen pulled into the Speedway (10:22:24 pm[87]), she did not believe that any criminal activity was taking place.[88] In fact, when her supervisor, Sgt. Phelps, arrived soon after, with the same information Officer Nielsen had upon arrival, he did not believe it was even a "criminal investigation" as "there wasn't enough information yet to show a crime had occurred."[89]

Upon arrival, Officer Nielsen did not observe any criminal activity or traffic infractions.[90] Rather, she observed the Vehicle legally stopped at the gas pump, immediately adjacent to Lebanon Street.[91]  No lights having a strobe effect were activated.[92]  Officer Nielsen understood that that it was not illegal to drive a Crown Victoria, and she had no sense of how the vehicle may have been used in the past.[93] While Officer Nielsen was able to identify the Vehicle and confirmed its location, she was unable to verify any activity referenced in the dispatches.[94]

As Officer Nielsen pulled in behind the Vehicle, she observed a lightbar frame in its rear window but did not know that the lightbar did not function and could not tell what color its light lights would be if it did function.[95]  She observed that the Vehicle had tinted windows, a "Sherriff's supporter" license plate, a thin blue line decal on the rear and a spotlight near the driver's side window.  All perfectly legal, these items which were not exclusive to police vehicles and were not an indication that a vehicle was being represented to the public as a police vehicle.[96]   Moreover, none of the items observed on the vehicle were referenced in dispatches as being used by the driver to hold himself out as a police officer.  The dispatches also gave no indication these legal items even had been observed by a caller or interpreted by anyone to indicate the driver was intentionally representing himself as a police officer.[97]

Officer Nielsen immediately pulled up behind the Vehicle (10:22:31pm).[98]  Within one (1) second of stopping, she flashed her search light into the Vehicle's back window.[99] Within two (2) seconds of stopping, she turned on her Red and Blues (10:22:33 pm).[100] Officer Nielsen did so to inform the driver that she wanted to "hold him there to speak to him" and that "he was not free to go."[101] Officer Nielsen confirmed the Vehicle's license plate was valid and then waited.[102]

Mr. Mwangangi was parked at Pump 12, facing south, electronically logging in his service-run.[103]  He noticed Officer Nielsen's searchlight beam come through his back window and the flashing Red and Blues behind him.[104] He immediately understood he was not free to leave.[105]

Like many African Americans in the United States, Mr. Mwangangi had developed an acute concern about interactions with police.[106]  He took specific steps to make sure he gave the police no reason to misinterpret any action.[107]   He avoided making any confusing body movements.[108]  He then waited with both of his hands on the steering wheel, in the 10-2 position.[109]

### E.  MR. MWANGANGI IS SURROUNDED AND ORDERED FROM HIS CAR

Approximately 28 seconds after Officer Nielsen engaged her Red and Blues, Mr. Mwangangi saw a police vehicle, with Red and Blues flashing, exit I-65 and turn north onto Lebanon Street,

towards the Speedway (10:23:00 pm).[110] This was Officer Root.[111] Within seconds, Mr. Mwangangi could hear multiple police sirens approaching (10:23:03 pm).[112]  He watched in his rear-view mirror as multiple police cars filed into the Speedway's north entrance.[113]

When Officer Nielsen could see Officer Root approaching, she exited her cruiser and approached (10:23:01 pm).[114] Officer Root, Officer Hendrix and Officer Noland entered the north Speedway entrance in rapid succession, at 10:23:11 pm, 10:23:12 pm and 10:23:17 pm, respectively, each with Red and Blues flashing, with Officers Hendrix and Noland's sirens activated.[115]  The vehicles each stopped abruptly, forming a wall of four (4) police cars behind Mr. Mwangangi, Root to the left of the Nielsen cruiser, Hendrix to the right and Noland to the left of the Root cruiser.[116] There were four (4) police cars fanning out behind Mr. Mwangangi before Officer Nielsen had spoken a word to him. (10:23:19 pm).[117] The police wall closed in the area between Pump 12 and the north entrance, making an exit to his rear/north impossible.[118]  The fuel island to his left/east and the curb and grassy area to his right/west would have already precluded an exit in either of those directions.[119]

When Officer Nielsen arrived at Mr. Mwangangi's passenger window, he opened the electric window.[120]  Officer Nielsen introduced herself and then, ten (10) seconds later, after a single question (Are you a police officer?), she ordered him to exit his vehicle.[121]

There was a flurry of additional police activity going on during those ten (10) seconds (10:23:22-32 pm).   Officer Nielsen asked "Are you with the Sheriff's Department or anything?"(10:23:22-25 pm)[122]  As Mr. Mwangangi confirmed he was not a police officer, he could see Deputy Garst's Sheriff's Department vehicle, Red and Blues engaged, entering the facility from the Southeast, representing the 5th police car.[123]  Deputy Garst came to a stop on the other side of the pump, to the left/east of Mr. Mwangangi's vehicle.[124]  Officer Root, who was approaching on foot (with his hand on his weapon)[125]  arrived at the Vehicle's driver's side window by 10:23:27 pm.[126]

Although Officer Root approached with his hand on his holstered weapon,[127] he testified that he had no specific concern that he would be required to draw his weapon.[128]   He was aware there was no report of a gun, gunshots or a specific threat of injury to any person or property.[129]   Officer Root confirmed the encounter was not a "tactically intense situation."[130]   By the time he reached Mr. Mwangangi's driver's side window, he knew several other officers were moving in behind him, on foot.[131]   Officer Nielsen's initial 10 second exchange continued:

| | |
|---|---|
| Officer Nielsen | (10:23:27 pm) "We have been hearing reports that you have been pulling people over, Okay."[132] |
| Mr. Mwangangi | "Pull people over?  No."[133] |
| Officer Nielsen | (10:23:32 pm) "Why don't you go ahead and step out with that Officer ____." [pointing to Officer Root standing at Driver's side window, with his hand on weapon][134] |

At 10:23:36 pm, Sgt. Phelps arrived, representing the 6th police car with Red and Blues, and stopped behind the existing line of police cars.[135] Officer Nielsen then asked about and Mr. Mwangangi stated that he had no weapons. (10:23:37-38 pm).[136]

At 10:23:50 pm a 7th Police vehicle, with Red and Blues flashing, entered the facility from the southwest and stopped in front of Mr. Mwangangi's vehicle (south).[137] With officers standing at both front windows,  the police cars surrounded Mr. Mwangangi on three (3) sides (north, south and east), with the fuel island and curve already precluding driving to the east or west.[138]

Officer Nielsen gave additional instructions for exiting the car, as Officer Noland and Deputy Garst provided backup (each with a hand on his holstered weapon) a few feet behind Officer Root.[139] "Go ahead and open the door; you can leave your window down, you're good." (10:23:51- 53 pm).[140]

## F.  POLICE OBSERVATIONS INSIDE THE VEHICLE

Mr. Mwangangi was wearing a yellow reflective safety vest over a dark colored patterned short sleeve synthetic shirt, khaki trousers, a black baseball hat and running shoes.[141]  None of his clothes had any noticeable writing on them or decals.[142]  The word "police" was nowhere on his

clothing.  Officer Nielsen confirmed that his apparel was consistent with someone who provided roadside assistance as an occupation.[143]

Officer Nielsen observed items within the vehicle consistent with a vehicle which provides roadside assistance.[144]  She saw traffic vests, traffic cones, a flashlight, and a computer mount.[145] She also saw speakers which she initially thought was a radar system.[146] Multiple Defendant Officers have confirmed  that these items were not illegal or an indication the driver was representing himself as a police officer.[147] None of the items she observed in the vehicle had been specifically identified as being used in any conduct referenced in a dispatch.  Officer Nielsen did not see any indication of weapons present and the content of the vehicle gave no suggestion of anything dangerous.[148]

Officer Nielsen testified that Mr. Mwangangi was cooperative: responding appropriately, respectfully, politely and promptly to every request/inquiry.[149] He made no movement like he was trying to hide something or do anything inappropriate or illegal.[150]  She confirmed there was not "anything about him or his person that seemed dangerous."[151]

Officer Nielsen ordered Mr. Mwangangi out of his Vehicle not because of any specific concerns but out of a general caution about unreported and unobserved possibilities.[152] Both Officers Nielsen and Root testified that Mr. Mwangangi did not have the option to stay in the car; he was required to comply with the police order.[153]

### G.  Mr. Mwangangi is Frisked and Cuffed

Officer Root was focused on Mr. Mwangangi's activity in the Vehicle.[154] He saw no indication Mr. Mwangangi was uncooperative or angry.[155]  He did not observe anything suggesting Mr. Mwangangi had any weapons or there was any imminent danger.[156] When Officer Nielsen ordering Mr. Mwangangi out of his Vehicle, Officer Root planned to take him some distance away so he would have no access to the interior of the Vehicle.[157]

When Mr. Mwangangi pulled the door latch, as ordered, Officer Root pulled the door open[158] and ordered, "Hop out; Hop Out."[159]  Like Officer Nielsen, Officer Root made no inquiries about

who Mr. Mwangangi was or why he was at the Speedway or in Lebanon.[160]  He only asked, "Do you have any weapons on you?"  Mr. Mwangangi responded, "No, no, no, no."[161]  Officer Root observed nothing about Mr. Mwangangi's demeanor/response that gave him reason to doubt his answer.[162]  By that time, Officer Root was aware that there were several police officers present and police vehicles with Red and Blues flashing, as many as could fit, fanning out behind him.[163]

Before Mr. Mwangangi had finished exiting, Officer Root put his hands on him[164] and physically guided him from his car.[165] As he was taken from the Vehicle, Mr. Mwangangi looked left/north, and had a full view of scope of the police car enclosure and the numerous officers surrounding him and/or closing in.[166]

Officer Root turned him around and performed a thorough pat down of Mr. Mwangangi.[167] He found no weapons.[168] Prior to patting down Mr. Mwangangi, Officer Root had no special/specific concerns about "violence or guns or knives" or any other common weapons.[169]  Rather, he patted him down because "that is just something one does to address officer safety."[170]  During the process, he told Mr. Mwangangi where to stand and physically moved/directed him with his hands.[171]  He ordered Plaintiff to lay his cell phone down because Officer Root had decided he did not need it.[172] Mr. Mwangangi responded promptly and politely to every order.[173]  Neither Officer Root nor Officer Nielsen observed anything suggested Mr. Mwangangi  was armed, dangerous, a threat, or planned to take violent action or flee.[174] In fact, given his age and size and the armed police force surrounding him, there was no indication that successfully fleeing the scene was even a possibility.[175]

Although he had seen/found nothing to indicate that he or anyone else was in any danger,[176] Officer Root immediately placed Mr. Mwangangi in handcuffs.[177]  Mr. Mwangangi did not resist.[178] As he had planned before the cuffing,  Officer Root used his hands to lead/guide Mr. Mwangangi to a separate area, in the center of wall of police vehicles.[179]  Officer Nielsen asked Officer Noland to guard Mr. Mwangangi[180] and then spoke to Officer Root.[181]  From the time Officer Root laid his

hands on Plaintiff to take him from his car, to the time he left Mr. Mwangangi with Offer Noland,

Officer Root's hands were always on Mr. Mwangangi.[182]

Officer Nielsen testified that she did not see any reason why Officer Root was placing Mr.

Mwangangi in handcuffs and testified during her deposition that she still does "not know why Officer

Root placed him in handcuffs."[183]  Although she was in charge of the investigation, she testified,  "I

don't know what [Officer Root's] policies are."[184]  She never made any inquiry to any officer about

the cuffing.[185]  She testified, "I saw no issue with the way [Officer Root] handled it."[186]

Officer Root contends Mr. Mwangangi was cuffed for "officer safety."

Q      What did you specifically observe prior to handcuffing him that made you
        concerned about officer safety?

A      So I've been doing this a long time. And every fight I've gotten into, I have not had
        a person say, "Hey, I'm getting ready to punch you. Hey, I'm getting ready to run.
        Hey, I'm getting ready to do this," they just do it.  This is a call that can go south
        really quick if it is, in fact, what it is. And that's -- I don't know what it is, that's
        why I'm investigating it. So I detained him for officer safety so there was no
        possible way for it to go that way. It's for my safety just as much as it is for his.

Q      Why is it for his safety?

A      Because if he decides to fight, and as you continue to say seven officers, he could
        possibly get hurt, if he decides to fight seven officers. So if he is in handcuffs,
        there's no possible way for him to do that.

Q      Is it your policy to always handcuff someone who is detained?

A      It's officer discretion.

Q      What informs that discretion?

A      What's that mean?

Q      Officer discretion seems pretty broad –

A      It is. . . . Yes.

Q      Is it just a gut check at the time?

A      Basically.

Q      . . . You're saying that in this particular situation, you just kind of felt like your gut was saying, "Let's do this," but you hadn't observed anything specific?

A      Yes.[187]

     * * *

Q      [I]s it your position that if there's an investigation where the officer wants to protect his safety, he has or she has the right to handcuff that person even if there is no specific information indicating a cause for concern?

A      Yes.[188]

     * * *

Q      [The cuffing was based on] [n]othing specific that you saw in terms of danger or fleeing, just a preference on your part?

A      Yes. [189]

Officer Root's cuffing policy actually mirrors the unwritten policy and custom practiced in the Lebanon Police Department.  The Lebanon Police accepted practice is: "It is okay to handcuff someone whenever you detain them."[190]  They contend, Officers have absolute discretion to cuff citizens during *Terry* stops even when there is no specific articulable fact indicating the seized citizen is armed, dangerous or a flight risk.[191] This claimed officer discretion is justified because there is always a conceivable possibility that the detained person could completely change their behavior.[192]

Mr. Mwangangi remained in handcuffs until he arrived at the Boone County Jail.[193] Multiple Defendant Officers testified about the rule followed in the Lebanon and Whitestown police departments relating to handcuffs during a *Terry* Stop: ***If someone is put in handcuffs, they have to stay in handcuffs, in all circumstances, unless and until, that person is completely free to leave.***[194] This unwritten rule is vigilantly followed, without exception, and  without regard to what is being investigated or the lack of articulable facts indicating a citizen is armed, dangerous or a flight risk.[195]

According to Officer Nielsen, the Cuffs-Stay-On-No-Matter-What *Terry* Stop Protocol is something "on the street" the officers all know and "that is what [they] abide by."[196]  If the handcuffs cause pain or there is a medical problem caused by the handcuffs, an ambulance may be called, but

the handcuffs stay on, even when there is no articulable danger or flight risk.[197]  Mr. Mwangangi repeatedly complained that the cuffs were hurting him, first to Officer Noland, then to Officer Nielsen, then to Officers Root *and* Noland.[198]  After indicating the cuffs would be loosened,  officers did not loosen them or take them off.[199]  As Officer Nielsen explained to Mr. Mwangangi more than once, "Well, they ain't made to be comfortable."[200]  Officer Root actually mocked him in response, "You know how to prevent [pain from tight cuffs], right? Don't be put in them."[201]

That evening, Officer Nielsen asked to see Mr. Mwangangi service logs to verify his story.[202]  When Mr. Mwangangi indicated he would do so but could not do so while cuffed,[203] she said, "I can't uncuff you."[204]  As she reported to her supervisor at the scene, "He won't let me have his logbook. He said, 'You can, but you have to take these cuffs off.' It's not happening."[205]  The Cuffs-Stay-on-No-Matter-What *Terry* Stop Protocol is absolute, without regard to any circumstances that exist on the scene. "Once someone's placed in handcuffs, we do not allow them to be taken out."[206]

## H.  First Information about Caller(s)

After Officer Root began cuffing Plaintiff, but before the process was completed,[207] Boone Dispatch initiated a call giving new information (10:24:12 pm):[208]

> **Boone units on scene at Speedway South,  my caller is going to be in the black Kia parked in front of the gas station. He is clear to stay in his vehicle. he advised that is the vehicle that he called state police on about a half hour ago.**[209]

This was the first notice to Defendants that the caller was still at the Speedway.[210]  The Officers did not begin to speak to the caller(s) until 10:24:54 pm,[211] after Mr. Mwangangi had already been cuffed, brought to a separate location and handed off to Officer Noland to guard (10:24:52 pm).[212]

## I.  The Second Frisk

Standing 4-5 feet away, Officer Noland watched what he believed was Officer Root's thorough frisk and believed Mr. Mwangangi had no weapons, had no access to weapons and did not plan to, and was not capable of, fleeing the scene.[213]  He saw no indication of danger or volatility at any time.[214]  Nonetheless, when Officer Nielsen asked him to guard Mr. Mwangangi,[215] he

16

immediately laid his hands on him (10:24:53 pm).[216] As Mr. Mwangangi started to turn around to face south, Officer Noland physically redirected him, steering him against a police cruiser.[217]   His hands remained on Mr. Mwangangi as he initiated  yet another search (10:24:54-10:25:45).[218]

Over the next 51 seconds, Officer Noland ran his flattened hands all over Mr. Mwangangi's body:[219] his belly, hips, buttocks, ankles, upper legs, inner thighs and chest.[220]  He grabbed pocketed areas, removing keys, examining them and examined the inner seems of plaintiff's reflective vest, before plunging his arm down the back of plaintiff's vest.[221]  Officer Noland confirmed he searched Mr. Mwangangi more thoroughly than merely feeling for weapons outside his clothes.[222]

Official Lebanon police *Terry*-frisk policy mirrors federal court decisions indicating a "carefully limited" search of "outer clothing aimed at discovering weapons" is "only justified" if the "officer can articulate specific facts that lead him to believe" the person detained is armed or dangerous.[223]  While that may be Lebanon's  standard operating procedure, Noland testified that was not the "standard operating practice."[224]  He testified that even with no indication Mr. Mwangangi was armed or dangerous, he "absolutely" had the right to perform the further search because he was being "handed from one officer to another."[225]   The Noland-Frisk began at the exact same moment that Defendants Phelps and Hendrix began speaking with the newly identified caller(s).[226]

### J.  SUBSEQUENT INVESTIGATION/REPORT FROM THE KIA

After Plaintiff had been cuffed and placed under guard, and as the second frisk began, the police began speaking to the people in the Kia (10:24:54 pm).[227]  The Kia driver, Dustin Washington, and his passenger reported that, earlier that night, they were traveling in the left-hand/fast/passing[228] lane of eastbound I-465,[229] in Marion County.  Plaintiff entered the passing/fast lane behind the Kia and began to follow closely,[230] for an unspecified period of time.[231]  The Kia did not leave the passing lane or yield the right of way to Plaintiff.[232]  After an unspecified period of time, Plaintiff  turned on his white strobe lights,[233] for an unspecified period of time.[234]  Plaintiff also turned on his left turn signal,[235] for an unspecified period of time.[236]  Mr. Washington felt like Plaintiff was trying to pull

him over.[237]   Nonetheless, he continued to maintain his speed in the passing/fast lane.[238]  Mr. Washington never made any effort to pull over or change lanes to yield the right of way.[239]   The Plaintiff then turned off both the white strobe lights[240] and left turn signal[241] but continued to stay in the passing/fast lane,[242] behind the Kia, for an unspecified period of time.[243]   At some later point, Mr. Washington, still in the passing/fast lane,[244] slowed to 50 mph,[245] and the Plaintiff matched his speed, for some unspecified period of time.[246]  Mr. Washington then slowed to 45 mph,[247] still in the passing/fast lane,[248] and Plaintiff then passed the Kia on the right.[249]  Mr. Washington then called ISP.[250]  While the record unmistakably establishes the he called ISP only after Plaintiff passed him, that evening, the Defendant Officers believed he called while Plaintiff was still behind the Kia.[251]

Later the Kia's occupants saw the Vehicle, at the Speedway, with white strobe lights on,[252] for an unspecified period of time.[253] They thought Plaintiff may be stopping a vehicle,[254] that then left. Mr. Washington called Boone County Dispatch.

After/as Officer Noland took Mr. Mr. Mwangangi away to jail, his Vehicle was searched by Officers Root, Nielsen, Hendrix and Phelps, without obtaining a warrant.[255]   Deputy Garst did not intervene.[256]  Defendants contend this search was an inventory of the Vehicle's contents.[257]

### III. LEGAL ARGUMENTS

#### A.  THERE WAS NO REASONABLE SUSPICION AT THE INCEPTION OF THE SEIZURE

A Fourth Amendment seizure occurred the moment Officer Nielsen turned on her Red and Blues and initiated what Defendants contend was an investigatory stop/*Terry* stop.[258]  In determining whether a *Terry* stop is reasonable, Courts first evaluate "whether the officer's action was justified at its inception." *United States v. Smith*, 3 F.3d 1088, 1094 (7th Cir. 1993).   A *Terry* stop is permissible where the police officer has "reasonable suspicion, supported by articulable facts, that criminal activity is afoot." *U.S. v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005).  Officer Nielsen did not have reasonable suspicion to seize Mr. Mwangangi.

1.  **Reasonable Suspicion was not Established Through the Boone Dispatches**

In evaluating possible Reasonable Suspicion stemming from the Boone Dispatches, only the actual communication to the Defendant Officers is relevant. The 7th Circuit has recently determined, "[T]he government cannot justify an investigative stop based on information that a 911 caller provides to a dispatcher who does not, in turn, notify the police on the scene." *United States v. Rickmon*, No. 19-2054, at *11 n. 4 (7th Cir. Mar. 11, 2020). Officer actions are evaluated based upon what an officer knew at the time of the action, not what she/he later learns. Therefore, the content of any calls to the Boone Dispatch not relayed, by the time specific officer action was taken, is not part of the totality of circumstances informing that police action.

Investigatory stops must be supported by "a particularized and objective basis for suspecting" criminal activity. *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). In some circumstances, reasonable suspicion can be supplied by a 911 call alone, if it has specificity of information and that information has sufficient indicia of reliability. *See Alabama v. White,* 496 U.S. 325 (1990). "Without such indicia of reliability the stop will be illegal unless the officers acting on the report have 'sufficiently corroborated [the report] to furnish reasonable suspicion that [the subject] was engaged in criminal activity' or had been so engaged." *U.S. v. Cutchin*, 956 F.2d 1216, 1218 (D.C. Cir. 1992)(quoting *White*, 496 U.S. at 331).

a)  *The 865 Dispatch*

The ISP's prior interest in the Vehicle does not support a reasonable suspicion that Mr. Mwangangi had represented himself as a police officer. Blind reliance on police interest, without any reliable factual details explaining the basis of that interest, cannot establish reasonable suspicion. The "demand for *specificity in the information* upon which police action is predicated is the central teaching of [the Supreme] Court's Fourth Amendment jurisprudence.*" Id.*, at 21, n. 18 (emphasis

added)  "A detention must be based on more than the officer's subjective good faith, inarticulate hunches, and generalized suspicion." *United States v. Pavelski*, 789 F.2d 485, 489 (7th Cir. 1986).

Mr. Mwangangi acknowledges that the 865 Dispatch identified his Vehicle.  But reasonable suspicion requires information that is reliable in its assertion of illegality,  not just in its tendency to identify a determinate person. *Florida v. J. L.*, 529 U.S. 266, 267 (2000).   The Defendant Officers were given no information about the basis for the suggested ISP interest.  No illegal activity was identified.  There was no information about a caller or what a possible caller may have reported.  In fact, the officers all believed there was no caller information.

The lack of a reliable indication of illegality is further demonstrated by the nature of the crime being investigated.  A citizen may be expected to give a reliably report she/he has been battered, robbed, or raped as those terms have an intuitive quality and defined conduct/harm.  The same is not true for legal conclusions about "possible police impersonation."[259]  As Officer Phelps confirmed, calling conduct police impersonation inevitably involves interpretation, some of which may be in the eye of the beholder.[260] Moreover, "intent" to represent oneself as police officer is an element of the crime.  Intent cannot even be conjured without specific information about conduct.

The Defendant Officers had no way of knowing who had labeled the Vehicle as a "possible police impersonator"[261] or if that person  had any training or understanding of the factors relevant to such a legal conclusion or the content of statutes that might be relevant to the analysis.[262] Without specificity as to the conduct suggesting "possible police impersonation," there is no indicia of reliability that can support reasonable suspicion.  That does not mean that an officer hearing the 865 Dispatch could not investigate.  It does mean that that same officer must perform that investigation through methods other than an immediate *Terry* stop.

### b)  *The Speedway Dispatch(es)*

The Speedway Dispatches did not add any new, reliable, particularized and objective indication of illegality which cumulatively established reasonable suspicion.   The alleged

20

conduct/information referenced in the Speedway Dispatches prior to Officer Nielsen's arrival included: 1) The Vehicle had allegedly stopped someone at the Speedway; 2) a caller (not in the car supposedly stopped at the Speedway) alleged that the Vehicle had, at some point, followed him/her; 3) either the Speedway facility or the Vehicle had its lights on, at night; 4) the purported pulled over car, at the gas station, had actually left; 5) the Vehicle was now stopped at a gas pump; and 6) the driver did not seem to be pumping gas yet.  The Defendants have acknowledged these, activities are neither illegal nor indicate a driver had tried to represent herself/himself as a police officer.

No details were given about what the caller observed, how long he observed it, why he thought someone was pulled over or how the driver was allegedly representing herself/himself as a police officer.  To the extent the caller alleged he was, at some point, followed by the Vehicle, there was no identified conduct indicating the driver was representing herself/himself as a police officer.  Legal conduct without some demonstrable intent to present oneself as a police officer, even if it is confusing or frightening to others, does not violate the law.  *See*, *United State v. Williams*, 731 F.3d 678, 692-93 (7th Cir. 2013)(discussing why description of legal conduct, without information demonstrating statutorily required malicious intent, will not support reasonable suspicion). "A *Terry* stop does not require probable cause for an arrest, of course, but it still requires reasonable suspicion of genuinely criminal conduct." *Id*.

Courts sometimes treat emergency calls as having heightened reliability potentially supporting a *Terry* stop.  But such cases involve facts with imminent danger to the public or a caller. The Speedway Dispatches did not describe such an emergency.  The Speedway Dispatches called for an investigation of general criminality without even identifying any illegal conduct.  To the extent any officer ever imagined some unmentioned danger, such delusions of grandeur should have been immediately tempered when informed that the putative victim, allegedly pulled over at the Speedway, had left; and the Vehicle was now "by a pump" doing nothing.  There was no ongoing danger or emergency suggesting greater reliability or supporting reasonable suspicion.

Again, the police could investigate.  They might choose to approach Mr. Mwangangi and ask if he would voluntarily speak to them.  They might also watch, wait and see if he committed some traffic infraction, to justify a stop.  But they could not simply stampede into a *Terry* stop or arrest.

### 2.   Nielsen's Observations Upon Arrival Cannot Establish Reasonable Suspicion

Upon her arrival, Officer Nielsen did not observe any illegal activity or a traffic infraction. She did not believe there was illegal activity taking place.[263] In the eight (8) seconds it took to turn into the Speedway, pull behind Plaintiff and initiate her Red and Blues (seizing Plaintiff), she did not discover any new articulable facts indicating criminal activity was afoot.  In fact, she testified that she seized Mr. Mwangangi based solely on what she had been told by Dispatch.[264]

The Supreme Court's decisions in this area "have consistently recognized the value of corroboration of details of an informant's tip by independent police work." *Illinois v. Gates*, 462 U.S. 213, 241 (1983).  The degree of corroboration required before police may deprive a person of liberty, even briefly, depends on the reliability of the source. *Alabama v. White,* 496 U.S. 325, 329, (1990) (With "relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.");  see *J.L.* , 529 U.S. at 271. ("The tip in the instant case lacked the moderate indicia of reliability present in ... and essential to the Court's decision.").  Besides the presence of the Vehicle in a public, well-lit, and heavily traveled location, Officer Nielsen could not corroborate any of the previously described legal conduct referenced by Boone Dispatch.

The Court must assume that as she pulled in behind plaintiff, Officer Nielsen observed that the Vehicle had tinted windows, a "sheriffs supporter" license plate, a spotlight and some type of lightbar in the back window.  However, even the Defendant Officers have testified these items are completely legal and not an indication the Vehicle was being represented as a police car. *see Tuckson v. United States*, 77 A.3d 357, 362 (D.C. 2013) (noting observing items used by police officers may be nothing more than "possession of the tools and materials of [a person's non-police] trade, [and

therefore] the law requires further inquiry . . . into the surrounding circumstances"). Courts interpreting legal equipment, not exclusively used by police, have found that it does not support a reasonable suspicion of past or future police impersonation. See *United States v. Reis,* 906 F.2d 284, 288 (7th Cir.1990) (noting that suspect "can hardly be punished for driving an automobile that resembles an unmarked police car"); *Tuckson* 77 A.3d at 365 (Rejecting any "objective justification" for suspecting future criminal activity "based on a hunch that a civilian appearing in broad daylight with legally possessed police-related equipment may be up to no good").

In this case, no dispatch report indicated that a spotlight, a lightbar, tinted windows or license plate were observed or part of any relevant fact pattern or legal conclusion, a caller may have reported. There was no indication that these legal items were intentionally used by Mr. Mwangangi to represent himself as a police officer or to "deceive [or] induce compliance with the [his] instructions, orders, or requests." See, I.C. § 35-44.1-2-6. "[T]he mere possibility of unlawful use [of a legal item] is not enough to create a reasonable suspicion of a criminal act." *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014 (7th Cir. 2016); *United States v. Watson*, 900 F.3d 892, 896 (7th Cir. 2018). "It must instead be sufficiently probable that [some type of] observed [use of the lawful item] suggests unlawful activity." *United States v. Watson*, 900 F.3d 892, 896 (7th Cir. 2018)(quotation/citation omitted).

Experienced Officers sometimes claim to be capable of assigning meaning to activities based on experience. In *Terry*, for example, the Cleveland Police Detective involved "had been a policeman for 39 years and a detective for 35 and that he had been assigned to patrol [that] vicinity of downtown Cleveland for shoplifters and pickpockets for 30 years." *Terry v. Ohio*, 392 U.S. 1, 5 (1968). The record indicated the officer had "routine habits of observation over the years" relevant to the criminal activity at issue. *Id.* After watching the suspects for "10 to 12 minutes" and only after observing them make *dozens* of trips examining a building and looking through windows and conferring, he suspected they were "casing a job, a stick-up." *Id.* at 6. In that circumstance, the

Supreme Court found there was "specificity in the information" needed to establish reasonable suspicion. *Id* at n.18.  Officer Nielsen had never investigated a police impersonation claim in her life.[265]  She made *no* effort to observe Mr. Mwangangi's activity before seizing him.

Finally, evaluating the totality of the circumstances means that neither the officer nor this Court may ignore circumstances that suggest criminal activity is less likely.  Plaintiff was parked next to a well-lit pump, at a gas station that was open for business, in what Officer Nielsen confirmed was "an incredibly public spot,"[266] right next to what Lt. Phelps believes may be the busiest portion, of the busiest road, in Lebanon, Indiana.[267]  In gas stations, wholly unrelated cars, stopped at different pumps, could be misinterpreted as having a connection.[268]  Moreover, criminals pursuing illegal activity are not known for seeking well-lit, well-traveled, public areas, with likely security cameras, as the preferred venue for stealthy illegal activity.  True enough, sometimes criminals are just dumb.  But the public location and nature of the facility, should have caused some skepticism or at least some pause before embracing legal conclusions and assumptions from unknown sources.

Officer Nielsen could investigate the situation in a variety of ways.  But she did not have reasonable suspicion to support a *Terry* stop.  Plaintiff is entitled to partial summary judgment as requested in his Motion or as the Court determines justice and the application of law require.

### B. POLICE ACTIONS EXCEEDED THE REASONABLE SCOPE OF A *TERRY* STOP AND POLICE ACTION REPRESENTED AN ARREST WITHOUT PROBABLE CAUSE

Assuming *arguendo*, that there was reasonable suspicion to forcibly detain Plaintiff at the Speedway, the Court's inquiry does not end.  Constitutional protections still mandate that "the scope of the detention must be carefully tailored to its underlying justification." *Fla. v. Royer*, 460 U.S. 491, 500 (1983).  The "investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion." *Id.* (citation omitted).  Unreasonable intrusiveness and/or "force may escalate to the point where the encounter becomes, as a matter of law, a formal arrest." *Jewett v. Anders*, 521 F.3d 818, 824 (7th Cir. 2008).

This seizure can be divided into moments of escalating intrusiveness. Such "progressively deeper intrusions into [Mr. Mwangangi's] privacy require[d] progressively weightier justifications." *Mitchell v. City of Indianapolis*, No. 1:18-cv-00232-SEB-TAB, at *21 (S.D. Ind. Mar. 31, 2020). Each moment of escalation, discussed below, violated the Fourth Amendment because: 1) standing alone, each act exceeded, or recklessly disregarded, the scope of a *Terry* stop, in a manner that was wholly untethered to any underlying justification or existing circumstances; and/or 2) either individually or viewed cumulatively with prior police action, the act represented a loss of liberty of movement consistent with an arrest, without probable cause.

When addressing any single police act, in this context, Courts properly evaluate the "fear or humiliation which it engenders. It makes a difference whether the police merely insist that the suspect stop and answer a few questions and submit to a pat down or whether they manacle him" or perform an invasive search of his body. *U.S. v. Serna-Barreto*, 842 F.2d 965, 967 (7th Cir. 1988).

## 1. Defendant Officers Surrounding Mr. Mwangangi

The Defendant Officers escalated this encounter into a full arrest within seconds of Officer Nielsen engaging her Red and Blues. A horde of police vehicles, seven (7) in total, arrived with Red and Blues engaged, surrounding Plaintiff on three (3) sides. Before Officer Nielsen said a word to Plaintiff, a minimum of four (4) police cars had entered the facility, converging in a line behind him. A throng of police descending on a citizen, in overwhelming numbers, is not the least intrusive means to address suspicions, which in this case involved no reported illegal conduct or ongoing danger. Before arriving, all of the police knew that the allegedly stopped putative victim had left. Surrounding Plaintiff with massive force was not a reasonable act.

The swarm of Red and Blues must be assessed not only by its colossal over-reaction to the situation but also the fear and humiliation it would engender in a reasonable person. To that end, Plaintiff draws the Court attention to the screen shot included in ¶ 34 of the *Mwangangi Aff.*, Ex. 2, showing the moment Plaintiff looked back, as he was taken from his car.

In Indiana, "[a]n arrest has occurred when police officers interrupt the freedom of an accused and restrict his liberty of movement." *Phillips v. State* (1986), Ind., 492 N.E.2d 10, 17 (*overruled on other grounds Moore v. State* (1986), Ind., 498 N.E.2d 1), (internal quotation and citation omitted). In these circumstances, a reasonable person would believe that his liberty of movement had been restricted in a manner consistent with an arrest.[269]  Defendant Officers did not have probable cause to support such an arrest.  Mr. Mwangangi is entitled to Partial Summary Judgment as requested in his Motion or as the Court determines justice and the application of law require.

### 2. Officer Nielsen's  Lack of Inquiry

A *Terry* stop  may include a request to see identification and inquiry necessary to confirm or dispel the officer's suspicions." *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185-89, (2004). If Officer Nielsen had treated this as a *Terry* stop involving non-specific reports of general criminality, she would have focused on asking the most basic investigatory questions.  Who are you and what are you doing here?  Had this occurred when she approached, plaintiff could have provided immediate context to the Speedway Dispatch;[270] shown her his business card sitting on the console;[271] shown her the log entries he was working on (as he was not handcuffed);[272] or even pushed redial on his cell phone and asked Mr. Palmisano if he would talk to the officers (as he would not have been in handcuffs).[273]

The reported conduct of concern at the time of Officer Nielsen's initial communication was that plaintiff had stopped someone at the Speedway.  But the only inquiry Officer Nielsen made before escalating the intrusion further was whether he was a law enforcement officer.

Failing to make any effort to seek basic information from Mr. Mwangangi before ordering him out of his car demonstrates that this was never a *Terry* stop, aimed at using the least intrusive means of addressing suspicions.  This was, from its inception, intended to be an arrest.  Mr. Mwangangi is entitled to Partial Summary Judgment as requested in his Motion or as the Court determines justice and the application of law require.

26

### 3.   Officer Nielsen Orders Mr. Mwangangi to Exit his Vehicle

It was unreasonable to order Mr. Mwangangi to exit his Vehicle.  Prior to the police arrival, there were no reports of weapons, violence or a volatile situation. Officer Nielsen saw no criminal activity or suspicious behavior.  Nothing seen in the car was illegal or suggested danger.

Plaintiff acknowledges that in *Pennsylvania v. Mimms,* 434 U.S. 106, 109-11 (1977), the Supreme Court held that during a lawful traffic stop, a police officer may order the driver out of the car as a precautionary measure, even in the absence of reasonable suspicion that the driver is armed. *But this was not a traffic stop.*  No officer observed Mr. Mwangangi commit an infraction.

In  *Mimms*, the Supreme Court took pains to note the narrow nature of its ruling:

> "[W]e do not hold today that whenever an officer has an occasion to speak with the driver of a vehicle, he may also order the driver out of the car. We hold only that once a motor vehicle has been lawfully detained *for a traffic violation*, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment . . . ." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6 (1977). (emphasis added).

*Mimms* narrow ruling balanced officer safety concerns with ordering drivers out of a car pending completion of the traffic infraction stop. *Mimms*, 434 U.S. at 111. Implicit in the analysis was the reality that traffic stops are short, only taking the time it takes to issue a citation.  In this case, the police planned to take Plaintiff out of the car for an uncertain duration, without any report of criminality or any suggestion of danger.  That is not reasonable.

"In determining whether the degree of intrusiveness of an investigatory stop was objectively reasonable, [courts] consider whether the suspect's own actions in resisting the legitimate efforts of police to stop and question him played a role in bringing about the challenged police conduct." *U.S. v. Weaver*, 8 F.3d 1240, 1243 (7th Cir. 1993).  In this case, Plaintiff made no sudden or furtive movements.   He was cooperative and there was no specific articulable danger.

One of the recurring themes in depositions in this matter has been the Defendant Officers' claimed unfettered discretion to apparently do anything they want in the name of officer safety.  The

Supreme Court has held, "When balancing these competing interests in different factual contexts, [a court's] central concern is that 'an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field.'" *Brown v. Texas*, 443 U.S. 47, 51 (1977)(citation omitted). Officer Root testified that Officer Nielsen did not need a reason to Order Mr. Mwangangi out of his vehicle.

> Q.    [If there was no indication of weapons or danger] why does an officer order someone to exit a vehicle?
>
> A    Because we can.
>
> Q.    . . . What did you observe at the scene that indicated that it was appropriate, beyond the fact that she could, ask him to exit the vehicle? . . .
>
> A    There is nothing that -- beyond the fact that she could.[274]

Neither the Supreme Court nor the 7th Circuit Court of Appeals have held police have unfettered discretion to Order a driver out of a vehicle outside the context of a lawful traffic stop. Curtailing liberty based on the totality of the circumstances can be appropriate, but it still requires that there be reasonable articulable issues of safety. *Reinhart v. State*, 930 N.E.2d 42, 47 (Ind. Ct. App. 2010).   None exist in this case.

There is some 7th Circuit dicta that suggests police have discretion to Order such an exit in a valid Terry Stop, notwithstanding the narrow ruling in *Mimms*.   But these cases inevitably involve police-observed traffic infractions or circumstances where probable cause already exists.   Neither was present here.   For example, in *Smith v. Ball State Univ*, 295 F.3d 763 (7th Cir. 2002), the police were dealing with a suspected drunk driver who had reportedly veered off the road and almost hit pedestrians on a nearby sidewalk. *Id*. at 768.   The police found the car running, stopped on the sidewalk, with an unresponsive driver. *Id*.   In evaluating the officers' efforts to extract the driver from the car, the Court observed in passing that police "are permitted to order" drivers out of vehicles "during the course of an investigatory stop." *Id*. (referencing *Mimms with "see" designation.)*   But the Court did not characterize such orders as a universal right in investigatory stops.   Rather, at the

onset, the Court noted the issues relating to removal from the vehicle in that case were rendered moot by the Court's prior determination that the officers already had probable cause to make an arrest. *Id*. at 768, n. 4. The Court also held that because of the nature of the drunk driving investigation being conducted, the officers had to have the discretion to order the driver from his vehicle. *Id*. at 769. The Court specifically found that the driver "posed a threat to himself, the officers and the general public, even after Officer[s] . . . turned off [the] vehicle." *Id*. Finally, the court found the driver's behavior/response to police action exacerbated the already obvious danger to the police. *Id*.

In this case, the police surrounded plaintiff and ordered him out of the Vehicle with almost no inquiry. There were no articulable facts suggesting actual danger and there were no reports of illegal conduct. In these circumstances, ordering Mr. Mwangangi from his Vehicle was unreasonable and a violation of the Fourth Amendment.

In addition, surrounded by police cars and armed officers and ordered from his vehicle, a reasonable person would believe his liberty of movement had been restricted in a manner consistent with an arrest.[275] The Defendant Officers did not have probable cause for such an arrest. Mr. Mwangangi is entitled to Partial Summary Judgment as requested in his Motion or as the Court determines justice and the application of law require.

### 4. Officer Root's Frisk

Immediately upon pulling the door open, Officer Root laid his hands on Plaintiff, controlled and directed his movement, frisked him, and then kept his hands on Plaintiff. Courts have repeatedly written about the intrusive nature of frisks. *see*, *Terry*, 392 U.S. 1, 16-17 (1968)("a serious intrusion upon the sanctity of the person ... inflict[ing] great indignity and arous[ing] strong resentment ... not to be undertaken lightly"). Given their more burdensome intrusion, frisks are analyzed separately from an initial stop. Courts evaluated frisks narrowly, allowing them only "when the officer can point to articulable facts that would establish the separate and specific

condition that the detainee has a weapon or poses some danger." *Id.* at 27.   In other words, the right to frisk is not automatic.  To do so, the officer must have some articulable suspicion that the subject is "armed and dangerous." *Arizona v. Johnson,* 555 U.S. 323, 323 (2009).

The Officer Root repeatedly confirmed he had no articulable suspicions Plaintiff was armed or dangerous.[276] *see, Kimbrew v. Evansville Police,* 867 F. Supp. 818, 825 (S.D. Ind. 1994)(rejecting hypothetical pen as possible weapon for *Terry* "armed and dangerous" standard). While they were investigating possible police impersonation, there was no reported act indicating plaintiff specifically represented himself as a police officer.   There were no reports indicating weapons were present. Having equipment that police also may use does not mean one is likely carrying a gun.  *See, Tuckson v. United States,* 77 A.3d 357, 366 (D.C. 2013) (rejecting "generalization that any person whose car is lawfully equipped, like [Plaintiff]'s, with police-type equipment, is likely to also carry guns").  Standing alone, Officer Root's intrusion upon Mr. Mwangangi's body was unreasonable and a violation of his Fourth Amendment rights.

Moreover, Mr. Mwangangi had been surrounded by seven (7) police cars, ordered  from his vehicle, hands were laid upon him and stayed on him.  He had multiple officers just feet away (some with their hands on their weapons), and the most protected zone of privacy in American law, his body, had been intruded upon by an unwarranted frisk.  A reasonable person would believe his liberty of movement had been restricted  in a manner consistent with an arrest.[277]   The Police did not have probable cause for such an arrest.  Plaintiff is entitled to Partial Summary Judgment as requested in his Motion or as the Court determines justice and the application of law require.

### 5.  Handcuffing Mr. Mwangangi

Handcuffing Mr. Mwangangi that night was unreasonable, as a matter of law. "Of course, the use of handcuffs substantially aggravates the intrusiveness of a *Terry* stop." *U.S. v. Glenna*, 878 F.2d 967, 972 (7th Cir. 1989). "There can be little question that a suspect placed in handcuffs is not free to leave and, for all practical purposes, is in police custody . . . ." *U.S. v. Wilson*, 2 F.3d 226,

231 (7th Cir. 1993); *see Glenna*, 878 F.2d at 972 ("[H]andcuffs are restraints on freedom of movement normally associated with arrest.") *Wright v. State*, 766 N.E.2d 1223, 1230 (Ind. Ct. App. 2002)("the use of handcuffs would cause the reasonable person to feel that one was not free to leave, and that one's freedom of movement was restrained to the degree associated with a formal arrest."). The 7th Circuit recognizes certain "rare" circumstances where the use of handcuffs does not convert an investigatory stop into a formal arrest, but none of those are present here. *See, Glenna*, 878 F.2d at 972–73 (identifying exceptions as "rare").

Cuffing can only be defended if "common sense and ordinary human experience convince [this Court that the Defendants] reasonably believed that an investigative stop could be effectuated safely only in this manner." *Id.* Here cuffing was not a reasonably graduated response to the demands of the situation. None of the activity Boone Dispatch described was illegal.[278] At the moment the handcuffing began, no officer knew of any caller's identity, his reliability, why he thought a car was pulled over or if he was even at the facility.[279] There was no volatility or danger. Mr. Mwangangi was cooperative, surrounded by armed police, had been patted down and was about to be taken to a distant spot. In these circumstances, police intrusion should have been *de*-escalated, not ratcheted up. *Reinhart v. State*, 930 N.E.2d 42, 47 (Ind. Ct. App. 2010)(indicating once a perceived danger is no longer present, escalating intrusiveness violates Fourth Amendment).

While the 7th Circuit indicates cuffing in *Terry* stops should be "rare," that is not the view in the Lebanon Police Department.[280] Its officers contend, "It is okay to handcuff someone whenever you detain them."[281] Moreover, "they abide by"[282] an unwritten rule that if cuffs are used in any stop, they stay on, no matter what, without regard to the time, changing circumstances or the lack of an articulable reason to use them in the first place.[283] This local rule further demonstrates this was never intended to be a *Terry* stop, carefully tailored to the underlying justification and defined by the least intrusive method to address suspicions. As Officer Nielsen admitted, once cuffs went on, possible adjustment to a less intrusive approach, whether to ease pain or even to let him prove his

innocence, was "not about any circumstances that existed at the time."[284] Rather, the ongoing intrusive course of action was a certainty, wholly controlled by the Officers' pre-set policy.[285]

Standing alone, the cuffing was unreasonable, as a matter of law.  Moreover, a reasonable person (surrounded with overwhelming force, ordered out, hands put upon him, frisked and cuffed) would believe his liberty of movement had been restricted in a manner consistent with an arrest.[286] Defendant Officers did not have probable cause for an arrest. Mr. Mwangangi is entitled to Partial Summary Judgment as requested in his Motion or as the Court determines justice and the law require.

### 6. Officer Noland's Frisk

Officer Noland testified he knew of no articulable facts indicating Plaintiff was armed or otherwise dangerous.[287]  Pursuant to Lebanon written policy (and repeated directives from Federal Courts in the proceeding 49 years), the Noland-frisk was therefore prohibited.  But Officer Noland draws a distinction between approved department procedures and the "standard operating practice" of the Lebanon Police.[288] Standard practice "stressed" that it was "absolutely" appropriate to have wholly gratuitous extra-physical-touching searches of detained citizens because, "It doesn't hurt anything."[289] Our Supreme Court seems to see things differently. *Terry* 392 U.S. at 16-17 ("a serious intrusion upon the sanctity of the person … not to be undertaken lightly").  As a matter of law, standing alone, the Noland-frisk violated Plaintiff's Fourth Amendment rights.

But Officer Noland's excuse is actually telling. Officer Noland justified the frisk because Plaintiff was being "handed from one officer to another."[290]  The policy practice Officer Noland actually seems to be referencing is Lebanon Standard Operating Guideline 45:

> Any officer ***making an arrest*** or *otherwise* ***coming into control of a prisoner***(s) shall make an immediate and thorough physical search ***of the prisoner*** and all clothing immediately after handcuffing.[291](emphasis added)

Officer Noland's rationale for his 51 second search of Plaintiff's body, and the policies he references, demonstrate Plaintiff had been arrested and was the Defendant Officers' prisoner.

Without regard to these written policies, a reasonable person would believe his liberty of movement had been restricted  in a manner consistent with an arrest.[292]   The Defendant Officers did not have probable cause for an arrest.  Mr. Mwangangi is entitled to Partial Summary Judgment as requested in his Motion or as the Court determines justice and the application of law require.

### C. THERE WAS NEVER PROBABLE CAUSE EVEN AFTER THE POST-ARREST INVESTIGATION.

Even the Defendants Officers' post-arrest investigation, did not establish probable cause. White strobe lights and a left-turn signal neither indicate someone is being pulled over[293] nor that a driver is representing herself/himself as a police officer.[294] Legal conduct without some demonstrable intent[295] to present oneself as a police officer,[296] even if that conduct is confusing to others, does not violate the law. *See*, *United State v. Williams*, 731 F.3d 678, 692-93 (7th Cir. 2013)(discussing why description of legal conduct, without information demonstrating statutorily required malicious intent, will not support reasonable suspicion).

Defendant Officers intentionally ignored their knowledge of Indiana law[297] and their own experience[298] to blindly embrace unfounded assumptions[299] and specious legal conclusions[300] of third parties.[301] "If a reasonable officer should be suspicious that the putative victims' complaints are not reliable, then the officer is obliged to conduct a further examination of the complaint." *Neiman v. Keane*, 232 F.3d 577, 581 (7th Cir. 2000); *see, Reardon v. Wroan,*811 F.2d 1025 (7th Cir. 1987); *Moore v. Marketplace Restaurant, Inc.,*754 F.2d 1336, 1344-47 (7th Cir. 1985).  After a one (1) minute discussion[302] with the caller(s), without any discussion with Plaintiff, Sgt. Phelps decided that Plaintiff was going to jail[303] and that the police would search his Vehicle without a warrant.[304] The Defendant Officers did not engage in even rudimentary analysis[305] or investigation[306] sufficient to cause a reasonably cautious person to believe Mr. Mwangangi had committed the crime of intentional police impersonation.

*WHEREFORE*, Plaintiff Mwangangi submits his Brief in Support of Partial Summary Judgement.

Respectfully Submitted,

/s/ *E.G. Bielski*
Edward G. Bielski, #17862-53
Bielski Law LLC
608 East Market Street
Indianapolis, Indiana 46202
(317) 631-6866
(317) 685-2329 (Fax)
ed@edbielski.com
*Attorney for Plaintiff*
*Daudi M. Mwangangi*

## CERTIFICATE OF SERVICE

I certify that the foregoing was electronically filed using the Court's CM/ECF system on the day of filing and is available to all counsel of record using the same.

/s/ *E.G. Bielski*
Edward G. Bielski