UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DAUDI M. MWANGANGI, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | No. 1:19-cv-04105-JMS-MJD |
| | ) | |
| TAYLOR NIELSEN, BLAINE ROOT, FRANK | ) | |
| NOLAND, BEN PHELPS, TREY HENDRIX, and | ) | |
| CITY OF LEBANON, INDIANA, | ) | |
| | ) | |
| *Defendants*. | ) | |

## ORDER

On the evening of October 7, 2017, Plaintiff Daudi Mwangangi, who works as a roadside
assistance provider, responded to a call to assist a stranded motorist at a gas station in Lebanon,
Indiana.  Shortly after Mr. Mwangangi finished helping the motorist, seven police officers arrived
and then detained, searched, handcuffed, arrested, and jailed him for impersonating a law
enforcement officer, a charge that was ultimately dismissed.  At the heart of this case is the
requirement that investigatory *Terry* stops be reasonable in scope.  In particular, this case serves
as a reminder to law enforcement of the Seventh Circuit's repeated admonition that "in the ordinary
case a *Terry* stop should not be functionally indistinguishable from a full-blown arrest" and the
use of handcuffs is not part and parcel with a *Terry* stop, but rather "generally signifies an arrest."
*Matz v. Klotka*, 769 F.3d 517, 527 (7th Cir. 2014).

Mr. Mwangangi has sued the City of Lebanon (the "City"), as well as City Police Officers
Taylor Nielsen, Frank Noland, Trey Hendrix, City Police Sergeant Ben Phelps, and Whitestown

Police Officer Blayne Root[1] in their individual capacities (collectively, the "Individual Defendants"),[2] alleging multiple claims under 42 U.S.C. § 1983 and Indiana tort law.   Mr. Mwangangi has filed a Motion for Partial Summary Judgment as to some of his § 1983 claims. [Filing No. 74.]   The City, Officers Nielsen, Noland, and Hendrix, and Sergeant Phelps (the "City Defendants") have filed a Cross-Motion for Summary Judgment, [Filing No. 86], and Officer Root has also filed a Cross-Motion for Summary Judgment as to the claims asserted against him, [Filing No. 82].   Both the City Defendants and Officer Root seek dismissal of all claims asserted against them.   These matters are now ripe for the Court's decision.

## I.
### STANDARD OF REVIEW FOR SUMMARY JUDGMENT

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.   *See* Fed. R. Civ. P. 56(a).   As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.   Fed. R. Civ. P. 56(c)(1)(A).   A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.   Fed. R. Civ. P. 56(c)(1)(B).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.   A disputed fact is material if it might affect the outcome of the

---

[1] Plaintiff's Complaint misspelled the first name of Defendant Blayne Root as "Blaine."   [*See* Filing No. 77-4 at 5.]   The Clerk is directed to correct the docket to reflect the correct the spelling of "Blayne."

[2] The titles refer to the Individual Defendants' respective positions at the time of Mr. Mwangangi's arrest on October 7, 2017.

suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). On review of cross-motions for summary judgment, the Court views all facts and inferences from those facts in the light most favorable to the nonmoving party on each motion. *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787 (7th Cir. 2015). However, "[w]hen the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016).

The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson*, 325 F.3d at 898.

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the summary judgment standard detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most

favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).  Fortunately, the parties largely agree upon the facts in this case because of the extensive video and audio evidence.  *See Williams*, 809 F.3d at 942.

### A.  Mr. Mwangangi's Work

Mr. Mwangangi is a black man who emigrated to the United States from Kenya and has been a naturalized citizen since 2008.  [Filing No. 77-2 at 2.]  Although he has been in the United States for some time, Mr. Mwangangi speaks with a Kenyan accent.  [Filing No. 77-2 at 2.]

Mr. Mwangangi provides roadside assistance to stranded motorists for a company called Finderserve LLC, which subcontracts with larger national automotive assistance and service companies to provide roadside services in the greater Indianapolis area.  [Filing No. 77-2 at 2.] When his services are needed, Mr. Mwangangi receives a text or email advising him of the name and location of the motorist in need of assistance.  [Filing No. 77-2 at 4; Filing No. 77-2 at 17.] Mr. Mwangangi's job performance is evaluated, in part, on how quickly he responds to requests for assistance.  [Filing No. 77-2 at 4.]  In addition, pursuant to Finderserve LLC's agreement with the larger national service companies, Mr. Mwangangi is required to keep information about each service call confidential.  [*See* Filing No. 77-2 at 17.]

In October 2017, Mr. Mwangangi drove a dark blue 2003 Ford Crown Victoria (the "Crown Victoria") as his work vehicle.  [Filing No. 77-2 at 2.]  Mr. Mwangangi had purchased the Crown Victoria some years earlier and has not made changes to the vehicle following his purchase.  [Filing No. 77-2 at 2.]  He bought it used and has no knowledge as to whether it was previously used as a law enforcement vehicle, but if it had been used as such, by the time Mr. Mwangangi bought the Crown Victoria, any law enforcement-specific equipment or signifiers (such as specialized

4

painting) had been removed or disabled.  [Filing No. 77-2 at 2-3.]  While there was no red-and-blue light bar atop the Crown Victoria, the vehicle did have a "non-functioning lightbar" in the rear window, with "all wiring cut/removed rendering it a useless shell." [Filing No. 77-2 at 3.]  In addition, the Crown Victoria was equipped with flashing clear strobe lights on the exterior corners of the vehicle, which Mr. Mwangangi used to provide additional safety and visibility when he was providing roadside assistance.  [Filing No. 77-2 at 3-4.]  All parties concede that such clear strobe lights are legal under Indiana law, as is driving with such lights activated.  [*See, e.g.*, Filing No. 77-2 at 3-4; Filing No. 77-3 at 143; Filing No. 77-4 at 156; Filing No. 77-5 at 61.]  The Crown Victoria had no red-and-blue lights which, by law, are reserved for the exclusive use on law enforcement vehicles in the state of Indiana.  Ind. Code § 9-19-14-5.5(a).

### B.  The October 7, 2017 Service Request

At 9:31 p.m. on October 7, 2017, Mr. Mwangangi received a service request from a company called Agero.  [Filing No. 77-2 at 4; Filing No. 77-2 at 17.]  The service request indicated that an individual named Charles Palmisano was located at a Speedway gas station at 1618 North Lebanon Street in Lebanon, Indiana, and that his car, a 2012 black Toyota Camry, would not start. [Filing No. 77-2 at 17.]  Mr. Mwangangi set out for the Speedway at 1618 North Lebanon Street in his Crown Victoria.  [Filing No. 77-2 at 5.]  However, when Mr. Mwangangi arrived at that location, he was unable to locate Mr. Palmisano.  [Filing No. 77-2 at 5.]  A phone call to Mr. Palmisano revealed that he was at a different Speedway gas station on South Lebanon Street. [Filing No. 77-2 at 5.]  Mr. Mwangangi arrived at the correct Speedway at approximately 10:16 p.m. [Filing No. 77-2 at 5; *see also* Filing No. 76 (Ex. 5, Surveillance Video).]  Upon his arrival, Mr. Mwangangi located Mr. Palmisano's black Toyota Camry, which was parked at a gas pump, and then parked his Crown Victoria at an angle about two car lengths from Mr. Palmisano's vehicle

and engaged his clear strobe lights.  [Filing No. 77-2 at 5-6; Filing No. 77-10 at 3.]  Mr. Palmisano approached Mr. Mwangangi's vehicle to explain his issues and thereafter Mr. Mwangangi, wearing a reflective safety vest, proceeded to jump start Mr. Palmisano's Camry with a portable battery charger.  [Filing No. 77-2 at 6-7; Filing No. 77-10 at 3-4.]  Mr. Palmisano explained to Mr. Mwangangi that he was heading home to Cincinnati after a trip to Chicago.  [Filing No. 77-2 at 7; Filing No. 77-10 at 3.]  Having successfully jumpstarted Mr. Palmisano's car, Mr. Palmisano left the gas station at approximately 10:19 p.m.  [Filing No. 76 (Ex. 5, Surveillance Video); Filing No. 77-2 at 7.]

Mr. Mwangangi turned off his clear strobe lights and pulled forward to park at a gas pump.  [Filing No. 77-2 at 7.]  Mr. Mwangangi intended to log his service call with Mr. Palmisano and then get gas.  [Filing No. 77-2 at 7.]

### C.  The First 911 Call

Unbeknownst to Mr. Mwangangi, before he arrived at the South Lebanon Street Speedway, a 911 call had been placed about him.  Dustin Washington was traveling westbound in his black Kia, with a passenger, on Interstate 465 in the far-left lane when Mr. Mwangangi, driving the Crown Victoria, began tailgating Mr. Washington by driving closely behind him.  [Filing No. 77-13 at 111; Filing No. 77-13 at 121.]  The other lanes of Interstate 465 were clear of traffic.  [Filing No. 77-13 at 124.]  At some point, Mr. Mwangangi turned on his clear strobe lights and his left turn signal.  [Filing No. 77-13 at 111.]  Mr. Washington slowed his speed to about 45 miles per hour and stayed in the left lane.  [Filing No. 77-13 at 123; Filing No. 77-13 at 136.]  Mr. Mwangangi turned off his clear strobe lights and left turn signal and passed Mr. Washington's vehicle via the right lane.  [Filing No. 77-13 at 135; Filing No. 77-13 at 138.]  At no point did Mr. Washington stop his Kia.  [Filing No. 77-13 at 119.]  To merge onto Interstate 865 from Interstate

465, a vehicle must be in the left lane of Interstate 465, and both Mr. Washington and Mr. Mwangangi ultimately merged on to Interstate 865. [*See* Filing No. 77-13 at 137.]

After the Crown Victoria passed him, Mr. Washington placed a 911 call. [Filing No. 77-13 at 113-14.] He told the operator that "I don't know that it's necessarily an emergency, but I just had a vehicle try and pull me over with strobe lights on." [Filing No. 77-13 at 113.] Mr. Washington increased his speed to keep the Crown Victoria within his eyesight. [Filing No. 77-13 at 156.] After being transferred to the Indiana State Police, Mr. Washington told them that he "just had a Crown Victoria that's not a police car attempt to pull [him] over with strobe lights in their headlights." [Filing No. 77-13 at 117.] Mr. Washington also relayed that the vehicle in question was "right in front" of him and provided the license plate number—SR393. [Filing No. 77-13 at 119.]

### D.  The 865 Dispatch

In Boone County, a dispatcher with Boone County Dispatch receives 911 calls from the public, and the dispatcher then relays certain information to law enforcement officers over the dispatch radio. [*See* Filing No. 77-3 at 38; Filing No. 77-4 at 18-19.] Generally, law enforcement officers do not hear the 911 calls directly; they only hear the information passed along by the dispatcher over the radio, as well as communications from other law enforcement officers. [*See* Filing No. 77-3 at 38-39; Filing No. 77-4 at 19; Filing No. 77-4 at 28.]

In response to Mr. Washington's call with the Indiana State Police, at approximately 9:50 p.m., Boone County Dispatch made the following statement to law enforcement via the radio (the "865 Dispatch"):

> Boone County and Whitestown units investigate for a possible police impersonator westbound on 865 from the two, westbound on 865 from the two, approaching 65 northbound.  It's going to be a blue Crown Vic with strobe lights, plate S Sam R

Robert 393.  They do have a trooper attempting to catch up to it at this time.  No further.

[Filing No. 77-3 at 58-59].  Law enforcement officers in the area, including Officer Nielsen and Officer Root, heard the 865 Dispatch.  [Filing No. 77-3 at 58-59; Filing No. 77-4 at 29.]  The 865 Dispatch did not indicate why the Crown Victoria with license plate SR393 had been identified as a possible police impersonator.  [See Filing No. 77-3 at 51.]

Officer Root was positioned at the 129-mile-marker turnaround on nearby Interstate 65 (Interstate 865 merges into Interstate 65) and asked Boone County Dispatch whether there was a caller, but Officer Root was only told that "All [the Indiana State Police] advised they had a trooper trying to catch up to it."  [Filing No. 77-4 at 32-33; Filing No. 77-4 at 36.]  Officer Root did not see the vehicle.  [Filing No. 77-4 at 37-38.]  From his vantage point, Officer Root eventually observed the Indiana State Police abandon its search for the suspect vehicle, and Officer Root also ended his efforts to locate the vehicle.  [Filing No. 77-4 at 37-39.]

### E.  The Second 911 Call and the Speedway Dispatches

In the meantime, Mr. Washington exited Interstate 65 at the Lebanon Street exit to obtain food and observed the same Crown Victoria that he had encountered earlier parked nose-to-nose with a black Toyota at the South Lebanon Street Speedway, so Mr. Washington called 911 again. [Filing No. 77-13 at 17.]  Mr. Washington told the dispatcher that he was just on the phone with the Indiana State Police about "an unmarked Crown Vic that was impersonating a police officer," and that the vehicle in question was now at the Speedway where the vehicle was "pulled in here with his strobe lights flashing behind another car."  [Filing No. 77-13 at 43.]  Mr. Washington believed that the vehicle that he had previously encountered on the interstate was attempting to pull over a vehicle that was stopped at the Speedway gas pump.  [Filing No. 77-13 at 43-44.]  Mr. Washington pulled into the Speedway to call 911 and remained there.  [Filing No. 77-13 at 73.]

8

At about 10:20 p.m., following Mr. Washington's second 911 call, Boone County Dispatch sent a series of three radio calls to law enforcement (the "Speedway Dispatches"). The first Speedway Dispatch provided law enforcement with the following information:

> Lebanon unit - - for Speedway south, 1335 South Lebanon Street for a possible police impersonator with a vehicle pulled over. Be an unmarked Crown Vic.

[Filing No. 77-3 at 42.] Shortly thereafter, in response to an inquiry from Officer Nielsen, Boone County Dispatch reported the following:

> My caller advised the one that followed him is at the Speedway South. He advised the lights are on. He pulled up behind the pump or on the side of it. They are trying to get a description of it.

[Filing No. 76 (Ex. 6, Nielsen Dashcam at 1:00-1:15); Filing No. 77-3 at 19.] All four of the City of Lebanon police officers on duty that evening—Sergeant Phelps, Officer Nielsen, Officer Hendrix, and Officer Noland—responded to the call, as well as Officer Root from the Town of Whitestown, Boone County Sheriff Deputy Wesley Garst, and Officer White, a reserve officer from the Town of Thorntown. [Filing No. 77-3 at 120-22; Filing No. 77-4 at 173; Filing No. 77-5 at 20.] As the officers were nearing the Speedway, the Boone County Dispatch provided an additional report:

> Information the vehicle they thought they had pulled over left, but that vehicle still, the blue Crown Vic, it is still pulled over by a pump, not getting gas, not getting out of the vehicle or anything.

[Filing No. 76 (Ex. 6, Nielsen Dashcam at 1:38-1:50); Filing No. 77-3 at 56.]

**F. Officers Seize, Pat Down, and Handcuff Mr. Mwangangi**

Officer Nielsen arrived on the scene first at approximately 10:22 p.m.—about three minutes after Mr. Palmisano had departed the gas station. [Filing No. 76 (Ex. 5, Surveillance Video at 13:00-15:25); Filing No. 76 (Ex. 6, Nielsen Dashcam at 1:52.)] As the first law enforcement officer to arrive, Officer Nielsen was in charge of the scene and any corresponding

investigation.  [Filing No. 77-3 at 32.]   Furthermore, because the Speedway was located within the City of Lebanon, the City of Lebanon's police department had primary jurisdiction over the investigation.  [*See* Filing No. 77-4 at 20.]   As the ranking member of the Lebanon police force, Sergeant Phelps, who arrived at the scene shortly after Officer Nielsen, became in charge of the scene.  [Filing No. 77-5 at 24.]  Officers from other jurisdictions—Officer Root from Whitestown, Officer White from Thorntown, and Deputy Sheriff Garst—arrived to assist the City officers.  At thetime the other officers arrived, Officer Nielsen was investigating Mr. Mwangangi for the crime of impersonating a police officer.  [Filing No. 77-3 at 80.]

When Officer Nielsen arrived, Mr. Mwangangi was inside his Crown Victoria, parked at a gas pump.  [Filing No. 76 (Ex. 6, Nielsen Dashcam at 1:55).]  Officer Nielsen pulled her vehicle behind the Crown Victoria, turned on her spotlight, and pointed it at the Crown Victoria because the vehicle had tinted windows.  [Filing No. 76 (Ex. 6, Nielsen Dashcam at 1:59); Filing No. 77-3 at 78.]  Officer Nielsen took notice of the Crown Victoria's license plate, which was a "sheriffs-supporter plate," an lawful optional specialty license plate available to Indiana drivers.  [Filing No. 77-3 at 78; Filing No. 77-5 at 95-96.]  She also noticed the lightbar in the rear window.  [Filing No. 77-3 at 78.]  About two seconds after she pulled behind Mr. Mwangangi's Crown Victoria, Officer Nielsen engaged the red-and-blue lights on her car.  [Filing No. 76 (Ex. 6, Nielsen Dashcam at 2:02).]  At this moment, as Officer Nielsen testified, Mr. Mwangangi was not free to leave.  [Filing No. 77-3 at 80.]

Officer Root arrived immediately after Officer Nielsen, at approximately 10:23 p.m., about 30 seconds after Officer Nielsen engaged her red-and-blue lights.  [Filing No. 76 (Ex. 6, Nielsen Dashcam at 2:34).]  Officer Nielsen radioed in the license plate number of the Crown Victoria and then approached the passenger-side window of the car.  [Filing No. 76 (Ex. 6, Nielsen Dashcam at

10

2:45-3:00).] She identified herself and asked Mr. Mwangangi if he was a law enforcement officer, and Mr. Mwangangi replied that he was not. [Filing No. 76 (Ex. 6, Nielsen Dashcam at 2:45-2:54).] Officer Nielsen told Mr. Mwangangi that she had received reports that he was trying to pull people over and asked if that was true, and Mr. Mwangangi answered in the negative. [Filing No. 76 (Ex. 6, Nielsen Dashcam at 2:45-3:00); Filing No. 77-2 at 9.] Officer Nielsen noticed reflective traffic vests, a "SureFire flashlight that was mounted to the dashboard," a tablet that appeared to be mounted on the center console, and what she believed to be radar equipment[3] inside the Crown Victoria. [Filing No. 77-3 at 103.] Officer Nielsen then asked Mr. Mwangangi to exit his vehicle, which Mr. Mwangangi did without hesitation. [Filing No. 76 (Ex. 9, Root Bodycam at 0:00-0:03).] By that point, six police cars had arrived at the Speedway with their red-and-blue lights activated, with a seventh arriving seconds later. [Filing No. 76 (Ex. 6, Nielsen Dashcam at 3:14).] Officer Nielsen told Mr. Mwangangi to exit his vehicle because she believed it was safer for law enforcement to speak to him outside of the Crown Victoria because they "d[id]n't know what he ha[d] in the car." [Filing No. 77-3 at 106.]

Officer Root met Mr. Mwangangi as he exited the Crown Victoria. [Filing No. 76 (Ex. 9, Root Bodycam at 0:00-0:05.] Officer Root testified that the Officer Nielsen had ordered Mr. Mwangangi to exit his vehicle "because we can." [Filing No. 77-4 at 74.] Officer Root asked Mr. Mwangangi if he had any weapons, and Mr. Mwangangi answered in the negative. [Filing No. 76 (Ex. 9, Root Bodycam at 0:06-0:10).] Officer Root then instructed Mr. Mwangangi to turn around and proceeded to pat down Mr. Mwangangi to make sure that Mr. Mwangangi had no weapons on his person, even though Officer Root did not suspect that Mr. Mwangangi had any weapons. [Filing No. 76 (Ex. 9, Root Bodycam at 0:10-0:28); Filing No. 77-4 at 75; Filing No. 77-4 at 81.]

---

[3] The items were speakers, not radar equipment. [*See* Filing No. 81-1 at 1.]

Officer Root testified that he chose to pat down Mr. Mwangangi as a matter of course to address officer safety issues and noted that he was concerned about Mr. Mwangangi's access to items that could potentially be used as a weapon, such as windshield wiper fluid.  [Filing No. 77-4 at 75-76; Filing No. 77-4 at 81 (Q. Did you have any belief that he had access to guns, knives or any weapons?  A. He had access to other weapons, but didn't have them.  Q. What type of weapons would those be?  A. I mean, there's the windshield washer-- Q. Okay.  A. --fluid.  I mean, anything around anybody can be used as a weapon.).]  Officer Root also instructed Mr. Mwangangi to place his phone on top of his Crown Victoria because, according to Officer Root, Mr. Mwangangi "didn't need the phone in his hand at that time."  [Filing No. 76 (Ex. 9, Root Bodycam at 0:13-0:17); Filing No. 77-4 at 78.]  Mr. Mwangangi was compliant with all of Officer Root's instructions.  [Filing No. 76 (Ex. 9, Root Bodycam at 0:00-0:30).]

Officer Root then placed handcuffs on Mr. Mwangangi.  [Filing No. 76 (Ex. 9, Root Bodycam at 0:23).]  Officer Root handcuffed Mr. Mwangangi out of a concern for officer safety and Mr. Mwangangi's own safety.  [Filing No. 77-4 at 88 ("This is a call that can go south really quick if it is, in fact, what it is . . . .  So I detained him for officer safety so there was no possible way for it to go that way.  It's for my safety just as much as it is for his.").]  Officer Root believes that an officer has open-ended discretion to handcuff an individual who is being detained, even if there is no immediate concern the individual poses a danger or is a flight risk.  [Filing No. 77-4 at 89; Filing No. 77-4 at 260.]

Officer Nielsen did not see a specific reason why Mr. Mwangangi needed to be handcuffed, but she "d[id]n't know what [Officer Root's] policies are."  [Filing No. 77-3 at 138.]  She testified that within the City police department, it was a common practice to handcuff individuals that were being detained, even when officers had no reason to suspect the individual possessed a weapon or

would attempt to flee.  [Filing No. 77-3 at 317].  Likewise, Officer Noland believes that regardless of whether there is a legitimate reason to believe a suspect is armed or dangerous, "[i]t is okay to handcuff someone whenever you detain them," [Filing No. 77-6 at 113], and that the determination is a matter of "officer discretion," [Filing No. 77-6 at 112.]

Officer Root led Mr. Mwangangi to an area away from the Crown Victoria.  [Filing No. 76 (Ex. 9, Root Bodycam at 0:35).]  Officer Root asked Mr. Mwangangi why his pants were "unbuttoned."  [Filing No. 76 (Ex. 9, Root Bodycam at 0:50).]  Mr. Mwangangi responded that he did not know why.  [Filing No. 76 (Ex. 9, Root Bodycam at 0:50).]  In fact, Mr. Mwangangi's pants were zipped and buttoned, but his belt was undone.  [Filing No. 77-2 at 10.]  Mr. Mwangangi had gained weight, which made sitting in his car with a belt buckled uncomfortable, so he would occasionally unbuckle his belt when he was driving.  [Filing No. 77-2 at 10.]

Around the same time Officer Root was placing Mr. Mwangangi in handcuffs, Boone County Dispatch radioed the following information concerning Mr. Washington's presence at the scene:

> Boone units on scene at Speedway South, my caller is going to be in the black Kia parked in front of the gas station.  He is clear to stay in his vehicle.  He advised that is the vehicle that he called state police on about a half hour ago.

[Filing No. 76 (Ex 6, Nielsen Dashcam at 3:40-3:55).]  Officer Root left Mr. Mwangangi with Officer Noland while he and Officer Nielsen moved to a different area of the gas station to exchange information.  [Filing No. 76 (Ex 6, Nielsen Dashcam at 4:15); Filing No. 77-3 at 137.]  Even though Officer Noland had observed Officer Root pat down Mr. Mwangangi moments earlier, Officer Noland performed a second pat down of the handcuffed Mr. Mwangangi to check for weapons.  [Filing No. 76 (Ex 6, Nielsen Dashcam at 4:20-5:15); Filing No. 77-6 at 105.]  The second pat down was longer and more extensive than Officer Root's pat down, with Officer Noland

running his hands over Mr. Mwangangi torso and arms, in between Mr. Mwangangi's spread legs and inside of Mr. Mwangangi's reflective vest.  [*Compare* Filing No. 76 (Ex. 6 Nielsen Dashcam at 3:29-3:40) *with* Filing No. 76 (Ex. 6, Nielsen Dashcam at 4:20-5:15); *See also* Filing No. 77-6 at 108-09 (Officer Noland confirming his pat down was more thorough).]  Officer Noland testified that performing a second pat down in such a situation is "standard operating practice" because "[w]e do stress at any time an individual is handed from one officer to another, go ahead and pat him down again.  It doesn't hurt anything, and it only verifies safety for everyone involved," even if law enforcement officers have not observed anything indicating a danger.  [Filing No. 77-6 at 106.]

### G.  Witness Statements

Sergeant Phelps and Officer Hendrix approached the black Kia to interview Mr. Washington and his passenger to find out what had happened that led to their calls to 911.  [Filing No. 77-5 at 107.]  They told Sergeant Phelps that they were driving on Interstate 465 to Interstate 865 when Mr. Mwangangi's Crown Victoria came up behind Mr. Washington's Kia and began tailgating, then turned on strobe lights and activated a left turn signal before eventually passing the Kia on the right.  [*See* Filing No. 77-5 at 110; Filing No. 77-13 at 86.]  They also relayed that they had then seen the Crown Victoria pulled in at the Speedway on South Lebanon Road with its front end pulled nose-to-nose with a second vehicle (Mr. Palmisano's black Toyota).  [Filing No. 77-13 at 87-88.]  Mr. Washington and his passenger later completed witness statements summarizing their observations. [Filing No. 89-1 at 1-2.]

### H.  Law Enforcement Officers Discuss the Information Gathered Thus Far

Officers Nielsen and Root joined Sergeant Phelps and Officer Hendrix at the black Kia. [Filing No. 76 (Ex. 9, Root Bodycam at 2:02).]  Sergeant Phelps, Officer Nielsen, and Officer Root

then stepped to the side to exchange information. [Filing No. 76 (Ex. 9, Root Bodycam at 2:20).]

Officer Root's bodycam captured the following conversation about the information gathered thus far in their investigation:

| | |
|---|---|
| **Ofc. Root:** | Did it happen here?  In the parking lot? |
| **Sgt. Phelps:** | Yeah, over there.  He was nose to nose -- |
| **Ofc. Nielsen:** | Let me grab a piece of paper for you.  Okay. |
| **Sgt. Phelps:** | with the uh, with another vehicle, with strobes on.  He tried to stop him on 465. |
| **Ofc. Root:** | Okay.  Well. |
| **Ofc. Nielsen:** | Do we know, are we [indecipherable] red and blues? |
| **Sgt. Phelps:** | He said that they're clear strobes in the front. |
| **Ofc. Nielsen:** | And so how does that play in the state of Indiana? |

***

| | |
|---|---|
| **Ofc. Root:** | Yeah. He's, he's intending to detain or stop somebody. |
| **Ofc. Nielsen:** | He said that he was -- he told me that he never tried to pull anybody over. |
| **Sgt. Phelps:** | 'Cause he got up on his ass and turned the strobes on and motioned him over to the shoulder. |
| **Ofc. Nielsen:** | Is that enough to prove intentional impersonating? |
| **Sgt. Phelps:** | On his? |
| **Ofc. Nielsen:** | Yeah, that's what I am saying. |
| **Sgt. Phelps:** | I think that when you take that and you couple it with if he pulled in here and went nose to nose … [inaudible]. |
| **Ofc. Nielsen:** | You ought to see the shit that he's got in there --  He's, he's got like frickin' vests. |
| **Sgt. Phelps:** | What does he do? |
| **Ofc. Nielsen:** | I haven't talked to him. |
| **Ofc. Root:** | I don't know, but his pants are undone. |
| **Ofc. Nielsen:** | Yeah. His pants are undone. |
| **Ofc. Root:** | His pants and his belt are undone. |
| **Ofc. Nielsen:** | He's got like traffic vests.  He's got traffic cones.  He's got a - - |
| **Ofc. Root:** | He's got a light bar that goes the whole back window. |
| **Ofc. Nielsen:** | He's got, like, a whole radar system in the front. |

| | |
|---|---|
| **Sgt. Phelps:** | I think, I think if you add the two together – |
| | *** |
| **Sgt. Phelps:** | So what did he have to say, anything? |
| **Ofc. Nielsen:** | I, I… |
| **Ofc. Root:** | I didn't talk, I didn't ask.  I just asked why his pants were undone, and he just … [imitating] "uhhhhhhhhhh, I uhhhhh." |
| **Ofc. Nielsen:** | When I got up there, he rolled the window down that's when I noticed all the shit.  Half of his passenger side window was covered up, so I peeked my head down, and he was, like, "What's," it was some Indian guy.  He was like, [parroting Mr. Mwangangi's accent] "What's going on?"  And I was, like, "Well, we have reports that you were pulling people over," or I asked him, I said, "Are you a sheriff's officer or anything like that, a police, deputy, anything?"  He's like, "No."  I'm, like, "Okay, well, we had reports that you were trying to pull people over."  He's like, "Pull people over?"  And that's when I told him -- he said, "No."  And that's when I told him . . . to step out of the car." |

[Filing No. 76 (Ex. 9, Root Bodycam at 2:20-4:44).]

## I.  Officer Nielsen Interviews Mr. Mwangangi

Officer Nielsen then returned to where the other officers were standing with Mr. Mwangangi to interview him. [*See* Filing No. 76 (Ex. 6, Nielsen Dashcam at 10:30).]   After reading Mr. Mwangangi his *Miranda* rights, Officer Nielsen proceeded to question him, during which time Mr. Mwangangi explained that he lived in nearby Carmel, Indiana and provided roadside assistance for a company called Finderserve.  [Filing No. 76 (Ex. 6, Nielsen Dashcam at 10:40-11:40).]  Officer Nielsen appears to have thought Mr. Mwangangi was saying "Find*a*serve." [Filing No. 76 (Ex. 6, Nielsen Dashcam at 11:42-11:48).]   Officer Root searched Google for the company to confirm Mr. Mwangangi's story.  [Filing No. 77-3 at 207.]  Mr. Mwangangi denied that he had attempted to pull any vehicles over that evening and explained that the exterior strobe lights on the corners of his vehicle were clear and denied turning them on while driving on the interstate.  [Filing No. 76 (Ex. 6, Nielsen Dashcam at 12:16-12:53).]   Mr. Mwangangi then

explained the nature of the service call that had brought him to the Speedway in Lebanon that evening.

| | |
|---|---|
| **Ofc. Nielsen:** | Where were you coming from?  Were you coming from Carmel? |
| **Mr. Mwangangi:** | Carmel. |
| **Ofc. Nielsen:** | Where [were] you headed to? |
| **Mr. Mwangangi:** | Right here. |
| **Ofc. Nielsen:** | Oh, you were headed here? |
| **Mr. Mwangangi:** | Right here.  Their car was stopped right here from Chicago. |
| **Ofc. Nielsen:** | Were you headed to Chicago? |
| **Mr. Mwangangi:** | No. The car was stopped right here. |
| **Ofc. Nielsen:** | Yeah.  The car was stopped here. |
| **Mr. Mwangangi:** | Yeah, and I gave jump start. |
| **Ofc. Nielsen:** | Yeah, what car? |
| **Mr. Mwangangi:** | They left -- they just left. |
| **Ofc. Nielsen:** | They just left? |
| **Mr. Mwangangi:** | Yes.  So I jump start them, they were going to Cincinnati. |

[Filing No. 76 (Ex. 6, Nielsen Dashcam at 12:53-13:20).]

Officer Nielsen then asked Mr. Mwangangi if she and officers at the scene could "look at" his phone.  [Filing No. 76 (Ex. 6, Nielsen Dashcam at 13:28).]  Officer Nielsen testified that this request meant law enforcement would take Mr. Mwangangi's phone and search it. [Filing No. 77-3 at 202.] Mr. Mwangangi refused this request. [Filing No. 76 (Ex. 6, Nielsen Dashcam at 13:32).] Moments later, he did offer to show Officer Nielsen the call log on his phone to show Mr. Palmisano's service request if she would uncuff him so that he could operate his phone.  [Filing No. 76 (Ex. 6, Nielsen Dashcam at  15:05).]  Officer Nielsen responded that "I can't uncuff you." [Filing No. 76 (Ex. 6, Nielsen Dashcam at 15:10).]  Officer Nielsen testified that the City police "don't allow that," and explained that "[o]nce someone's placed in handcuffs, we do not allow them

17

to be taken out, especially during a criminal matter.  We do not hand them any type of evidence that would be potential (sic) in the case so that it could be deleted or anything along those lines." [Filing No. 77-3 at 211.]   Sergeant Phelps confirmed this in his deposition, testifying that it was the City police department's practice that once an individual is placed in handcuffs, the handcuffs are to stay on, no matter what.  [Filing No. 77-5 at 185.]

Shortly after Officer Nielsen told Mr. Mwangangi that she could not uncuff him, Mr. Mwangangi told Officer Nielsen the handcuffs that Officer Root had placed on him were too tight, complaining that they were "frightfully tight" and that the handcuffs were "biting my bones." [Filing No. 76 (Ex. 6, Nielsen Dashcam at 15:11-15:21).]   Officer Nielsen responded that "they are not made to be comfortable" but that she would "loosen them up here in a second."  [Filing No. 76 (Ex. 6, Nielsen Dashcam at 15:22-15:30).]  Officer Nielsen proceeded to check the spacing of Mr. Mwangangi's handcuffs by ensuring that two of her fingers could fit between the wrist and the handcuffs.  [Filing No. 77-3 at 219.]   Officer Nielsen testified that both of her fingertips fit underneath the handcuffs, and therefore she did not believe that Mr. Mwangangi's handcuffs were too tight.  [Filing No. 77-3 at 219-20.]

### J.  Officers Arrest Mr. Mwangangi and Inventory the Crown Victoria

Officer Nielsen then stepped aside to confer with Sergeant Phelps and Officers Root and Noland about her interview with Mr. Mwangangi and what actions to take next.

**Ofc. Nielsen:** His story – his story is not making sense.  He says a company out of Carmel called Findaserve.  . . .  He won't let me have his logbook. He said, "You can, but you have to take these cuffs off."  It's not happening.  He won't let me look at his log book or anything.  He told [Officer] Frank [Noland] the people he was coming to see were from Chicago.  He told me Cincinnati.  There is a bunch of other things not making sense.

**Sgt. Phelps:**   We are gonna J3 and hook[4] and search and all that shit.  We can't get a video [from the Speedway] until Jim gets back from vacation next week.  So we will do the report.  We will start it on 465 which is – – and if they want to fucking drop it, drop it.

**Ofc. Nielsen:**   Okay.  I mean, we got enough with the witness and everything.

[Filing No. 76 (Ex. 9, Root Bodycam at 18:29).]  Officer Nielsen testified that Mr. Mwangangi's story did not "make sense" to her because she thought he was being deceptive about the travel path of Mr. Palmisano, "[t]he manner in which he initiated his strobe lights[, w]hat we observed in the vehicle, which granted, it's legal, however it was put in a manner that it did appear to be a type of law enforcement equipment . . .[, a]nd he wouldn't allow us to look at his log because we could not take the handcuffs off."  [Filing No. 77-3 at 245-46.]

Officer Nielsen testified that she believed there was probable cause to arrest Mr. Mwangangi because, based on the statements of Mr. Washington and his passenger, Mr. Mwangangi was attempting to pull them over by portraying himself as a law enforcement officer because of the strobe lights and because he was "motioning to get them over to the shoulder." [Filing No. 77-3 at 240.]  Officer Root transferred Mr. Mwangangi to Officer Noland's handcuffs. [Filing No. 76 (Ex. 6, Nielsen Dashcam at 19:40).]  Mr. Mwangangi was placed in Officer Noland's vehicle and transported to the local jail.  [Filing No. 77-6 at 143.]  The remaining officers at the scene completed an inventory search of Mr. Mwangangi's Crown Victoria and had the vehicle towed.  [Filing No. 76 (Ex. 6, Nielsen Dashcam at 20:30-36:31, Ex. 25, Nielsen Dashcam 2).]

Mr. Mwangangi spent two days in the Boone County Jail.  [Filing No. 38 at 24.]  A search warrant was issued about a month after his arrest to search the contents of Mr. Mwangangi's cell

---

[4] The term "J3" means to arrest an individual, and "hook" means to tow the vehicle.  [Filing No. 77-5 at 224-25.]

phone and iPad.  [Filing No. 91-1.]  The phone and iPad were not returned to Mr. Mwangangi until

some 5 ½ months after the October 7, 2017 arrest.  [Filing No. 38 at 26-27.]

According to the parties, Mr. Mwangangi was charged with impersonating a police officer

in violation of Indiana Code § 35-44.1-2-6(b).  In October 2019, two years after the October 7,

2017 incident at the Lebanon Speedway, the charges were dismissed.  [Filing No. 38 at 27.]  The

parties provided no further information to the Court about the prosecution and the Court's search

of the public record reveals no information at all about the case.

### K.  Procedural History

Mr. Mwangangi initiated this litigation in October 2019, and filed an Amended Complaint

against the City and the Individual Defendants on January 9, 2020.[5]  [Filing No. 38.]  The Amended

Complaint is not a model of clarity, lacking numbered counts asserted against clearly identified

defendants.  [*See generally* Filing No. 38.]  However, reading the Amended Complaint together

with Mr. Mwangangi's Statement of Claims, [Filing No. 73], and Motion for Partial Summary

Judgment, [Filing No. 74], he appears to assert the following claims, which can be organized into

three categories.  First, Mr. Mwangangi asserts numerous Fourth Amendment claims under 42

U.S.C. § 1983 against the Individual Defendants, claiming that: (a) no reasonable suspicion existed

to seize Mr. Mwangangi at the Lebanon Speedway at the time Officer Nielsen initiated her red-

and-blue lights; (b) even if there were a reasonable suspicion, certain aspects of the seizure,

including ordering Mr. Mwangangi out of his car, surrounding Mr. Mwangangi with numerous

police vehicles, the pat downs, and the use of handcuffs rendered the seizure unreasonable; (c) no

---

[5] Mr. Mwangangi also sued Boone County, Boone County Sheriff's Deputy Wesley Garst, Boone County Jail Corrections Officer Matthew Brennan, and Boone County Jail Corrections Officer Gordon Weliky (the "Boone County Defendants").  [Filing No. 38.]  Mr. Mwangangi subsequently dismissed the Boone County Defendants from his lawsuit.  [Filing No. 63; Filing No. 98.]

probable cause existed to arrest Mr. Mwangangi; (d) the officers used excessive force; and (e) certain officers failed to intervene to prevent Mr. Mwangangi's constitutional rights from being violated.  Second, Mr. Mwangangi asserts claims against the City under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978), relating to its policies concerning handcuffing and vehicle inventory searches.  [Filing No. 73 at 5-6; Filing No. 91 at 31-33].  Third, Mr. Mwangangi asserts state-law tort claims of false arrest, false imprisonment, battery, negligence in relation to the handling of his personal property, and negligent training and supervision against the City Defendants.  [Filing No. 73 at 7; Filing No. 74 at 5; Filing No. 91 at 33 n.14 (noting that Mr. Mwangangi "is not pursuing state law claims against Officer Root").].[6]

Mr. Mwangangi filed a Motion for Partial Summary Judgment (the "Initial Motion"), in which he seeks summary judgment on liability against the Individual Defendants for the following Fourth Amendment claims under 42 U.S.C. § 1983: (a) no reasonable suspicion existed to seize Mr. Mwangangi at the Lebanon Speedway at the time Officer Nielsen initiated her red-and-blue lights; (b) even if there were a reasonable suspicion, certain aspects of the seizure, including ordering Mr. Mwangangi out of his car, surrounding Mr. Mwangangi with numerous police vehicles, the pat downs, and the use of handcuffs rendered the seizure unreasonable; and (c) no probable cause existed to arrest Mr. Mwangangi.  [Filing No. 74 at 2-5.]

Officer Root filed a Response to Plaintiff's Initial Motion, [Filing No. 79], and his own

---

[6] Mr. Mwangangi's Amended Complaint also asserted a variety of claims related to a blood draw at the Boone County Jail.  [*See, e.g.*, Filing No. 38 at 3 (alleging the City is liable under 42 U.S.C. § 1983 for the "unreasonable search and seizure of blood").]  These claims are not listed in Mr. Mwangangi's Statement of Claims, [Filing No. 73], or otherwise addressed by the parties in the cross-motions for summary judgment.  Accordingly, the Court finds that any claims related to the blood draw have been abandoned.  *See Jackson v. Regions Bank*, __F. App'x__, 2021 WL 754836, at *2 (7th Cir. Feb. 26, 2021) (affirming district court's finding that a plaintiff had abandoned claim by not including it in its Statement of Claims).

Motion for Summary Judgment (the "Root Cross-Motion"), [Filing No. 82], in which he seeks summary judgment on all claims asserted against him and also raises the defense of qualified immunity. The City Defendants filed a Joint Response to Plaintiff's Partial Motion for Summary Judgment and Cross-Motion for Summary Judgment (the "Cross-Motion/Response"), [Filing No. 86], in which they also seek summary judgment on all claims asserted against them by Mr. Mwangangi, also raising qualified-immunity defenses. Mr. Mwangangi, both in support of his Initial Motion and in opposition to the Root Cross-Motion and the City Defendants' Cross-Motion/Response, filed a single brief entitled Plaintiff's Consolidated Response in Opposition to the Defendants' Motions for Summary Judgment and Reply in Support of his Motion for Partial Summary Judgment (the "Consolidated Response and Reply"). [Filing No. 91.] Officer Root filed a Reply in support of the Root Cross-Motion, [Filing No. 100], and the City Defendants also filed a Reply in support of the Cross-Motion/Response, [Filing No. 99]. Mr. Mwangangi then filed a four-page Surreply responding to the Defendants' respective replies. [Filing No. 103.] The City Defendants filed an Objection to the filing of the Surreply, [Filing No. 104], as did Officer Root, [Filing No. 105]. Mr. Mwangangi filed a Response to the Objections, [Filing No. 106], contending that the Surreply was appropriate because the City Defendants and Officer Root raised new arguments in their replies.

The Court finds that Defendants raised new arguments in their respective reply briefs—in particular, the City Defendants' arguments that the City cannot be held liable for any of the actions of Officer Root, [*see* Filing No. 99 at 13], and a more nuanced argument from Officer Root that the 865 Dispatch and the Speedway Dispatches were emergencies, [*see* Filing No. 100 at 4]. Therefore, the Objections of the City Defendants, [104], and Officer Root, [105], are **OVERRULED** to the extent that the Court will consider Mr. Mwangangi's Surreply, [Filing No.

103], in resolving the summary judgment motions. *See Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utilities*, 410 F. Supp. 3d 943, 949 (S.D. Ind. 2019) ("Courts allow a surreply brief only in limited circumstances to address new arguments or evidence raised in the reply brief or objections to the admissibility of the evidence cited in the response.").

### III.
### MR. MWANGANGI'S § 1983 CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

As discussed above, in his Initial Motion, Mr. Mwangangi asks the Court to enter summary judgment in his favor on certain Fourth Amendment claims that he has asserted under 42 U.S.C. § 1983, specifically, that there was no reasonable suspicion to detain him at all, that certain aspects of the investigatory stop exceeded constitutional bounds, and that there was no probable cause to arrest him.  [Filing No. 74.]  The City Defendants and Officer Root ask that the Court enter summary judgment in their favor on the same claims.  [Filing No. 82; Filing No. 86.]  The parties appear to agree that the material facts necessary to resolve these claims are not in dispute—likely because of the extensive video and audio evidence—and Defendants have not identified any material facts in dispute as required by Local Rule 56-1.  [Filing No. 82 at 1; Filing No. 86 at 2; Filing No. 91 at 1-2.]  Despite the parties' agreement via their cross-motions that no genuine dispute of material fact exists with respect to these claims, the Court has an obligation to deny all motions if the parties have not established their respective rights to judgment as a matter of law. *See Jimenez v. CRST Specialized Transp. Mgmt., Inc.*, 213 F. Supp. 3d 1058, 1061 (N.D. Ind. 2016).

The City Defendants and Officer Root have also moved for summary judgment on Mr. Mwangangi's § 1983 claims of excessive force and failure to intervene.  [Filing No. 83 at 25; Filing No. 87 at 28.]  Mr. Mwangangi opposes this request, arguing that material issues of fact preclude summary judgment.  [Filing No. 91 at 31.]

It bears mentioning at the outset that Mr. Mwangangi's Amended Complaint, [Filing No. 38], and Statement of Claims, [Filing No. 72], assert claims § 1983 claims against all the Individual Defendants, *i.e.*, he does not distinguish among the officers. The Individual Defendants have not asserted that a specific individual officer is entitled to summary judgment as to a particular § 1983 claim because he or she was not sufficiently involved in the alleged constitutional violation. *See, e.g., Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997) ("We reiterate that personal involvement is a prerequisite for individual liability in a § 1983 action."). The Court has no obligation, and, indeed, cannot make arguments on behalf of parties that they may have missed. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (holding that "just as a district court is not required to scour the record looking for factual disputes, it is not required to scour the party's various submissions to piece together appropriate arguments" because "[a] court need not make the lawyer's case"). Therefore, unless a specific claim is made on behalf of a specific defendant, any argument concerning lack of personal involvement is deemed waived for purposes of the Court's rulings on the instant motions.

A cause of action may be brought under 42 U.S.C. § 1983 against "[e]very person who, under color of statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." In evaluating the constitutionality of law enforcement's conduct, the Court "must 'carve up the incident into segments and judge each on its own terms to see if the officer[s] w[ere] reasonable at each stage.'" *Estate of Williams v. Ind. State Police*, 26 F. Supp. 3d 824, 842 (S.D. Ind. 2014) (quoting *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999)) (alternations original). Therefore, the Court examines in turn each segment of the Individual Defendants' actions toward Mr.

24

Mwangangi on the evening October 7, 2017.

**A.  The Initial Seizure with Officer Nielsen's Red-and-Blue Lights**

The first discrete action by law enforcement on October 7, 2017 was Officer Nielsen's seizure[7] of Mr. Mwangangi when she pulled behind his Crown Victoria at the Speedway and activated her red-and-blue lights.  Mr. Mwangangi argues that the information known to law enforcement at the time Officer Nielsen detained him by activating her lights—the 865 Dispatch, the Speedway Dispatches, and what Officer Nielsen was able to observe in the moment between her arrival at the scene and the activation of her lights—was insufficient to establish a reasonable suspicion to support an investigatory *Terry* stop and therefore he is entitled to summary judgment. [Filing No. 77 at 19-20.]  Mr. Mwangangi largely focuses his arguments on the information Officer Nielsen would have heard via the dispatches and contends that the 865 Dispatch provided "no information about the basis for the suggested [Indiana State Police] interest" in the Crown Victoria for impersonating a police officer because "[n]o illegal activity was identified," nor was information about a caller or the existence of a caller provided.  [Filing No. 77 at 20.]   Mr. Mwangangi argues that from the information provided via the dispatches, the Individual Defendants "had no way of knowing who had labeled the [v]ehicle as a 'possible police impersonator' or if that person had any training or understanding of the factors relevant to such a legal conclusion," and therefore the dispatches lacked sufficient reliability to support reasonable

---

[7] Mr. Mwangangi and the City Defendants agree that Officer Nielsen's activation of her red-and-blue lights constituted a seizure within the meaning of the Fourth Amendment because Mr. Mwangangi was not free to leave, [Filing No. 77 at 18; Filing No. 87 at 11], and the Court agrees. *See United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015) ("The crucial test for determining if there has been a seizure is whether taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.") (internal quotation marks and citation omitted).

suspicion.  [Filing No. 77 at 20.]  Mr. Mwangangi further argues that the Speedway Dispatches only established that the previously identified Crown Victoria had reportedly stopped a car at the Speedway with its lights on, but that the purportedly stopped car had already departed, and the Crown Victoria was now simply parked at a gas pump.  [Filing No. 77 at 21.]  Mr. Mwangangi argues that none of these activities are illegal or evidence of criminal activity giving rise to a reasonable suspicion, nor does the information in the dispatches describe an imminently dangerous situation which would otherwise afford the 911 call heightened reliability.  [Filing No. 77 at 21 (noting that the car supposedly pulled over by the Crown Victoria had left and the driver of the Crown Victoria was parked at a gas pump "doing nothing").]

In their Cross-Motion/Response, the City Defendants argue the contrary—that Officer Nielsen had a reasonable suspicion to initiate a *Terry* stop because she knew that "the [Indiana State Police] was looking for a possible police impersonator," "that the police impersonator had tried to pull someone over earlier," that the suspect vehicle was a blue Crown Victoria with the license plate SR393, that "the vehicle was headed north on I-65 towards Lebanon," and that "the vehicle was last spotted at the Speedway gas station possibly with another vehicle pulled over with lights on."  [Filing No. 87 at 11.]  Further supporting reasonable suspicion for a *Terry* stop, the City Defendants argue, once at the Speedway, Officer Nielsen confirmed the Crown Victoria matched the information provided by the dispatches, "saw a light bar in the back window, a sheriff supporter license plate, and noted that the windows had a very dark tint."  [Filing No. 87 at 11.] The City Defendants also argue that Mr. Washington's two 911 calls to Boone County Dispatch were sufficiently reliable to provide a basis for a reasonable suspicion because: (1) Mr. Washington reported specific information regarding the Crown Victoria's activities on the interstate, as well as the make, model, and license plate number; (2) Mr. Washington's first call

was placed "within minutes after the pullover attempt" and the second call was placed in real time as he observed Mr. Mwangangi at the Speedway; and (3) Mr. Washington never sought to remain anonymous.  [Filing No. 87 at 13.]   The City Defendants also argue that in addition to the information she possessed first-hand, "Officer Nielsen was permitted to rely upon the fact that [the Indiana State Police] had asked other agencies, including Lebanon, to be on the lookout for this exact vehicle in furtherance of her reasonable suspicions about the past criminal conduct."  [Filing No. 87 at 14.] Finally, the City Defendants emphasize that the Court must consider the totality of the circumstances, not whether isolated activities are illegal.  [Filing No. 87 at 14-15.]

Like the City Defendants, Officer Root argues that he is entitled to summary judgment because the *Terry* stop was supported by reasonable suspicion.  [*See* Filing No. 83 at 9.]  Officer Root acknowledges that although he "was not the first officer to arrive on the scene, he did participate in the initiation of the investigatory stop" of Mr. Mwangangi.  [Filing No. 83 at 9.] Officer Root argues that there was reasonable suspicion to initiate a *Terry* stop because the 865 and Speedway Dispatches identified the Crown Victoria as being a possible police impersonator, and Officer Root was subsequently able to verify the license plate number and match the vehicle description.  [Filing No. 83 at 9-10.] He further argues that 911 calls are inherently reliable because they present emergency circumstances.  [Filing No. 83 at 10-11 (citing *United States v. Drake*, 456 F.3d 771, 774-75 (7th Cir. 2006)).]  He also argues that "the dispatches did not suggest that the caller was anonymous and, indeed, it was either known or quickly determined that the complaining witness was, in fact, on the scene of the encounter virtually immediately after the encounter started."  [Filing No. 83 at 11.]

In his Consolidated Response and Reply, Mr. Mwangangi responds that while Officer Nielsen matched the Crown Victoria to the vehicle description in the dispatches, "[r]easonable

[s]uspicion analysis has almost nothing to do with identity[; r]ather, it is *conduct* (alleged, observed and/or corroborated) which controls the existence of [r]easonable [s]uspicion." [Filing No. 91 at 15 (emphasis original).]  Mr. Mwangangi also describes the 865 Dispatch and the Speedway Dispatches as "uncorroborated information, from a nameless source" that "a vehicle was pulled over at the Speedway (but left)" and "that the caller had been followed," which did not equate to illegal activity or ongoing danger. [Filing No. 91 at 16.]  Mr. Mwangangi counters the Individual Defendants' assertions that Mr. Washington's 911 calls were reliable because he was not anonymous by pointing out that "[p]rior to seizing [Mr. Mwangangi], [the Individual] Defendants were not informed of his name, his location, his vantage point, what he had observed or how long he had observed" Mr. Mwangangi.  [Filing No. 91 at 18.]

The City Defendants reply by reiterating that the information Officer Nielsen possessed prior to engaging her red-and-blue lights provided sufficient reasonable suspicion. [Filing No. 99 at 3-4.] They contend that "after receiving the dispatches regarding a possible police impersonator, learning that there existed a caller (witness), and locating the exact vehicle," it "was beyond reasonable for Officer Nielsen to have suspicions about the vehicle and its driver." [Filing No. 99 at 4.]

Officer Root replies by reiterating that 911 calls are inherently reliable and provide reasonable suspicion, even in the absence of details about the caller. [Filing No. 100 at 3.] He contends that the 865 and Speedway Dispatches provided Officer Root with "specific information of two (2) emergency situations that appeared to be occasioned by the same vehicle …. A police impersonator attempting to pull over and/or actually pulling over two (2) separate vehicles within a short period of time, late at night constitutes an emergency." [Filing No. 100 at 4.]

Mr. Mwangangi's Surreply disputes Officer Root's contention that the dispatches described two emergencies.  [Filing No. 103 at 1.]  He argues that the 865 Dispatch did not provide a description of any conduct underlying the request from state police to be on the lookout for a "possible police impersonator" to qualify as an emergency, and the Speedway Dispatches did not indicate an emergency situation because the dispatches themselves noted that the vehicle thought to have been pulled over had left.  [Filing No. 103 at 1.]

The Fourth Amendment protects individuals "against unreasonable searches and seizures."  U.S. CONST. amend. IV.  However, it does not prevent all encounters between the police and citizens.  It comes into play when a law enforcement officer "uses physical force or a show of authority to restrain the liberty of a citizen."  *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000).  To make an arrest, an officer needs probable cause to believe that a person has committed or is committing a crime.  *Id.*

Short of arrests, officers are also allowed to make "*Terry* stops," which are "investigatory stops limited in scope and executed through the least restrictive means reasonable."  *Id.* (citing *Terry v. Ohio,* 392 U.S. 1 (1968)).  Because *Terry* stops are made without warrants or probable cause, they are subject to limits.  *United States v. Lopez,* 907 F.3d 472, 478 (7th Cir. 2018).  Officers may carry out a *Terry* stop only when they "have a reasonable suspicion, grounded in specific and articulable facts" that an individual has committed a felony or is about to commit a crime.  *United States v. Hensley*, 469 U.S. 221, 229 (1985).  Reasonable suspicion is "something less than probable cause and more than a hunch."  *Swift*, 220 F.3d at 506.  To find that reasonable suspicion existed to justify a stop, courts "must examine the totality of the circumstances in the situation at hand, in light of the individual officers' own training and experience, and should uphold the stop if it finds that 'the detaining officer ha[d] a particularized

and objective basis for suspecting legal wrongdoing.'" *United States v. Williams*, 731 F.3d 678, 683-84 (7th Cir. 2013) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Determinations of probable cause and reasonable suspicion normally are mixed questions of fact and law, but when the facts are undisputed, the ultimate resolution of whether probable cause or reasonable suspicion existed becomes a question of law. *United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010).

"Because anonymous tips relayed to a police officer 'seldom demonstrate[] the informant's basis of knowledge or veracity,' they alone usually are not reliable enough to establish reasonable suspicion." *United States v. Watson*, 900 F.3d 892 (7th Cir. 2018) (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000)) (alterations original).  However, in *Navarette v. California*, 572 U.S. 393 (2014), the Supreme Court found that an anonymous 911 call alleging that a driver "ran the caller off the roadway" and providing the make, model and license plate number of the offending vehicle provided sufficient reasonable suspicion for a *Terry* stop. *Id.* at 399.  In so holding, the Court identified three factors that made the anonymous tip reliable enough to create reasonable suspicion: "the tipster (1) asserts eyewitness knowledge of the reported event; (2) reports contemporaneously with the event; and (3) uses the 911 emergency system, which permits call tracing." *Watson*, 900 F.3d at 895 (citing *Navarette*, 572 U.S. at 399-400).  Furthermore, officers are permitted to rely on information from callers, even if the caller is ultimately shown to be mistaken. *See, e.g.*, *United States v. Miranda-Sotolongo*, 827 F.3d 663, 669 (7th Cir. 2016) ("Reasonable suspicion … does not require the officer to rule out all innocent explanations of what he sees.  The need to resolve ambiguous factual situations—ambiguous because the observed conduct could be either lawful or unlawful—is a core reason the Constitution permits investigative stops."). *See also Hill v. Vill. of Crete*, 2008 WL 4559859, at *4 (N.D. Ill. Oct. 6, 2008) (finding reasonable suspicion to detain

individual to investigate gun that turned out to be the plaintiff's walking cane where: (1) "an individual contacted 911 to report that a firearm was in a vehicle parked at the Shell gas station"; (2) "there were not inconsistencies between the dispatcher's description of the suspect vehicle and plaintiff's vehicle"; and (3) "based on the circumstances known to [the officer] at the time of the stop," he "reasonably believed that [plaintiff] had a gun in his vehicle").

Also relevant here, the collective knowledge doctrine "permits an officer to stop, search, or arrest a suspect at the direction of another officer…even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion." *United States v. Williams*, 627 F.3d 247, 252-53 (7th Cir. 2010). This doctrine enables officers to stop a person based on "wanted" bulletins issued by other law enforcement agencies, so long as the collective knowledge of the agency on whose behalf the detaining officer acts had reasonable suspicion. *Id. See also United States v. Celio*, 945 F.2d 180, 183 (7th Cir. 1991) (finding probable cause where Illinois State Police stopped and searched a vehicle at the request of the DEA, based solely "on the bald assertion by the federal agents that they suspected drug trafficking"). In order for the collective knowledge doctrine to apply, "(1) the officer taking the action must act in objective reliance on the information received," (2) "the officer providing the information—or the agency for which he works—must have facts supporting the level of suspicion required," and (3) "the stop must be no more intrusive than would have been permissible for the officer requesting it." *Williams*, 627 F.3d at 252-53.

The parties' briefs spend a lot of time discussing whether Mr. Washington's 911 calls were sufficiently reliable anonymous calls to provide Officer Nielsen with reasonable suspicion to detain Mr. Mwangangi, but the parties do a poor job answering the threshold question of whether Mr. Washington's calls were, in fact, anonymous. [*See* Filing No. 77 at 20-22; Filing No. 83 at

10-11; Filing No. 87 at 12-14.]  A review of the record evidence shows that both Boone County

Dispatch and the Indianapolis State Police had Mr. Washington's name and telephone number from

his first call to 911 on the interstate.  [*See* Filing No. 77-7 at 53-54 (transcription of audio recording

of Boone County Dispatch relaying name and phone number to the Indiana State Police).]  Under

the collective knowledge doctrine, Mr. Washington's calls could not be considered anonymous at

the time Officer Nielsen pulled behind Mr. Mwangangi's Crown Victoria with her red-and-blue

lights engaged.  *See Williams*, 627 F.3d at 252-53.  *See also Drake*, 456 F.3d at 774 (finding caller

was not anonymous to detaining officer where caller had given her name to 911 operator as "she

saw the police coming down the street" because "[w]hen law enforcement officers are in

communication with one another, the question whether they possess reasonable suspicion for a

stop turns on their collective knowledge, and thus it is incorrect to describe the police as having

acted on an anonymous tip") (internal citations omitted).  Furthermore, even if Mr. Washington's

911 calls prior to Officer Nielsen's detention could be deemed anonymous, the calls were

sufficiently reliable under *Navarette* because Mr. Washington was (1) reporting first-hand

information; (2) reporting current activities (rather than alleging past criminal conduct); and (3)

still on the phone with dispatch at the time the officers arrived at the Speedway.  *See Navarette*,

572 U.S. at 399-400.

In addition to imputing knowledge of Mr. Washington's identity, the collective knowledge

doctrine also imputed to Officer Nielsen the information provided by Mr. Washington that had

prompted the Indiana State Police to issue a request to "be on the lookout" for Mr. Mwangangi's

Crown Victoria as a suspected police impersonator via the 865 Dispatch.  *See Williams*, 627 F.3d

at 252-53.  Specifically, Mr. Washington testified that he told the Indiana State Police that he "just

had a Crown Victoria that's not a police car attempt to pull [him] over with strobe lights in their

headlights." [Filing No. 77-13 at 117.] Officer Nielsen's activation of her red-and-blue lights to detain Mr. Mwangangi and inquire further was supported by the reasonable suspicion afforded by the information possessed by the Indiana State Police as provided by Mr. Washington. *See id.; see also United States v. Wimbush*, 337 F.3d 947, 950 (7th Cir. 2003) (finding reasonable suspicion where officer "halted the vehicle based on a general dispatch report, and the factual foundation for the description supplied was unknown to him"). Mr. Mwangangi argues throughout his briefing that the only relevant inquiry for assessing reasonable suspicion is what first-hand information Officer Nielsen possessed at the time she initially detained him, but the inquiry is not so limited under the collective knowledge doctrine.

Mr. Mwangangi also focuses on the notion that the isolated activities reported by Mr. Washington—such as flashing lights and parking at a gas station pump nose-to-nose to another vehicle—are not themselves illegal activities, and therefore cannot provide a basis for a reasonable suspicion. [*See* Filing No. 77 at 20-21; Filing No. 91 at 16.] However, this argument fails for two reasons. First, it ignores Mr. Washington's report that Mr. Mwangangi's Crown Victoria had attempted to pull him over on the interstate, which, if done while falsely representing himself to be a law enforcement official, is a crime under Ind. Code § 35-44.1-2-6(b). Second, when evaluating reasonable suspicion, the "relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *United States v. Sokolow*, 490 U.S. 1, 10 (1989).

In *Sokolow*, the Supreme Court determined that DEA agents had reasonable suspicion to detain a traveler where the traveler had paid for airplane tickets from Honolulu to Miami with cash, purchased the tickets under false names, did not check any luggage, and had scheduled a return flight to Honolulu that departed less than 48 hours after his arrival in Miami. *Id.* at 8-9. The Court

noted that "[a]ny one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel.  But we think taken together they amount to reasonable suspicion." *Id.* at 9.  Under *Terry* and its progeny, Officer Nielsen was not required to establish that Mr. Mwangangi had committed a crime prior to detaining him with her red-and-blue lights.  *See, e.g.*, *United States v. Raibley*, 243 F.3d 1069, 1074 (7th Cir. 2001) ("We readily agree with [defendant] that the facts known to [the law enforcement officer] did not, standing alone, establish a violation of the stalking statute.  But *Terry* does not require proof that a crime has occurred; it demands only such facts as are necessary to support a reasonable suspicion that a crime may have occurred.").

In sum, at the time Officer Nielsen pulled her vehicle behind Mr. Mwangangi at the Speedway and activated her red-and-blue lights, Officer Nielsen had a "particularized and objective basis for suspecting legal wrongdoing" that warranted reasonable further investigation. *See Arvizu*, 534 U.S. at 273.  By that time, she possessed the following information, either first-hand or through the collective knowledge doctrine: (1) an identified 911 caller had reported that a blue Crown Victoria with license plate SR393 had attempted to pull him over on the interstate by using flashing strobe lights; (2) the Crown Victoria was headed in the direction of Lebanon; (3) the same 911 caller had spotted the Crown Victoria at the Speedway and it had pulled nose-to-nose with another vehicle; and (4) the Crown Victoria at the Speedway matched the description of the vehicle and license plate identified by the 911 caller.  Mr. Mwangangi's attempts to challenge the reliability of Mr. Washington's 911 calls are undermined by the collective knowledge doctrine and the reliability factors identified in *Navarette*.  To the extent that Officer Root also helped initiate the *Terry* stop, he is imputed with the same knowledge as Officer Nielsen, and therefore his actions were reasonable for the same reasons.

### B. Reasonableness of the Investigatory *Terry* Stop

The conclusion that Officer Nielsen and Officer Root had a reasonable suspicion to initially stop Mr. Mwangangi does not preordain as constitutional all of the activities that followed.  That is because the "'central inquiry' in determining whether a *Terry* stop is legal focuses on 'the reasonableness in all the circumstances of the particular governmental invasion' of a person's 'personal security.'"  *Lopez*, 907 F.3d at 479  (quoting *Terry*, 392 U.S. at 19).  A *Terry* investigative stop is "a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity."  *United States v. Vega,* 72 F.3d 507, 515 (7th Cir. 1995) (quotation omitted).  For an investigative stop based on reasonable suspicion to pass constitutional muster, the investigation that follows the stop "must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests."  *United States v. Robinson,* 30 F.3d 774, 784 (7th Cir. 1994) (citing *United States v. Sharpe,* 470 U.S. 675, 685-86 (1985)).  The Seventh Circuit uses a sliding-scale approach to assess the reasonableness of an investigatory stop.  *United States v. Bullock*, 632 F.3d 1004, 1014-15 (7th Cir. 2011).  "[S]tops too intrusive to be justified by suspicion under *Terry,* but short of custodial arrest, are reasonable when the degree of suspicion is adequate in light of the degree and the duration of restraint."  *Id.* at 1015 (quoting *United States v. Chaidez,* 919 F.2d 1193, 1198 (7th Cir. 1991)).

A *Terry* stop based on reasonable suspicion "can ripen into a de facto arrest that must be based on probable cause if it continues too long or becomes unreasonably intrusive."  *Bullock*, 632 F.3d at 1015.  Such a transformation occurs when an officer's use of force "is sufficiently disproportionate to the purpose of the stop—which may include ensuring the safety of the officers or others—in light of the surrounding circumstances*." Matz*, 769 F.3d at 524-25.  *See also United*

35

*States v. Adamson*, 441 F.3d 513, 520 (7th Cir. 2006) ("There is no brightline rule as to how long an investigative detention may last; instead we look to whether the police diligently pursued a means of investigating that was likely to confirm or dispel quickly their suspicions.").   In evaluating whether an investigative detention is unreasonable, "common sense and ordinary human experience must govern over rigid criteria."  *Sharpe*, 470 U.S. at 685.

Mr. Mwangangi contends that even if Officers Nielsen and Root had reasonable suspicion to initially detain him, aspects of the investigation that followed exceeded the scope of the initial stop such that the investigatory detention was transformed into an arrest requiring probable cause. Each aspect of the investigatory detention identified by Mr. Mwangangi as problematic is addressed below.

### 1. *Officer Nielsen Ordering Mr. Mwangangi Out of the Crown Victoria*

Mr. Mwangangi contends that Officer Nielsen ordering him out of his Crown Victoria without asking basic questions such as "Who are you and what are you doing here?" rendered her order to exit unreasonable under the circumstances.[8]   [Filing No. 77 at 26.]  He argues that "[f]ailing to make any effort to seek basic information from Mr. Mwangangi before ordering him out of his car demonstrates that this was never a *Terry* stop, aimed at using the least intrusive

---

[8] Mr. Mwangangi's Initial Motion includes a separate heading entitled "Officer Nielsen's Lack of Inquiry," [Filing No. 77 at 26-27], suggesting Mr. Mwangangi is asserting that Officer Nielsen's *Terry* stop independently violated the Fourth Amendment because she did not ask more questions. Mr. Mwangangi does not develop this argument and cites no cases in support of this theory.  To be sure, the Seventh Circuit has stated that a police officer may not close his or her eyes to facts that would help clarify the circumstances of an arrest, *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1016 (7th Cir. 2006), however this is a factor to be considered when assessing whether an investigatory stop was reasonable or whether an officer possessed reasonable suspicion or probable cause, not a mandate that law enforcement is *required* under the Fourth Amendment to ask more questions.  To the extent Mr. Mwangangi is advancing such an argument, the Court rejects it.  The Court will consider the limited inquiry in assessing whether the stop was reasonably executed and whether it was reasonable for officers to believe that probable cause existed.

means of addressing suspicions.  This was, from its inception, intended to be an arrest."  [Filing No. 77 at 26.]  He also argues that the order to exit was unreasonable because "there were no reports of weapons, violence, or a volatile situation," and "[n]othing seen in the car was illegal or suggested danger."  [Filing No. 77 at 27.]  He also points to deposition testimony from Officer Root in which he testified that he orders individuals out of their vehicles "because we can," rather than due to a specified concern, and argues that neither the Supreme Court nor the Seventh Circuit has held that reasonable suspicion affords law enforcement "unfettered discretion" to order occupants out of a vehicle.  [Filing No. 77 at 28.]

In their Cross-Motion/Response, the City Defendants contend that "Officer Nielsen was not required to conduct further inquiry before asking [Mr. Mwangangi] to step out of his vehicle because she had reasonable suspicion to believe he was armed or dangerous."  [Filing No. 87 at 17.]  They point to Officer Nielsen's knowledge that Mr. Mwangangi's Crown Victoria was previously identified as being driven by a possible police impersonator, which meant that the Crown Victoria and its occupant may have access to "the same tools as a member of law enforcement," as well as the Crown Victoria's tinted windows, which made it difficult to see inside.  [Filing No. 87 at 17.]  All of this together, the City Defendants argue, made it reasonable for Officer Nielsen to ask Mr. Mwangangi to step out of his vehicle.  [Filing No. 87 at 17.]

In his Consolidated Response and Reply, Mr. Mwangangi takes issue with the assertion that Officer Nielsen had reason to believe Mr. Mwangangi posed a danger.  [Filing No. 91 at 19.]  He points out that his Crown Victoria and all equipment in it were legal and therefore cannot support a reasonable belief that Mr. Mwangangi was armed or dangerous.  [Filing No. 91 at 19.]

The City Defendants reply that asking Mr. Mwangangi to step out of his vehicle was a *de minimis* intrusion and cite *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), for the proposition that

"because traffic stops expose officers to the risks of passing cars and unseen movements of the stopped driver, the '*de minimis*' intrusion of ordering the driver out of the car is generally justified." [Filing No. 99 at 6.]

In *Mimms*, the Supreme Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." 434 U.S. at 111 n.6. The order is justified even if, as in *Mimms*, the officer has "no reason to suspect foul play from the particular driver at the time of the stop." *Id.* at 109. Ordering an occupant to exit the vehicle is warranted while an officer completes the mission of the investigatory detention. *See United States v. Thompkins*, 833 F. App'x 648, 650 (7th Cir. 2020) (finding that "officer safety justifies ordering a driver from a car during a genuinely unconcluded investigation").

Here, Officer Nielsen ordered Mr. Mwangangi out of the car within seconds after approaching the Crown Victoria and after asking him if he was a law enforcement officer. At the time of the order, Officer Nielsen knew that Mr. Mwangangi's vehicle was suspected of attempting to pull over another vehicle on the interstate. Officer Nielsen had also seen equipment inside the Crown Victoria that she believed was similar to equipment law enforcement officials use. [*See* Filing No. 77-3 at 103.] Ordering Mr. Mwangangi to step out of the Crown Victoria so that law enforcement could safely further investigate whether Mr. Mwangangi was attempting to pull over vehicles while falsely holding himself out as a police officer was reasonable under these circumstances. *See Thompkins*, 833 F. App'x at 650.

While the Court is troubled by Officer Root's testimony that he believes it was appropriate for Officer Nielsen to order Mr. Mwangangi out of the car "because we can," it was Officer Nielsen who ordered Mr. Mwangangi to exit the vehicle, and, in any event, the standard for assessing the

reasonableness of an investigatory stop is objective, not subjective.  *See Whren v. United States*, 517 U.S. 806, 813 (1996) (holding that constitutional reasonableness of stops is an objective standard that does not depend "on the actual motivations of the individual officers involved"). While Officer Root's attitude demonstrates a poor approach to policing that undermines law enforcement efforts, the objective facts here support a finding that Officer Nielsen's order to exit the car was reasonable and within the scope of the suspicion she was investigating.  Therefore, summary judgment is granted to the Individual Defendants as to Mr. Mwangangi's claim that ordering him out of the Crown Victoria violated the Fourth Amendment.

### 2.  *Law Enforcement Vehicles "Boxing In" Mr. Mwangangi*

Mr. Mwangangi argues in his Initial Motion that the responding officers "escalated this encounter into a full arrest" when, as Mr. Mwangangi was being removed from the Crown Victoria, a "horde of police vehicles, seven (7) in total, arrived with Red and Blues engaged, surrounding [Mr. Mwangangi] on three (3) sides," and he is entitled to summary judgment on this issue. [Filing No. 77 at 25.]  He argues that "[a] throng of police descending on a citizen, in overwhelming numbers, is not the least intrusive means to address suspicions."  [Filing No. 77 at 25.]  Mr. Mwangangi appears to argue that this response and the "boxing in" by police vehicles converted his initial detention into an arrest requiring probable cause.  [Filing No. 77 at 26.]

The City Defendants do not respond to Mr. Mwangangi's argument in their Cross-Motion/Response.  [*See* Filing No. 87.]  Officer Root does not respond to this argument either. [*See* Filing No. 79; Filing No. 83.]  In his Consolidated Response and Reply, Mr. Mwangangi reiterates the arguments advanced in his Initial Motion.  The City Defendants and Officer Root do not address the argument in their respective Replies.  [*See* Filing No. 99; Filing No. 100.] Defendants have waived any argument in opposition to this issue by not addressing it in their

briefs.

As stated above, a *Terry* stop based on reasonable suspicion can transform into an arrest requiring probable cause "if it continues too long or becomes unreasonably intrusive." *Bullock,* 632 F.3d at 1015. While the quantity of police response is certainly a relevant factor in consideration of whether a detention has been converted into an arrest, the Fourth Amendment does not limit the amount of assistance that an officer may receive from other officers. *See McNair v. Coffey,* 279 F.3d 463, 466 (7th Cir. 2002) ("[N]othing in the fourth amendment specifies how many officers may respond to a call. The number of officers is not independently a 'seizure' of any kind."). Thus, the response from other Officers and the three-sided "boxing" in of the Crown Victoria, standing in isolation, did not convert Mr. Mwangangi's detention into arrest. However, as discussed more thoroughly below, the overwhelming police response, coupled with the frisks and handcuffing of Mr. Mwangangi, pushed the investigatory *Terry* detention over the line into an arrest because the stop became "unreasonably intrusive" and beyond the scope warranted by the permissible by a reasonable suspicion. *See Bullock,* 632 F.3d at 1015.

### 3. Officer Root's Pat Down of Mr. Mwangangi

Mr. Mwangangi contends that Officer Root's pat down of him was unreasonable, noting that Officer Root testified that he had no reason to believe that Mr. Mwangangi had a weapon like a knife or gun on his person and therefore lacked an articulable suspicion to support the pat down. [Filing No. 77 at 30.] Mr. Mwangangi further argues that Officer Root's pat down was unwarranted because by the time Officer Root conducted the pat down, additional police vehicles had arrived at the scene and numerous officers were mere feet away from Officer Root and Mr. Mwangangi. [Filing No. 77 at 30.]

In his Cross-Motion, Officer Root argues that the pat down was necessary to ensure safety because he "was unable to see clearly what was occurring inside the [Crown Victoria] prior to [Mr. Mwangangi's] exit due to the tint on the window." [Filing No. 83 at 12.] He adds that the detention of Mr. Mwangangi had occurred late at night, and "[w]hen [Mr. Mwangangi] exited the car, [Officer] Root noticed that his pants were undone,[9] and [Mr. Mwangangi] responded nervously" when questioned about his pants. [Filing No. 83 at 12.] He also argues that although he may not have suspected that Mr. Mwangangi possessed a traditional weapon, such as a gun or a knife, in Officer Root's experience, "multiple objects could be used as a weapon," justifying the pat down. [Filing No. 83 at 12-13.] Officer Root also cites the prior reports that Mr. Mwangangi had attempted to pull over a car on the interstate as providing a "reasonable suspicion to perform a minimally invasive pat down." [Filing No. 83 at 13.]

In his Consolidated Response and Reply, Mr. Mwangangi notes that Officer Root had never investigated a case of police impersonation and that while it may have been nighttime, Officer Root "was responding to a well-lit and highly traveled gas station … not known for being … a dangerous crime zone." [Filing No. 91 at 20.] He also notes that as Officers Root and Nielsen approached the Crown Victoria, Mr. Mwangangi "sat patiently, with his hands in the 10/2 position" and that Mr. Mwangangi was "polite and cooperative, responding promptly to all police orders," and was not evasive in responding to Officer Nielsen's initial questioning. [Filing No. 91 at 20.] As for Officer Root's claim that he believed Mr. Mwangangi was armed and dangerous because of his "nervous" responses to questions about his pants, Mr. Mwangangi correctly notes that Officer Root did not begin questioning Mr. Mwangangi about his pants until *after* he had been subject to

---

[9] This misrepresents the record; the record evidence is that Mr. Mwangangi's belt buckle was unbuckled, not that his "pants were undone." [Filing No. 77-2 at 10-11.]

Officer Root's pat down and placed in handcuffs.  [Filing No. 91 at 8 (citing Filing No. 76 (Ex. 9, Root Bodycam at 0:00-0:53)).]

In reply, Officer Root concedes that he did not question Mr. Mwangangi about his pants until after the pat down and cuffing.  [Filing No. 100 at 2.]  He also notes that the test for a reasonable suspicion is objective, not subjective, and reiterates that he was unable to see inside Mr. Mwangangi's Crown Victoria, that it was dark outside, and that he had received reports that the Crown Victoria had attempted to pull over a vehicle on the interstate.  [Filing No. 100 at 6.]

During an investigatory *Terry* stop, officers may conduct a pat down search to determine whether the person is carrying a weapon "if the officer has an articulable suspicion that the subject is armed and dangerous." *Carlisle*, 614 F.3d at 755.  The inquiry is an objective one.  *United States v. Barnett*, 505 F.3d 637, 640 (7th Cir. 2007) (finding frisk was supported by an articulable suspicion "even if [the officers] did not subjectively fear [the defendant] was armed when they announced that they intended to frisk him, because the legitimacy of their search stemmed at all times from whether a protective frisk for weapons was objectively reasonable under the circumstances").  Furthermore, some crimes by their very nature are suggestive of the presence and use of weapons and "a reasonable suspicion that someone has committed or is about to commit a burglary or another crime typically involving a weapon generally gives rise to a reasonable suspicion that the person might be armed." *Green v. Newport*, 868 F.3d 629, 635 (7th Cir. 2017).

It is worth emphasizing that officers may not conduct pat downs as a matter of right. "What we blandly call '*Terry* stops' can be highly intrusive.   When combined with a frisk … a *Terry* stop first deprives a person of liberty and then involves 'a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons ... performed in public by a policemen while the citizen stands helpless, perhaps facing a wall with his hands

raised.'" *Lopez*, 907 F.3d at 478 (quoting *Terry*, 392 U.S. at 16-17). "That's not just 'a petty indignity,'" but "'a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly.'" *Id.* (quoting *Terry*, 392 U.S. at 17). Absent a suspicion of a crime that involves a weapon in the usual course, an officer must identify facts that suggest a danger and that are not so generalized that they would apply to most of the population. *See Doornbos v. City of Chicago*, 868 F.3d 572, 582 (7th Cir. 2017).

In *Doornbos*, the Seventh Circuit concluded that a pat down was improper where the justifications cited by the officer were "so general they would have applied to everyone at the station," including that "it was a high-crime area," "it was dark," and plaintiff "was wearing a jacket with 'deep pockets' in which he 'could have hidden anything'" during February in Chicago. *Id.* The court found that "[w]ithout more, such justifications are too general because they could be applied to practically any person that had been around the area when the officers showed up that night." *Id.*

To "proceed from a stop to a frisk," Officer Root "was required to have reasonable suspicion that [Mr. Mwangangi] was armed and dangerous." *See id.* Officer Root has provided the following reasons: it was dark, he could not see inside Mr. Mwangangi's Crown Victoria, "anything" can be used as a weapon (such as windshield wiper fluid), and Mr. Mwangangi had reportedly attempted to pull over another vehicle on the freeway with strobe lights. [Filing No. 83 at 12-13.] The problem with three of Officer Root's reasons is that much like *Doornbos*, the justifications that it was dark, he could not see inside the Crown Victoria, and anything in a person's surroundings could be used as a weapon are so general that they would apply to practically any person at the Speedway that evening. *See id.*

43

As for Mr. Mwangangi being the subject of an investigation for police impersonation, none of the information provided to Officer Root that evening suggested that the driver of the Crown Victoria had brandished a weapon or had been aggressive towards anyone beyond flashing strobe lights.  In fact, of the two purported victims, Officer Root knew that the vehicle that had been parked nose-to-nose to the Crown Victoria had already left the Speedway without incident, and Mr. Washington had simply continued driving on the interstate after Mr. Washington passed him without incident.

In addition to Officer Root's explanations falling short, other circumstances that evening suggested that Mr. Mwangangi was neither armed nor dangerous.  Officer Root concedes that Mr. Mwangangi was cooperative, polite, and responded promptly to all orders from law enforcement.  [Filing No. 77-4 at 78.]  The gas station was well lit, and by the time Officer Root was patting down Mr. Mwangangi, he could see that numerous other law enforcement officers were on the scene or arriving on the scene.  [Filing No. 76 (Ex. 9, Root Bodycam at 0:00-0:30)].

In light of the foregoing, the Court finds that the undisputed facts establish that Officer Root lacked a reasonable suspicion that Mr. Mwangangi was armed or otherwise dangerous, and his pat down of Mr. Mwangangi violated the Fourth Amendment.  And Mr. Mwangangi is entitled to judgment as to liability.

### 4.  *Officer Root's Handcuffing of Mr. Mwangangi*

Mr. Mwangangi asserts that Officer Root's handcuffing of him at the Speedway was unreasonable and amounted to an arrest requiring probable cause.  [Filing No. 77 at 30-31.]  He argues that the handcuffing "was not a reasonably graduated response," that there was "no volatility or danger," that Mr. Mwangangi was "cooperative, surrounded by armed police, had been patted down and was about to be taken to a distant spot" from the Crown Victoria.  [Filing No. 77 at 31.]

He contends that although the Seventh Circuit has found that in certain circumstances, handcuffing during a *Terry* stop may be reasonable, the Court has also emphasized that such instances should be "rare" and notes that Officer Root testified that the decision to handcuff during a *Terry* detention is purely a matter of officer discretion, not based on any particular objective criteria. [Filing No. 77 at 31.] Mr. Mwangangi also contends that Officer Nielsen's testimony that it is the City's policy that once an individual is placed into handcuffs, the handcuffs remain on throughout the duration of the detention, regardless of new information or changed circumstances, further demonstrates that his placement in handcuffs and the continued use of handcuffs was predetermined and not based on the circumstances at the Speedway. [Filing No. 77 at 31-32.]

Officer Root seeks summary judgment in his favor, arguing that handcuffing is permissible during an investigatory detention, and that the use of handcuffs "does not automatically convert an investigatory stop into an arrest." [Filing No. 83 at 13 (citing *United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007)).] Officer Root contends that he had reason to believe that Mr. Mwangangi posed a danger and cites his inability to see inside the Crown Victoria, Officer Root's assessment that Mr. Mwangangi exhibited nervous behavior when questioned about his pants, and the report that Mr. Mwangangi had attempted to pull over another vehicle on the interstate. [Filing No. 83 at 14-15.] Officer Root contends that the information provided by dispatch concerning Mr. Washington's allegations provided him "reasonable cause to believe a crime had been committed by [Mr. Mwangangi] to justify a brief detention using handcuffs while [the officers] sorted the matter out." [Filing No. 83 at 15.]

In their Cross-Motion/Response, the City Defendants contend that the use of handcuffs was reasonable and did not convert the *Terry* detention into an arrest because an allegation of police impersonation is "a high priority call," which "carried the potential to escalate because police

impersonators often have available to them the same tools, and/or weapons, as police." [Filing No. 87 at 18.]

In his Consolidated Response and Reply, Mr. Mwangangi takes issue with the City Defendants' assertion that the crime of police impersonation is inherently dangerous. [Filing No. 91.] He contends that "even if some type of hypothetical statistical information existed" to support their claim that police impersonation is inherently dangerous, "there is no suggestion that any Defendant was aware" of such hypothetical information, and, in fact, none of the responding officers had previously been involved in a police impersonation case. [Filing No. 91 at 21.] He also points out that none of the information conveyed by the dispatches suggested that the alleged attempt to pull over Mr. Washington involved "police tools" or weapons. [Filing No. 91 at 21.] In response to Officer Root's contentions, Mr. Mwangangi once again correctly points out that the alleged nervous behavior exhibited by Mr. Mwangangi when questioned about his pants did not occur until *after* Mr. Mwangangi was in handcuffs. [Filing No. 91 at 21.] He reiterates that under Seventh Circuit case law, officers are not entitled to handcuff individuals during a *Terry* detention as a matter of right; rather, they must have some articulable rational basis for believing the suspect poses a risk. [Filing No. 91 at 22.]

Officer Root replies that placing Mr. Mwangangi in handcuffs was objectively reasonable under the circumstances, reiterating that impersonating a police officer is a serious crime. [Filing No. 100 at 7.] He further contends that because reasonable suspicion existed to initiate the *Terry* stop of Mr. Mwangangi, "some degree of physical coercion is appropriate." [Filing No. 100 at 7.]

The City Defendants do not address Officer Root's handcuffing in their Reply. [*See* Filing No. 99.]

46

The Seventh Circuit has made clear that while the use of handcuffs to ensure officer safety in a *Terry* stop does not automatically transform the stop into to an arrest, "that does not mean that law enforcement has carte blanche to handcuff routinely." *Ramos v. City of Chicago*, 716 F.3d 1013, 1018 (7th Cir. 2013). "Although the hallmarks of formal arrest such as applying handcuffs, drawing weapons, and placing suspects in police vehicles should not be the norm during an investigatory detention, all of those measures have been recognized as appropriate in certain circumstances." *Matz*, 769 F.3d at 526. *See also United States v. Tilmon*, 19 F.3d 1221, 1224-25 (7th Cir. 1994) (noting "for better or for worse" the trend of expanding *Terry* stops to include "the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons, and other measures of force more traditionally associated with arrest than with investigatory detention"). In evaluating whether the force used, including handcuffing, converted an encounter into a full arrest, courts must consider "whether the surrounding circumstances would support an officer's legitimate fear for personal safety." *Matz*, 769 F.3d at 526. In undertaking this assessment, courts should also consider "the suspect's own behavior in resisting an officer's efforts." *Id.*

In *Matz,* the Seventh Circuit concluded that the drawing of guns and use of handcuffs was reasonable under the circumstances and did not *de facto* convert a *Terry* detention into an arrest. 769 F.3d at 526. The Court noted that the suspect, who was a member of the Latin Kings gang, was suspected of having committed an armed robbery and possibly a murder. *Id.* at 523. Furthermore, the police officers, who were on foot, were outnumbered by the individuals in a moving car that the police believed contained the suspect. *Id.* The Court found that handcuffing and frisking the individuals in the vicinity of the suspect was reasonable because the plaintiff and everyone else in the vicinity had already made clear that they did not intend to remain where they

47

were and speak to the police, and so police could reasonably have believed handcuffing the occupants of the car was the most safe and efficient way to ascertain the suspect's whereabouts and any pertinent information about his suspected crimes. *Id.* at 526. Notably, in reaching this conclusion, the Seventh Circuit issued the following admonition:

> Although we conclude that the officers' safety and the dynamic situation they confronted justified using force and restricting [the plaintiff's] movement, *we again caution law enforcement officers that in the ordinary case a Terry stop should not be functionally indistinguishable from a full-blown arrest.* Of particular cause for concern in this regard is [an officer's] deposition testimony that he considers such detentions with handcuffs as part of "normal" police work: "[W]e detain people all the time. We handcuff them, we find out it's all legitimate, talk to them, let them go. It's part of daily police work." On the contrary, we remind law enforcement that using handcuffs generally signifies an arrest, which requires probable cause and not the less demanding reasonable suspicion standard that permits only a brief and minimally intrusive detention. Indeed, the fact that we have recognized exceptions for concerns such as officer safety should not be read to imply that the use of handcuffs and more intrusive measures will not be a significant factor in assessing whether officers have exceeded the bounds of a limited *Terry* detention.

*Id.* at 527 (emphasis added). At all times, the critical question in assessing the degree of force used is "whether the degree of intrusion [is] reasonably related to the known facts." *Tilmon*, 19 F.3d at 1224.

Here, the use of handcuffs following an illegal pat down by Officer Root, all while Mr. Mwangangi was surrounded by no fewer than seven police vehicles, well exceeded the degree of intrusion called for by the facts known to the officers. When Mr. Mwangangi was placed in handcuffs, his seizure amounted to a *de facto* arrest. For the same reasons the known facts did not support Officer Root's pat down of Mr. Mwangangi, they also did not support the use of handcuffs. Nothing about Mr. Mwangangi's activities that formed the basis of the investigation for suspicion of police impersonation suggested violence or the use of weaponry, in fact, the last update from Mr. Washington was that Mr. Mwangangi was sitting in his car, doing nothing. Mr. Mwangangi

48

was cooperative, polite, and responsive throughout the encounter; he made no evasive movement or otherwise took action to get away from the officers.  And, by the time he was placed in handcuffs, Mr. Mwangangi had already been frisked for weapons, further alleviating any purported safety concern.  Furthermore, the Speedway was well lit, and Mr. Mwangangi was outnumbered by law enforcement officers by a ratio of 7:1.

Officer Root did not have carte blanche to handcuff Mr. Mwangangi as part of the *Terry* stop.  *See Ramos*, 716 F.3d at 1018.  The use of handcuffs was not supported by reasonable safety concerns and had no relation to the purpose for which Mr. Mwangangi was originally stopped— to investigate his Crown Victoria allegedly attempting to pull over a vehicle by flashing strobe lights on the interstate.  *See Matz*, 769 F.3d at 526.  By the time Mr. Mwangangi was placed in handcuffs, the encounter was indistinguishable from a full-blown arrest.  *See id.*  The Court finds that the use of handcuffs was unreasonable, exceeded the scope of the *Terry* stop, and converted the *Terry* stop into an arrest requiring probable cause.  Mr. Mwangangi is entitled to judgment as to liability, unless the officers can establish that they had probable cause to arrest him.

### 5.  *Officer Noland's Second Pat Down of Mr. Mwangangi*

Mr. Mwangangi's Initial Motion also asks the Court to grant him summary judgment finding Officer Noland's second pat down of Mr. Mwangangi to be unjustified.  [Filing No. 77 at 32.]  Mr. Mwangangi cites Officer Noland's testimony that at the time he performed the second pat down, he had no articulable facts suggesting that Mr. Mwangangi was armed or otherwise dangerous.  [Filing No. 77 at 32.]  He also argues that by the time Officer Noland performed the second pat down, Mr. Mwangangi had already effectively been arrested.  [*See* Filing No. 77 at 32.]

In response, the City Defendants contend that they are entitled to summary judgment because the second pat down was reasonable and did not convert the encounter into an arrest.

49

[Filing No. 87 at 19.]  The City Defendants contend that Officer Noland conducted the second pat down "to confirm [Mr. Mwangangi] had no weapons on his person for safety reasons because he still considered [Mr. Mwangangi] to be a threat."  [Filing No. 87 at 20.]  The City Defendants argue that the search was reasonable under the Fourth Amendment because it was justified and "non-intrusive."  [Filing No. 87 at 20.]

In his Consolidated Response and Reply, Mr. Mwangangi contends that the arguments in the City Defendants' Cross-Motion/Response are not "plausible legal or factual defense[s]" and reincorporates the arguments made in his Initial Motion.  [Filing No. 91 at 24.]

In reply, the City Defendants argue that the reasonableness inquiry is an objective one, and therefore it does not matter whether Officer Noland personally viewed Mr. Mwangangi to be a threat or that his practice is to frisk anyone he comes into contact with that has been detained or arrested.  [Filing No. 99 at 7-8 (citing *United States v. Tinnie*, 629 F.3d 749, 753-54 (7th Cir. 2011)).]  The City Defendants further argue that "[i]t did not matter that Officer Root performed his own pat down, Officer Noland wanted to verify safety for all involved."  [Filing No. 99 at 8.]

To justify a warrantless pat down search without probable cause, an officer must point to specific and articulable facts indicating that the individual may be armed and present a risk of harm to the officer or to others.  *Carlisle*, 614 F.3d at 755.  As discussed above, by the time Officer Root conducted the second pat down, Mr. Mwangangi was already subject to an arrest requiring probable cause.

Even if the detention had not been converted to an arrest, the Court finds that the second pat down was unreasonable.  Officer Noland's second pat down was unreasonable for all the reasons Officer Root's initial pat down was unreasonable.  But Officer Noland's second pat down was even more unreasonable because he personally witnessed Officer Root complete the first pat

down and Mr. Mwangangi was in handcuffs.  *See United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013) (holding an officer may perform a second pat down only when the officer has a "credible reason to believe that [the officer] might have missed a dangerous weapon" the first time).  Mr. Mwangangi is entitled to summary judgment against Officer Noland unless Officer Noland can establish probable cause existed to arrest Mr. Mwangangi.

### 6.   *Refusal to Loosen or Remove Handcuffs*

Mr. Mwangangi's Initial Motion also states that he seeks summary judgment finding that Officers Nielsen, Root, and Noland's "refusal to loosen or take off the handcuffs during the alleged *Terry* Stop, violated the Fourth Amendment" because "this/these act(s) exceeded or recklessly disregarded, the scope of a *Terry* stop" and because "this/these act(s), either individually or viewed cumulatively with prior police actions, represented a loss of liberty of movement consistent with an arrest, without probable cause."  [Filing No. 74 at 4.]  However, Mr. Mwangangi does not further develop this argument in his briefing.  [*See* Filing No. 77.]

The Court has already concluded that the use of handcuffs was not reasonable, and Mr. Mwangangi's stop had been converted into an arrest.  The continued use of the handcuffs, absent a showing of probable cause, is problematic for the same reasons.

## C.  False Arrest

Having found that Mr. Mwangangi was under arrest at the time Officer Root placed him in handcuffs, the Court must determine if probable cause existed to arrest Mr. Mwangangi at that time or at any time during the encounter, and, if not, whether qualified immunity precludes liability.

1.  *Probable Cause to Arrest*

Mr. Mwangangi asks this Court to enter judgment in his favor on his claim that the officers did not have probable cause to arrest him on a charge of impersonating a police officer under Ind. Code § 35-44.1-2-6(b).  [Filing No. 74 at 4.]  He contends that "[a]fter a one (1) minute discussion with the caller(s), without any discussion with [Mr. Mwangangi], Sgt. Phelps decided that [Mr. Mwangangi] was going to jail and that the police would search his [v]ehicle without a warrant." [Filing No. 77 at 33.]  He notes that "[w]hite strobe lights and a left-turn signal neither indicate someone is being pulled over nor that a driver is representing herself/himself as a police officer." [Filing No. 77 at 33.]

In their Cross-Motion/Response, the City Defendants contend judgment should be entered in their favor because "probable cause to arrest Plaintiff existed from the inception of the encounter," and even assuming it did not, "the additional information collected [from Mr. Washington and his passenger] during [Mr. Mwangangi's] detention established probable cause to arrest [Mr. Mwangangi] on suspicion that he impersonated law enforcement."  [Filing No. 87 at 20.]  In addition to the information collected by dispatch that Mr. Mwangangi's Crown Victoria had attempted to pull over a vehicle on the interstate with flashing strobes, the City Defendants allege that the following additional information that supported a probable cause determination: the interview with Mr. Washington and his passenger, Officer Nielsen's observations about the features of the Crown Victoria, her interview with Mr. Mwangangi followed by failed attempts to confirm his business through a Google search, Mr. Mwangangi's refusal to permit a search of his phone, Mr. Mwangangi asking Officer Nielsen to uncuff him so that he could show her his log book on his phone, purported inconsistencies about the motorist Mr. Mwangangi had helped (*i.e.*, the officers' confusion about whether he was "from" Cincinnati (his home) or Chicago (the location

52

from which he had left)).  [*See* Filing No. 87 at 22-23.]  All of this, say the City Defendants, supplied Officer Nielsen with probable cause to arrest Mr. Mwangangi.

Officer Root also seeks summary judgment on this issue, and like the City Defendants, argues that probable cause existed at the inception of the encounter that evening.  [Filing No. 83 at 16-17.]  He argues that probable cause to arrest Mr. Mwangangi existed solely from the information provided by Mr. Washington in the 911 calls.  [Filing No. 83 at 18-19.]  Officer Root then argues that even if probable cause was not present at the inception of the encounter, it was present after Sergeant Phelps interviewed Mr. Washington and his passenger at the Speedway, during which Mr. Washington "indicated that [Mr. Mwangangi] activated flashing lights and attempted to pull him over on I-465."  [Filing No. 83 at 19.]  Officer Root says that "[a]fter hearing the complaining witness's story, there can be no dispute that no further investigation was required by Root."  [Filing No. 83 at 20.]

In his Consolidated Response and Reply, Mr. Mwangangi argues that the interview with Mr. Washington and his passenger could not provide probable cause because the crime of police impersonation is a specific-intent crime, requiring the offender to "intentionally and falsely represent[] herself/himself as a law enforcement officer."  [Filing No. 91 at 25.]  Mr. Mwangangi also points out that all of the conduct that Mr. Washington complained of—flashing white strobe lights—was legal and does not mean one is impersonating a police officer, and further notes that under Indiana law, the only lights that designate a police vehicle are red-and-blue lights.  [Filing No. 91 at 25.]  Mr. Mwangangi also points out that Mr. Washington's "report unmistakably indicated that he never actually thought [Mr. Mwangangi] was a police officer or that he was trying to get him to pull over" because he reported that when he saw the white strobe lights, "he continued to maintain his speed in the passing/fast lane."  [Filing No. 91 at 26.]

The City Defendants reply that while it is undisputed that individual aspects of the Crown Victoria and Mr. Mwangangi's conduct "were not illegal by themselves," the proper inquiry is whether the totality of the circumstances suggested that Mr. Mwangangi had committed a crime. [Filing No. 99 at 8-9.]  The City Defendants once again reiterate the information the officers possessed when they initiated the encounter and after interviewing the complaining witnesses. [Filing No. 99 at 10.]  The City Defendants also contend that "it is well-settled that the Officers were not required to determine [Mr. Mwangangi's] intent prior to formulating probable cause." [Filing No. 99 at 10 (citing *United States v. Reis*, 906 F.2d 284, 289 (7th Cir. 1990)).]

Officer Root also replies that the information solely from the 911 calls provided by dispatch indicated that there was "no question probable cause existed to arrest" Mr. Mwangangi.  [Filing No. 100 at 10.]  He says that once he pulled into the Speedway and matched the description of the Crown Victoria to that reported over the dispatches, "no further investigation was required." [Filing No. 100 at 11.]  He further contends that the interview with Mr. Washington added additional support to his probable cause determination.  [Filing No. 100 at 11.]

Under the Fourth Amendment, a warrantless arrest is permissible only if officers have probable cause to believe the individual has committed a crime.  *See Manuel v. City of Joliet*, __U.S.__, 137 S. Ct. 911, 917 (2017).   Probable cause is "a practical, common-sense determination." *Sornberger*, 434 F.3d at 1013 (citing *Maxwell v. City of Indianapolis,* 998 F.2d 431, 434 (7th Cir. 1993)).  Officers will ordinarily have probable cause "when a reasonable officer with all the knowledge of the officers on the scene would have believed that the suspect committed an offense defined by state law." *Jones v. Clark*, 630 F.3d 677, 684 (7th Cir. 2011).  The fact that criminal charges are eventually dropped "has no consideration in the determination of arguable probable cause at the time of the arrest." *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015).

54

The question of probable cause is typically "a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell*, 998 F.2d at 434.  However, where, as is the case here, the facts are undisputed, the ultimate resolution of whether probable cause existed becomes a question of law. *Carlisle*, 614 F.3d at 754 ("[W]hen 'what happened?' is not at issue, the ultimate resolution of whether probable cause or reasonable suspicion existed is a question of law.").

The starting point of the analysis is the state statute under which Mr. Mwangangi was arrested—Ind. Code § 35-44.1-2-6(b).  *See Jones*, 630 F.3d at 684.  That section provides as follows:

> (a) A person who, with intent to:
>
>> (1) deceive; or
>> (2) induce compliance with the person's instructions, orders, or requests;
>
> falsely represents that the person is a public servant commits impersonation of a public servant, a Class A misdemeanor, except as provided in subsection (b).
>
> (b) The offense described in subsection (a) is a Level 6 felony if the person falsely represents that the person is:
>
>> (1) a law enforcement officer; or
>> (2) an agent or employee of the department of state revenue, and collects any property from another person.

Ind. Code § 35-44.1-2-6.  An Indiana appellate court, interpreting a prior but similar version of the statute[10] found that the statute required the government to show "a false representation that a declarant is a public servant." *Poole v. State*, 559 N.E.2d 1214, 1215 (Ind. Ct. App. 1990).  A

---

[10] The statute then provides that "A person who falsely represents that the person is a public servant, with intent to mislead and induce another person to submit to false official authority or otherwise to act to his detriment in reliance on the false representation, commits impersonation of a public servant, a Class A misdemeanor...." *Poole*, 559 N.E.2d at 1215 (quoting former Ind. Code § 35-44-2-3).

review of cases involving the impersonation statute suggests that the statute is typically invoked when a defendant makes an affirmative representation that he or she is a law enforcement officer. *See, e.g., Poole*, 559 N.E.2d at 1216 (prosecution of defendant who told hospital staff that he was a police officer with the Indianapolis Police Department and supplied fake identification numbers for his badge, unit, supervisor, vehicle, and district); *Ferre v. State*, 124 N.E.3d 109, 114 (Ind. Ct. App. 2019) (defendant, while wearing a wearing a jacket with the Vigo County Sheriff's Office logo on the front and the word, "Sheriff" on the back, identified himself using a pseudonym and said he was a deputy with the Vigo County Sheriff's Office to staff at a mental health services center in connection with an inquiry about a jail inmate); *Piatt v. State*, 124 N.E.3d 639 (Ind. Ct. App. 2019) (unpublished) (defendant told victim that he was a police officer and demanded that the victim remove her clothes).

Noticeably absent in the record before the Court is a "representation" by Mr. Mwangangi that he was a law enforcement officer. The City Defendants focus on the interview of Mr. Washington and his passenger in which they said that "they thought they were being pulled over on the interstate through the use of the strobes," [Filing No. 87 at 23], and Officer Root focuses on the same. To the extent the City Defendants contend that Mr. Mwangangi's use of clear strobe lights constituted a "representation" that he was a law enforcement officer, this argument fails as a matter of fact and law. All parties agree that such lights are legal and are not reserved for law enforcement in Indiana. The use of legal clear strobe lights by citizens does not give rise to probable cause to arrest for police impersonation. Nor is driving a blue Crown Victoria exclusive to law enforcement such that officers have probable cause to arrest anyone driving a Crown Victoria for police impersonation. Nor are driving closely behind someone, using a left turn signal, or wearing a reflective vest exclusive to law enforcement such that when these actions are

56

undertaken by members of the general public, they are representing themselves as law enforcement officers.  And viewing all of these activities collectively also does not give rise to a reasonable belief that Mr. Mwangangi had made a representation that he was a law enforcement officer.

Although Mr. Mwangangi was arrested before he was read his *Miranda* rights and questioned by Officer Nielsen, the information provided by Mr. Mwangangi did not give rise to probable cause for arrest either.  Just like the interview with Mr. Washington and his passenger, the interview with Mr. Mwangangi uncovered no potential "representation" by Mr. Mwangangi that he was a law enforcement officer.  In fact, Mr. Mwangangi explained during the interview that he provided roadside assistance, which added some insight as to why Mr. Mwangangi might have white strobe lights—again, perfectly legal—on the exterior of his vehicle, why he had reflective vests and traffic cones, and why he would be parked nose-to-nose with another vehicle. The City Defendants' contention that Officer Root's inability to locate Mr. Mwangangi's employer through a Google search (he was misspelling Finderserve as "Findaserve") and the purported "confusion," caused entirely by the officers on the scene, about where the stranded motorist was "from" also did not provide probable cause to arrest Mr. Mwangangi for impersonating a law enforcement officer.  Nor did Mr. Mwangangi's refusal to allow officers to search his phone give rise to probable cause that he was representing himself as a law enforcement officer.

In sum, the officers did not have probable cause to arrest Mr. Mwangangi for impersonating a police officer when they arrived at the Speedway, when they surrounded and handcuffed Mr. Mwangangi, after interviewing Mr. Washington and his passenger, or after interviewing Mr. Mwangangi.  At no point did any of the officers on the scene have information that would cause a reasonable police officer to believe that Mr. Mwangangi committed the offense as defined by state law.  *See Jones*, 630 F.3d at 684.  Because the officers lacked probable cause, Mr. Mwangangi has

established that his two pat downs, handcuffing, and arrest violated the protections afforded under the Fourth Amendment.  Therefore, judgment must be entered in Mr. Mwangangi's favor on these claims unless the Individual Defendants can establish that qualified immunity protects them from liability.

### 2.  *Qualified Immunity*

The City Defendants argue that even if the Court finds the officers did not have probable cause to arrest Mr. Mwangangi, the individual City Defendants are nonetheless entitled to qualified immunity because arguable probable cause existed.  [Filing No. 87 at 25.]  The City Defendants contend that Officer Nielsen had arguable probable cause to arrest Mr. Mwangangi for a long list of reasons:

> (1) [Mr. Mwangangi] was the owner/driver [of] the vehicle; (2) he had various traffic cones/vests in the vehicle; (3) the vehicle had a light bar; (4) the vehicle had additional interior features similar to a law enforcement vehicle (radar system, lap top stand, mounted flashlight); (5) an on-scene witness identified [Mr. Mwangangi] as attempting to pull him over on I-465; (6) the same on-scene witness observed [Mr. Mwangangi] parked in front of another car with strobe lights activated; (7) that [Mr. Mwangangi] was not willing to show Officer Nielsen his log book; (8) that Officers were unable to confirm the existence of [Mr. Mwangangi's] roadside assistance service; (9) that [Mr. Mwangangi] gave conflicting statements about the customer/vehicle he was allegedly helping at the Speedway; (10) that the vehicle's strobe lights were functional; (11) that the vehicle [Mr. Mwangangi] was assisting at the Speedway was no longer present; and (12) generally speaking [Mr. Mwangangi]'s vehicle looked like an undercover police vehicle capable of engaging in the reported acts by Mr. Washington.

[Filing No. 87 at 27.]

Officer Root also argues that he is entitled to qualified immunity because arguable probable cause existed to arrest Mr. Mwangangi.  [Filing No. 83 at 20.]  He contends that "the information provided by dispatch and confirmed by the complaining witness" provided arguable probable cause.  [Filing No. 83 at 20.]

Mr. Mwangangi responds that many of the circumstances in the City Defendants' list occurred or were not known until after he was arrested. [Filing No. 91 at 29-30.] He contends that the legal behaviors identified by Defendants cannot form the basis of arguable probable cause. [Filing No. 91 at 30.]

In reply, the City Defendants contend that they have established that arguable probable cause existed and contend that Mr. Mwangangi has failed to rebut their qualified immunity defense because he has "not offered any case law on point placing the lawfulness of the detention and arrest of [Mr. Mwangangi] beyond debate." [Filing No. 99 at 12-13.]

In his reply, Officer Root contends that Mr. Mwangangi failed to offer "rational arguments that refute" Officer Root's entitlement to qualified immunity, [Filing No. 100 at 12], and reiterates his prior arguments, [Filing No. 100 at 12-14].

Qualified immunity shields officers from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Allin v. City of Springfield*, 845 F.3d 858, 862 (7th Cir. 2017) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). While qualified immunity is an affirmative defense, the plaintiff carries the burden of defeating a defendant's claim of qualified immunity. *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003). "Whether a government official is entitled to qualified immunity is a legal question for resolution by the court, not a jury." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).

A defendant is entitled to qualified immunity in a false-arrest case when, if there is no probable cause, "a reasonable officer could have mistakenly believed that probable cause existed." *Fleming v. Livingston Cty., Ill.*, 674 F.3d 874, 880 (7th Cir. 2012) (citations omitted). As long as law enforcement officer reasonably, "albeit possibly mistakenly, believed that probable

cause existed to arrest" the plaintiff, the officer is entitled to qualified immunity. *Id.* "This standard is often dubbed 'arguable probable cause.'" *Id.* (citations omitted). "Arguable probable cause is established 'when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law.'" *Id.* (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)) (emphasis original).

When examining a qualified immunity claim, the court considers two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Purtell*, 527 F.3d at 621. "A right is clearly established if it is sufficiently clear that any reasonable official would understand that his or her actions violate that right, meaning that existing precedent must have placed the statutory or constitutional question beyond debate." *Zimmerman v. Doran*, 807 F.3d 178, 183 (7th Cir. 2015).

Here, there is no serious dispute about the second question. The contours of the constitutional right that the officers violated here—"the right to be free from arrest without probable cause"—were clearly established when the events in question took place. *See Jones*, 630 F.3d at 682 (citing *Beck*, 379 U.S. at 91 and *Sornberger*, 434 F.3d at 1013). Accordingly, the only question before the Court is whether, under undisputed facts, the Individual Defendants violated this clearly established right. As discussed above, this Court has already concluded that the officers violated this right when they converted Mr. Mwangangi's detention into an arrest without probable cause to do so.

Nevertheless, the Court must assess whether "a reasonable officer could have mistakenly believed that probable cause existed." *See Fleming*, 674 F.3d at 880. Here, a reasonable officer

in the same circumstances with the same knowledge could not have reasonably believed that probable cause existed because, as discussed above, none of the facts presented to the officers indicated that Mr. Mwangangi had made a "representation" that he was a law enforcement officer. There was no mistaken understanding by the officers that Mr. Mwangangi had told Mr. Washington or anyone else that he was a police officer or had flashed a fake police badge or presented other law enforcement-exclusive items.  A reasonable officer would not have concluded that an individual flashing white strobe lights or parking nose-to-nose to another vehicle would constitute a "representation" that the individual was a law enforcement officer.  *See* Ind. Code § 35-44.1-2-6(b).

Because the right to be free of from arrest without probable cause was clearly established at the time Mr. Mwangangi was arrested for impersonating a police officer in the absence of any evidence of a "representation,"  an essential element of the crime, the Individuals Defendants are not entitled to qualified immunity for patting down, handcuffing, and arresting Mr. Mwangangi on the evening of October 7, 2017.[11]

### 3. Judgment as to the Individual Defendants

As noted earlier, the Individual Defendants have not asserted that a specific individual officer is entitled to summary judgment as to a particular § 1983 claim because he or she was not sufficiently involved in the alleged constitutional violation.  *See, e.g.*, *Gossmeyer*, 128 F.3d at 495 ("We reiterate that personal involvement is a prerequisite for individual liability in a § 1983

---

[11] Defendants raise a qualified immunity defense in response Mr. Mwangangi's *Terry* investigatory stop, contending that if the Court determined the officers lacked probable cause to stop Mr. Mwangangi, they were nevertheless entitled to qualified immunity because the officers possessed "arguable reasonable suspicion."  [Filing No. 83 at 20; Filing No. 87 at 25.]  Having concluded that a reasonable suspicion existed to detain Mr. Mwangangi and order him out of his vehicle, the Court need not address these arguments.  The Court notes that Defendants have not argued that "arguable reasonable suspicion" existed with respect to the pat downs of Mr. Mwangangi.

action.").  The Court has no obligation to make arguments on behalf of parties that they may have missed.  *See Little*, 71 F.3d at 641 (holding that "just as a district court is not required to scour the record looking for factual disputes, it is not required to scour the party's various submissions to piece together appropriate arguments" because "[a] court need not make the lawyer's case").

However, the Court can only enter judgment in Mr. Mwangangi's *favor* against a defendant if the undisputed evidence establishes that the officer was personally involved in the constitutional deprivation. *See Gossmeyer*, 128 F.3d at 495.  The undisputed evidence, viewed in the light most favorable to each of the Individual Defendants, establishes that Officer Root was personally involved in the unconstitutional pat down, handcuffing, and arrest of Mr. Mwangangi; that Officer Noland was personally involved in the unconstitutional second pat down and continued handcuffing of Mr. Mwangangi; that Officer Nielsen was personally involved in the unconstitutional continued handcuffing and arrest of Mr. Mwangangi; and that Sergeant Phelps was personally involved in the unconstitutional arrest of Mr. Mwangangi.  Whether the evidence supports Fourth Amendment illegal search and seizure claims against the remaining Individual Defendants is a question for the jury to decide.

In summary, Mr. Mwangangi's Initial Motion, [74], is **GRANTED** as to liability on his § 1983 illegal search, seizure, and arrest claims against the Individual Defendants as follows:

- The pat-down conducted by Officer Root lacked reasonable suspicion and was an unreasonable search in violation of the Fourth Amendment.  Mr. Mwangangi is granted judgment as to liability against Officer Root on this aspect of his claim and denied summary judgment as to the remaining Individual Defendants.

- The handcuffing of Mr. Mwangangi was unreasonable and converted the detention into an arrest without probable cause in violation of the Fourth Amendment.  Mr. Mwangangi is granted judgment as to liability against Officer Root, Officer Noland, and Officer Nielsen as to this aspect of his claim and denied summary judgment as to the remaining Individual Defendants.

- The pat-down conducted by Officer Noland lacked probable cause and reasonable suspicion in violation of the Fourth Amendment. Mr. Mwangangi is granted judgment as to liability against Officer Noland as to this aspect of his and denied summary judgment as to the remaining Individual Defendants.

- Mr. Mwangangi's arrest lacked probable cause in violation of the Fourth Amendment. Mr. Mwangangi is granted judgment as to liability against Officer Noland, Officer Noland, Officer Nielsen, and Sergeant Phelps as to this aspect of his claim and denied summary judgment as to the remaining Individual Defendants.

The City Defendants' Cross-Motion, [86], and the Root Cross-Motion, [83], are **DENIED** as to the same claims.

The City Defendants' Cross-Motion, [86], and the Root Cross-Motion, [83], as to Mr. Mwangangi's § 1983 illegal search and seizure claims against the Individual Defendants are **GRANTED** as follows:

- The initial detention with red-and-blue lights was premised on a reasonable suspicion and did not violate the Fourth Amendment.

- Ordering Mr. Mwangangi out of his vehicle was reasonable in connection with the investigatory detention and did not violate the Fourth Amendment.

Mr. Mwangangi's Initial Motion, [74], is **DENIED** as to the same claims.

### D. Excessive Force

Officer Root moves for summary judgment on Mr. Mwangangi's excessive force claim against him relating to the handcuffing of Mr. Mwangangi. He first argues that Mr. Mwangangi cannot maintain this claim because the entire encounter was supported by reasonable suspicion and probable cause, therefore the degree of force used in handcuffing Mr. Mwangangi was warranted. [Filing No. 83 at 25-26.] He also contends that Mr. Mwangangi cannot support an excessive force claim based on the tightness of the handcuffs because Mr. Mwangangi did not seek medical treatment. [Filing No. 83 at 26.] Alternatively, Officer Root argues that if there was excessive force, he is entitled to qualified immunity because his actions did not run afoul of

established Supreme Court precedent.  [Filing No. 83 at 27.]

Mr. Mwangangi responds by merely restating his prior arguments regarding why the use of handcuffs was unreasonable and converted his detention into an arrest.  [Filing No. 91 at 23.] He also argues that the standard is not whether Mr. Mwangangi was seriously injured by the handcuffs, but rather whether the handcuffing itself was unreasonable under the Constitution. [Filing No. 91 at 24 (citing *Herzog v. Vill. of Winnetka*, 309 F.3d 1041, 1043 (7th Cir. 2002)).]

In reply, Officer Root argues that the use of handcuffs was not disproportionate under the circumstances and notes that Officer Nielsen checked the spacing of Mr. Mwangangi's handcuffs to ensure they were not too tight.  [Filing No. 100 at 8.]

At the outset, it is not clear to the Court whether Mr. Mwangangi is asserting that the use of handcuffs itself was excessive force.  To the extent Mr. Mwangangi is advancing such a claim, the Court rejects it because Mr. Mwangangi failed to develop this claim in the context of excessive force, and, in any event, the Court has already found that the use of handcuffs was an unlawful seizure and transformed Mr. Mwangangi's seizure into an arrest without probable cause, which is the more appropriate claim.  *See Hurt v. Vantlin*, 2019 WL 3980759, at *4 (S.D. Ind. Aug. 23, 2019) (noting that courts are to look beyond labels to assess the nature of a plaintiff's claims).  The Court will address Mr. Mwangangi's claim that the handcuffs were too tight.

The Seventh Circuit has occasionally recognized valid excessive force claims based on overly tight handcuffs.  *Tibbs v. City of Chicago,* 469 F.3d 661, 666 (7th Cir. 2006).  In *Tibbs,* the Seventh Circuit held that the plaintiff could not survive summary judgment because he had complained to the officer only once about his handcuffs without elaborating on an injury, numbness, or degree of pain; was handcuffed for about twenty-five to thirty minutes; experienced redness on his wrist for less than two days; and did not seek or receive medical care for any alleged

wrist injury.  *Id.  See also Sow v. Fortville Police Dep't,* 636 F.3d 293, 304 (7th Cir. 2011) (granting summary judgment on the plaintiff's too-tight handcuffing claim when he complained only once that the cuffs were too tight, presented no evidence that he provided any elaboration, did not complain of any injury when he was taken to the jail, and did not receive any treatment); *Stainback v. Dixon,* 569 F.3d 767, 773 (7th Cir. 2009) (holding that generalized complaints, without any elaboration regarding a preexisting injury or other infirmity, would not have placed a reasonable officer on notice that the plaintiff would be injured by their actions).

On the record before the Court, viewed in a light most favorable to Mr. Mwangangi, he has failed to provide sufficient evidence from which a reasonable jury could conclude that Officer Root's handcuffs were unreasonably tight or that a reasonable officer would have been on notice that they were too tight.  Mr. Mwangangi has not put forward any evidence regarding this claim except that he told Officer Nielsen the handcuffs were too tight.  [Filing No. 76 (Ex. 6, Nielsen Dashcam at 15:11-15:21).]   He has not offered evidence about physical injury or otherwise elaborated on pain that he suffered from the handcuffs.  *See Tibbs*, 469 F.3d at 666.  The evidence is insufficient to sustain an excessive force claim.

Therefore, Officer Root's Cross-Motion, [82], is **GRANTED** with respect to Mr. Mwangangi's excessive force claim as it relates to the tightness of the handcuffs.

### E.  Failure to Intervene and Supervisory Liability

The City Defendants move for summary judgment on Mr. Mwangangi's failure to intervene claims against the Individual Defendants and the supervisory liability claim against Sergeant Phelps.  [Filing No. 87 at 28.]  The City Defendants' argument centers on the same arguments raised in connection with the unlawful seizure and arrest claims.  [Filing No. 87 at 28.]  "Because the failure to intervene claim is premised upon the false arrest and unlawful seizure claims," the

City Defendants contend that "the claim fails for the same reasons," namely that none of the officers observed any constitutional deprivations because "there existed both reasonable suspicion to detain and probable cause to arrest, and thus there was nothing with which the Officers were obligated to intervene." [Filing No. 87 at 28-29.]   The City Defendants also assert that this argument likewise requires the Court to enter judgment against Mr. Mwangangi on his supervisory liability claim against Sergeant Phelps.  [Filing No. 87 at 28 n.1.]

Mr. Mwangangi did not move for summary judgment on these claims and contends that summary judgment is inappropriate because questions of material fact remain.  [Filing No. 91 at 31.]

Although the failure-to-intervene claim is not addressed in Officer Root's Cross-Motion, [Filing No. 83], Officer Root nevertheless addresses the claim in his Reply, [Filing No. 100 at 14], apparently seeking summary judgment on this claim as well.  Officer Root first contends that Mr. Mwangangi has not properly asserted such a claim because it is not listed in a subsection of his Amended Complaint entitled "Legal Claims." [Filing No. 100 at 14 (citing Filing No. 38 at 30).] Second, he says that the claim fails because, as discussed in connection with the Fourth Amendment claims, "the designated evidence demonstrates that there were no applicable constitutional violations." [Filing No. 100 at 14.]

Even as a bystander, an officer can be held liable under § 1983 if a plaintiff can show the officer: "(1) had reason to know that a fellow officer was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring." *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009).  "[A] realistic opportunity to intervene may exist whenever an officer could have called for a backup, called for help, or at least cautioned [the violating officer] to stop." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th

66

Cir. 2005) (internal quotation marks and citation omitted).  The Seventh Circuit has made clear that "the prongs of this analysis almost always implicate questions of fact for the jury:  'Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the offending officer is 'generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.'"  *Id.* (quoting *Lanigan v. Vill. of E. Hazel Crest, Ill.,* 110 F.3d 467, 478 (7th Cir. 1997)).

Relatedly, "to succeed on a claim for supervisory liability, a plaintiff must show that the supervisor was personally involved in the constitutional violation." *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017).  That means that the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what he might see." *Id.* (internal quotation marks and alterations omitted).

The sole basis for the City Defendants' Cross-Motion is that no underlying Fourth Amendment violation occurred as a matter of law.  Having concluded that officers violated Mr. Mwangangi's Fourth Amendment rights in certain respects, this argument must be rejected.  Furthermore, because the City Defendants did not parse each officer's individual role and their ability to intervene in the illegal search and seizure, the Court cannot evaluate the sufficiency of the evidence as to each Individual Defendant.

The Court also rejects Officer Root's assertion that Mr. Mwangangi did not properly raise a failure-to-intervene claim.  In addition to including the claim in his Amended Complaint, [Filing No. 38 at 11 (alleging that the Individual Defendants "failed to intervene in the obviously illegal and unconstitutional actions of their fellow law enforcement officers")], Mr. Mwangangi also included this claim in his Statement of Claims, [Filing No. 73 at 5].

Therefore, the City Defendants' Cross-Motion for Summary Judgment, [86], is **DENIED** as to the failure-to-intervene and supervisory liability claims.

## IV.
### MR. MWANGANGI'S § 1983 *MONELL* CLAIMS AGAINST THE CITY

A municipality is a "person" under § 1983 and may be held liable for its own violations of the federal Constitution and laws. *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, __F.3d__, 2021 WL 684365, at *4 (7th Cir. Feb. 23, 2021) (citing *Monell*, 436 U.S. at 690-91). "Municipal liability under *Monell* carries an important limitation: the statute does not incorporate the common-law doctrine of respondeat superior, so a municipality cannot be held liable for the constitutional torts of its employees and agents." *Id.* Accordingly, a plaintiff must prove that the constitutional violation was caused by a governmental "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. The Seventh Circuit has interpreted this language to include three types of actions that can support municipal liability under § 1983: (1) "an express policy that causes a constitutional deprivation when enforced"; (2) "a widespread practice that is so permanent and well-settled that it constitutes a custom or practice"; or (3) "that the constitutional injury was caused by a person with final policymaking authority." *First Midwest Bank*, 2021 WL 684365, at *4 (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)).

Mr. Mwangangi has asserted *Monell* claims against the City based on the City's alleged unconstitutional practice and policy of (1) improperly using handcuffs in *Terry* stops when no reasonable safety concern exists and keeping handcuffs on suspects even if any potential danger has dissipated; and (2) using inventory searches to perform unconstitutional vehicle searches. [Filing No. 73 at 5-6.] The City has moved for summary judgment on both claims. [Filing No. 87 at 29-31.]

### A.  The Use of Handcuffs

The City argues that in order to demonstrate *Monell* liability, Mr. Mwangangi is required to show that the improper use of handcuffs was not an "isolated act[] of misconduct," but rather was a "series of violations" establishing a pattern of misconduct.  [Filing No. 87 at 30 (quoting *Phelan v. Cook County*, 463 F.3d 773, 789-90 (7th Cir. 2006)).]  The City contends that Mr. Mwangangi "is only speaking from his experience, which is decidedly insufficient."  [Filing No. 87 at 30.]  The City does acknowledge that on occasion, it is possible to demonstrate a widespread municipal practice or custom with evidence only of a plaintiff's personal experience, but such a plaintiff must show that his experience demonstrated "a true municipal policy."  [Filing No. 87 at 30 (quoting *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020)).]  However, the City argues that Mr. Mwangangi cannot point to evidence showing that "the use of handcuffs during a criminal investigation was a 'true municipal policy.'"  [Filing No. 87 at 30.]

Mr. Mwangangi responds that the record evidence demonstrates that the complained-of handcuffing practices "are so universally engrained in its officers, and so persistent and widespread, that they must be seen as [the City]'s standard operating procedure."  [Filing No. 87 at 31.]  Mr. Mwangangi cites the depositions of Officer Nielsen and Officer Noland in which they testify that officers could handcuff an individual during a *Terry* stop detention without regard to whether articulable safety concerns existed.  [Filing No. 87 at 31.]  He also cites the testimony from Sergeant Phelps that it was the City's policy that individuals placed in handcuffs were to remain in the handcuffs until the encounter was terminated.  [Filing No. 87 at 31-32.]  He argues that it is for a jury to determine whether this evidence amounts to a custom or practice adopted by the City.  [Filing No. 87 at 32.]

The City replies[12] by once again asserting that Mr. Mwangangi has not "come forward with any evidence that there is a widespread practice or custom causing the alleged deprivations pertaining to handcuffing." [Filing No. 99 at 14.]  The City again asserts that Mr. Mwangangi must put forward evidence that other individuals suffered the same constitutional deprivations as him.  [Filing No. 99 at 14.]  It also asserts that the handcuffing practices identified by Mr. Mwangangi do not run afoul of the Fourth Amendment.  [Filing No. 99 at 14.]  The additional argument raised in the City's Reply—that it cannot be held liable under § 1983 for Officer Root's decision to handcuff Mr. Mwangangi because he worked for the Whitestown police department, not the City, [Filing No. 99 at 13]—is both untimely because arguments advanced for the first time in a reply brief are waived, *Ferris Mfg. Corp. v. Carr*, 2015 WL 279355, at *5 (N.D. Ill. Jan. 21, 2015) (citing *Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 527 (7th Cir. 2013)), and unpersuasive because it ignores the role of the City officers who oversaw the investigation and arrest and kept Mr. Mwangangi in handcuffs.

To support a *Monell* claim premised on a widespread practice that constitutes a custom or policy, a plaintiff must show: (1) the practice itself violated the plaintiff's constitutional rights, and (2) the practice was "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision."  *Hildreth*, 960 F.3d at 426 (internal quotation marks omitted).  A custom or practice "can be proven in a number of ways, including but not limited to repeated actions."  *Howell v. Wexford Health Sources, Inc.*, __F.3d__, 2021 WL 405006, at *5 (7th Cir. Feb. 5, 2021).  Testimony from municipal employees that a practice was widespread can be sufficient.  *See Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303-04 (7th Cir. 2010) (holding that a jury could find practice of not retrieving medical requests on a daily basis to be widespread

where a number of employees testified that the practice was widespread); *Hare v. Zitek*, 414 F. Supp. 2d 834, 861 (N.D. Ill. 2005) (finding testimony from numerous officers about retaliation practice provided sufficient evidence of a widespread practice to overcome summary judgment).

Here, as discussed previously, the Seventh Circuit has made clear that while handcuffs may be appropriate during a *Terry* detention to ensure safety, "that does not mean that law enforcement has carte blanche to handcuff." *Ramos*, 716 F.3d at 1018.  Construing the facts most favorably to Mr. Mwangangi, he has put forward evidence, in the form of testimony of the City's officers, from which a jury could conclude that it was common practice to place individuals subject to an investigatory detention in handcuffs based only on "officer discretion," not identifiable safety concerns, and that handcuffs were to remain on for the entire encounter, even if any perceived safety concern had dissipated.

Therefore, the City's Cross-Motion for Summary Judgment, [86], is **DENIED** as to Mr. Mwangangi's *Monell* claim regarding handcuffing.

## B.  Vehicle Inventory

The City argues that inventory searches conducted incident to towing a car are constitutional so long as such searches are conducted pursuant to a standardized protocol.  [Filing No. 87 at 31.]  It argues that the record is devoid of any evidence that the inventory search of Mr. Mwangangi's Crown Victoria was not conducted pursuant to the City's standard operating procedure for vehicle inventories.  [Filing No. 87 at 31.]

In response, Mr. Mwangangi only argues that "the policies associated with Vehicle searches both as written and as practiced lead to violations of [Mr. Mwangangi's] civil rights in the form of an unreasonable search." [Filing No. 91 at 32 (internal citations omitted).]

The City replies that Mr. Mwangangi's response failed to identify what express policy or practice caused the purported constitutional deprivation.  [Filing No. 99 at 14.]

Inventory searches constitute an exception to the warrant requirement and are reasonable under the Fourth Amendment in certain circumstances. *See South Dakota v. Opperman,* 428 U.S. 364, 376 (1976).  "An inventory search is lawful if (1) the individual whose possession is to be searched has been lawfully arrested, and (2) the search is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures." *United States v. Cartwright*, 630 F.3d 610, 614 (7th Cir. 2010).

While the Court has concluded that the officers did not have probable cause to arrest Mr. Mwangangi, Mr. Mwangangi has not specified how the City itself violated the Fourth Amendment with respect to its policy or practices regarding inventory searches.  *See First Midwest Bank*, 2021 WL 684365, at *4.  From Mr. Mwangangi's meager briefing, the Court cannot discern exactly what practice, beyond a generalized "inventory search," is the subject of Mr. Mwangangi's complaint. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that arguments not presented to the district court in response to summary judgment motions are waived).

Therefore, the City's Cross-Motion, [86], is **GRANTED** as to Mr. Mwangangi's *Monell* claim regarding inventory searches.

### C.  Failure to Train

Even though Mr. Mwangangi has previously stated that his only § 1983 *Monell* claims against the City relate to its handcuffing and vehicle inventory policies, [*see, e.g.*, Filing No. 73 at 5-6; Filing No. 91 at 31], Mr. Mwangangi's Consolidated Response and Reply makes reference to an alleged "failure to train and supervise in relationship to use of handcuffs and vehicle searches." [Filing No. 91 at 32.]  To the extent Mr. Mwangangi is asserting a failure-to-train *Monell* claim,

the Court finds that Mr. Mwangangi has failed to preserve such a claim by omitting it from his Statement of Claims, [Filing No. 73], and not otherwise developing the claim in his summary-judgment briefing, [Filing No. 74; Filing No. 77; Filing No. 91]. *See Jackson*, 2021 WL 754836, at *2.

Therefore, the City Defendants' Cross-Motion, [86], is **GRANTED** as to any failure-to-train claim purportedly asserted by Mr. Mwangangi.

## V.
### MR. MWANGANGI'S STATE LAW CLAIMS AGAINST THE CITY DEFENDANTS

The City Defendants ask the Court to enter summary judgment in their favor on Mr. Mwangangi's state-law claims of false arrest, false imprisonment, battery, intentional infliction of emotional distress, negligence in relation to the handling of his personal property, and negligent training and supervision. [Filing No. 87 at 31-35.] As for the false arrest, false imprisonment, and battery claims, they argue that probable cause existed to arrest Mr. Mwangangi, so these claims fail. [Filing No. 87 at 32.] The City Defendants assert that they have immunity from Mr. Mwangangi's intentional infliction of emotional distress and property negligence claims by virtue of the law enforcement immunity section of the Indiana Tort Claims Act, Ind. Code § 34-13-3-1, *et. seq.* (the "ITCA"). [Filing No. 87 at 33-34 (citing Ind. Code § 34-13-3-3(8)).] With respect to the negligent training and supervision claim, the City Defendants contend that they are immune from the claim under the discretionary function immunity section of the ITCA, Ind. Code § 34-13-3-3(7), and for the additional reason that Mr. Mwangangi cannot make out a *prima facie* case with the record evidence. [Filing No. 87 at 34.]

Mr. Mwangangi responds that his claims for false arrest, false imprisonment, and battery should not be dismissed because the record evidence establishes that he was arrested without probable cause. [Filing No. 91 at 33.] He next argues that the ITCA does not bar the negligent

property damage claim because this claim is "not related to the arrest itself." [Filing No. 91 at 33.] He contends that the property claims are not related to acts associated with enforcing a law, but rather the "damage occurred during what [the City] now claims was an inventory search and/or during its later bailment of the vehicle" and this task does "not relate to the enforcement of a law." [Filing No. 91 at 34.] He points to the search warrant issued by the state court to search his phone and iPad to argue that the City Defendants were acting pursuant to a court order (the warrant) and not enforcing a law when the damage to his property occurred. [Filing No. 91 at 34.]

The City Defendants reply by reiterating the arguments in their Cross-Motion and emphasize that enforcement of a law is not limited to arrest but includes activities incident to arrests. [Filing No. 99 at 15.]

### A. Statutory Immunity

The ITCA governs state law tort claims against governmental entities and public employees. *Bushong v. Williamson*, 790 N.E.2d 467, 472 (Ind. 2003). "Among other things the statute provides substantial immunity for conduct within the scope of the employee's employment." *Id.* Specifically, "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." Ind. Code § 34-13-3-5(b); *see also Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014) ("Under the [ITCA], there is no remedy against the individual employee so long as he was acting within the scope of his employment.").

The section of the ITCA specific to law enforcement immunity provides that a "governmental entity or an employee acting within the scope of the employee's employment is not liable if a loss results from . . . [t]he adoption and enforcement of or failure to adopt or enforce . . . a law . . . unless the act of enforcement constitutes false arrest or false imprisonment." Ind.

Code § 34-13-3-3(8)(A).  To determine whether this provision immunizes a law enforcement officer's conduct, a court must assess whether: (1) the officer was acting within the scope of his employment when the injury to plaintiff occurred; and (2) whether the officer was engaged in the enforcement of a law at that time.  *Snyder v. Smith*, 7 F. Supp. 3d 842, 874 (S.D. Ind. 2014) (citing *Harness v. Schmitt*, 924 N.E.2d 162, 165 (Ind. Ct. App. 2010)).  "[T]he party seeking immunity bears the burden of demonstrating that its conduct is within the protection afforded by the ITCA." *F.D. v. Indiana Dep't of Child Servs.*, 1 N.E.3d 131, 136 (Ind. 2013).  Under Indiana law, the ITCA's grant of law-enforcement immunity does not extend to claims of assault or battery.  *Wilson v. Isaacs¸* 929 N.E.2d 200, 203 (Ind. 2010).

The section of the ITCA concerning discretionary functions provides that "a government entity or employee acting within the scope of the employee's employment is not liable for losses resulting from . . . discretionary functions."  Ind. Code § 34-13-3-3(7).  The issue of whether an act is discretionary is a question of law.  *Peavler v. Bd. of Comm'rs of Monroe Cnty.,* 528 N.E.2d 40, 46 (Ind. 1988).  "In assessing whether the function is the type intended to benefit from immunity, courts examine the nature of the conduct, the effect on governmental operations, and the capacity of the court to evaluate the propriety of the government's actions." *Hooper v. Lain,* 2015 WL 1942791, at *5 (N.D. Ind. Apr. 29, 2015) (internal quotation marks omitted).  "[A] governmental entity will not be held liable for negligence arising from decisions which are made at a planning level, as opposed to an operational level."  *Id.* (quoting *City of Crown Point v. Rutherford,* 640 N.E.2d 750, 752 (Ind. Ct. App. 1994)).  Indiana courts construe discretionary immunity "narrowly and place the 'burden of proving that the challenged act or omission was a policy decision made by consciously balancing risks and benefits' on the governmental defendant."  *Id.* (quoting *Peavler*, 528 N.E.2d at 46).

### B.  False Arrest and False Imprisonment[13]

The City Defendants acknowledge that the ITCA exempts false arrest and false imprisonment claims from statutory immunity.  [Filing No. 87 at 32.]  They argue that these claims are barred because the officers had probable cause to arrest Mr. Mwangangi.  However, as discussed above, the Court has concluded that the officers lacked probable cause when they arrested Mr. Mwangangi at the Speedway.

Therefore, the City Defendants' Cross-Motion, [86], is **DENIED** as to Mr. Mwangangi's false arrest claim.

### C.  Battery

Under Indiana law, "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind. 2007) (internal citations omitted).   Indiana law also provides that an individual is justified in engaging in conduct otherwise prohibited if he has legal authority to do so. *Campbell v. City of Indianapolis*, 2011 WL 5088633, at *5 (S.D. Ind. Oct. 25, 2011) (citing Ind. Code § 35-41-3-1).   Having concluded that the Individual Defendants lacked reasonable suspicion or probable cause for Officer Root's pat down, Officer Noland's pat down, and Mr. Mwangangi's handcuffing, these actions were taken without legal authority to do so.  Construing the record evidence in the light

---

[13] Where a claim of false imprisonment arises from an allegedly false arrest, courts need not conduct a separate analysis of the former. *Row v. Holt*, 864 N.E.2d 1011, 1016 n.4 (Ind. 2007).

most favorable to Mr. Mwangangi, a jury could conclude that the two pat downs and handcuffing constituted harmful or offensive contact.

Therefore, the City Defendants' Cross-Motion, [86], is **DENIED** as to Mr. Mwangangi's battery claim.

### D. Intentional Infliction of Emotional Distress

Although the claim of intentional infliction of emotional distress is addressed in the City Defendants' Cross-Motion, [Filing No. 87 at 33-34], this claim does not appear in Mr. Mwangangi's Statement of Claims, [Filing No. 73], nor does Mr. Mwangangi address such a claim in his Consolidated Response and Reply, [Filing No. 91]. Therefore, to the extent Mr. Mwangangi has asserted an intentional infliction of emotional distress claim, the Court finds that it has been abandoned. *See Jackson*, 2021 WL 754836, at *2.

The City Defendants' Cross-Motion, [86], is **GRANTED** as to any purported intentional infliction of emotional distress claim asserted by Mr. Mwangangi.

### E. Negligence in Handling of Personal Property

Mr. Mwangangi's primary argument as to why the ITCA does not bar his claims alleging the negligent handling of the personal property is that the searches conducted of his cell phone and iPad and the search and towing of his Crown Victoria were not completed in connection with the enforcement of a law. [Filing No. 91 at 34.] Under Ind. Code § 34-13-3-3(8)(A), the City Defendants are immune from liability if "a loss results from … [t]he adoption and enforcement of … a law." "This includes conduct of the same general nature as that authorized, or incidental to the conduct authorized." *Harness*, 924 N.E.2d at 166 (quoting *Celebration Fireworks, Inc. v. Smith*, 727 N.E.2d 450, 453 (Ind. 2000)) (internal alteration omitted). The Court finds that the searching and impounding of Mr. Mwangangi's personal property were performed in connection

with the enforcement of a law, and in the case of the iPad and cell phone, pursuant to a warrant. Therefore, the City Defendants are entitled to immunity for a negligence claim related to those actions. The Court further notes that Mr. Mwangangi has not identified evidence supporting this claim. *Cf. Branson v. Newburgh Police Dep't,* 849 F. Supp. 2d 802, 811 (S.D. Ind. 2011) ("Plaintiffs failed to put forth any evidence regarding the allegedly damaged property's condition before the search or any specific evidence that their property was damaged. Plaintiffs rest merely on their allegations that their property was damaged due to the search.").

The City Defendants' Cross-Motion, [86], is **GRANTED** as to Mr. Mwangangi's negligent handling of personal property claim.

### F. Negligent Training and Supervision

Courts have held that the training claims are properly classified as "discretionary functions" and therefore are subject to immunity under Ind. Code § 34-13-3-3(7). *See, e.g.*, *Lamb v. City of Bloomington,* 741 N.E.2d 436, 441 (Ind. Ct. App. 2001) (finding that a claim regarding the negligent instruction and/or training of the firefighters was properly dismissed as relating to a discretionary function); *Hooper,* 2015 WL 1942791, at *5 (finding ITCA applied to bar a plaintiff's claim regarding the failure to train jail staff). Likewise, courts have held that negligent supervision claims are afforded ITCA discretionary function immunity. *See, e.g.*, *Foster v. Pearcy,* 387 N.E.2d 446, 450 (1979) ("[T]he employment and supervision of deputies and employees in governmental offices … is a discretionary function."); *Coleman v. Curry,* 2013 WL 5232196, at *9 (S.D. Ind. Sept. 16, 2013) (barring suit against police department under the ITCA for "decisions as to how to train and supervise employees and/or officers"). Therefore, Mr. Mwangangi's negligent training and supervision claim is barred by the ITCA.

Mr. Mwangangi's argument that the ITCA does not apply because his claim seeks redress for "well-established civil rights violations," misses the mark.  The Indiana Supreme Court has held that "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known. " *Kellogg v. City of Gary*, 562 N.E.2d 685, 703 (Ind. 1990) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). However, Mr. Mwangangi has not, in response to the City Defendants' Cross-Motion, identified record evidence showing training or supervision that violated clearly established law.  *See White v. Novak*, 2013 WL 1339389, at *8 (S.D. Ind. Apr. 1, 2013) ("No evidence produced has indicated that the City violated a clearly established constitutional or statutory right in its hiring, supervision, or retention of [defendant].  Because hiring, supervising and retaining a police officer falls under the discretionary function immunity granted by the ITCA, the City is immune.").

Therefore, the City Defendants' Cross-Motion, [86], is **GRANTED** as to Mr. Mwangangi's negligent training and supervision claim.

## VI.
### CONCLUSION

Based on the foregoing, the Clerk is **DIRECTED** to update the docket to correct Officer Root's first name from "Blaine" to "Blayne."  The Objections of the City Defendants, [104], and Officer Root, [105], are **OVERRULED** to the extent that the Court has considered Mr. Mwangangi's Surreply, [Filing No. 103], in resolving the summary judgment motions.

Mr. Mwangangi's Partial Motion for Summary Judgment, [74], is **GRANTED IN PART** and **DENIED IN PART** as follows:

- As to liability on his § 1983 illegal search, seizure, and arrest claims against the motion is granted and denied as to certain Individual Defendants as follows:

- The pat-down conducted by Officer Root lacked reasonable suspicion and was an unreasonable search in violation of the Fourth Amendment. Mr. Mwangangi is **GRANTED** judgment as to liability against Officer Root on this aspect of his claim and **DENIED** summary judgment as to the remaining Individual Defendants.

- The handcuffing of Mr. Mwangangi was unreasonable and converted the detention into an arrest without probable cause in violation of the Fourth Amendment. Mr. Mwangangi is **GRANTED** judgment as to liability against Officer Root, Officer Noland, and Officer Nielsen as to this aspect of his claim and denied summary judgment as to the remaining Individual Defendants.

- The pat-down conducted by Officer Noland lacked probable cause and reasonable suspicion in violation of the Fourth Amendment. Mr. Mwangangi is **GRANTED** judgment as to liability against Officer Noland as to this aspect of his claim and **DENIED** summary judgment as to the remaining Individual Defendants.

- Mr. Mwangangi's arrest lacked probable cause in violation of the Fourth Amendment. Mr. Mwangangi is **GRANTED** judgment as to liability against Officer Noland, Officer Noland, Officer Nielsen, and Sergeant Phelps as to this aspect of his claim and **DENIED** summary judgment as to the remaining Individual Defendants.

- The motion is **DENIED** as to his § 1983 illegal search and seizure claims against the Individual Defendants relating to the initial detention with red-and-blue lights and Officer Nielsen ordering Mr. Mwangangi out of his vehicle.

The City Defendants' Cross-Motion for Summary Judgment, [86], is **GRANTED IN PART** and **DENIED IN PART** as follows:

- The motion is **GRANTED** as to Mr. Mwangangi's § 1983 search and seizure claim against the Individual Defendants as follows:

  - The initial detention with red-and-blue lights was premised on a reasonable suspicion and did not violate the Fourth Amendment.

  - Ordering Mr. Mwangangi out of his vehicle was reasonable in connection with the investigatory detention and did not violate the Fourth Amendment.

- The motion is **GRANTED** as to the *Monell* claim relating to inventory searches; the *Monell* claim relating to failure to train; and the state law claims of intentional infliction of emotional distress, negligent handling of property, and negligent training and supervision.

- The motion is **DENIED** as to the following claims:

  o Mr. Mwangangi's § 1983 illegal search, seizure, and arrest claims against the Individual Defendants for the pat-down conducted by Officer Root, the handcuffing of Mr. Mwangangi, the pat down by Officer Noland, and Mr. Mwangangi's false arrest;

  o Mr. Mwangangi's § 1983 claim against the Individual Defendants for failure-to-intervene/supervisory liability;

  o Mr. Mwangangi's *Monell* claim against the City relating to handcuffing; and

  o Mr. Mwangangi's state-law claims of false arrest, false imprisonment, and battery.

Officer Root's Cross-Motion for Summary Judgment, [82], is **GRANTED IN PART** and

**DENIED IN PART** as follows:

- The motion is **GRANTED** as to Mr. Mwangangi's § 1983 search and seizure claim against the Individual Defendants as follows:

  o The initial detention with red-and-blue lights was premised on a reasonable suspicion and did not violate the Fourth Amendment.

  o Ordering Mr. Mwangangi out of his vehicle was reasonable in connection with the investigatory detention and did not violate the Fourth Amendment.

- The motion is **GRANTED** as to Mr. Mwangangi's § 1983 excessive force claim against Officer Root for the tightness of the handcuffs.

- The motion is **DENIED** as to the following claims:

  o Mr. Mwangangi's § 1983 illegal search, seizure, and arrest claims against the Individual Defendants for the pat-down conducted by Officer Root, the handcuffing of Mr. Mwangangi, the pat down by Officer Noland, and Mr. Mwangangi's false arrest; and

  o Mr. Mwangangi's § 1983 claim against the Individual Defendants for failure-to-intervene/supervisory liability.

In addition to the measure of damages for claims in which Mr. Mwangangi has been granted

summary judgment on the issue of liability, the following claims remain for trial:

- § 1983 failure-to-intervene/supervisory liability claim against the Individual Defendants; *Monell* claim relating to the City's handcuffing practices;

81

- state-law claim for false imprisonment;

- state-law claim for false arrest; and

- state-law claim for battery.

The Court requests that the Magistrate Judge confer with the parties as soon as practicable regarding the possibility of resolving the remaining claims and issue short of trial.

Date: 3/5/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**